**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

███████████ , et al.,

      Plaintiffs,

v.                                                                   Case No. 1:23-cv-01941-LLA

ISLAMIC REPUBLIC OF IRAN,

      Defendant.

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF**
**THEIR MOTION FOR DEFAULT JUDGMENT REGARDING LIABILITY**

The Islamic Republic of Iran ("Defendant") has defaulted. [Doc. 41]. Neither 28 U.S.C.

§ 1608(e) nor Rule 55(d) "relieves the sovereign from the duty to defend cases" or otherwise

"require[s] the court to demand more or different evidence than it would ordinarily receive …."

*Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *certified question answered,* 194

A.3d 38 (D.C. 2018), and *vacated and remanded sub nom. Opati v. Republic of Sudan*, 140 S. Ct.

1601 (2020). Instead, "the quantum and quality of evidence that might satisfy a court can be less

than that normally required." *Id.* Consequently, plaintiffs may present evidence in the form of

affidavits and the court may accept plaintiffs' uncontroverted evidence as true. *Bodoff v. Islamic

Republic of Iran,* 424 F.Supp.2d 74, 82 (D.D.C. Mar. 29, 2006); *Blais v. Islamic Republic of Iran*,

459 F. Supp. 2d 40, 53 (D.D.C. 2006); *Campuzano v. Islamic Republic of Iran,* 281 F.Supp.2d

258, 268 (D.D.C. 2003); *Roberts v. Islamic Republic of Iran*, 581 F. Supp. 3d 152, 157 (D.D.C.

Jan. 24, 2022); *Hammons v. Islamic Republic of Iran*, 2023 WL 5933340, at 2 (D.D.C. 2023).

Plaintiffs' Second Amended Complaint included attacks that resulted in an extrajudicial

killing and those that, at this time, are unknown whether there was an extrajudicial killing. [Docs.

29 and 31]. After the filing of Plaintiffs' Second Amended Complaint, the D.C. Circuit addressed

the meaning of extrajudicial killing in *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053 (D.C. Cir. March 8, 2024). On September 9, 2024, Plaintiffs in *Borochov* filed a petition for writ of certiorari before the Supreme Court. *Borochov v. Islamic Republic of Iran*, No. 22-7058 (U.S. 2024). As of January 13, 2025, the Supreme Court has invited the Solicitor General to "file a brief in this case expressing the views of the United States." *Id.* Therefore, Plaintiffs in this case only seek default judgment regarding liability only for those Plaintiffs' attacks that are known to have resulted in a death. *See Exs. 1, 5, 7, 8, 9, 12, 14, 15, 16, 18, 19, 22, 24, 26, 28, 31, 33, 34, 35, 38, 39, 40, 41, 42, 44, 45, 48, 50, 52, 53, 57, 58, 59, 60, 62, 64, 68, 69, 70, 76, 81, 84, 86, 87, 92, 93, 94, 96, 103, 104, 106, 108, 111, 115, 116, 118, 120, 121, 122, 125, 127, 130, 133, 135, 137, 138, 141, 144, 148, 149, 150, 152, 153, 158, 160, 162, 164, 169, 170, 171, 172, 173, 177, 178.*[1]

## UNDISPUTED EVIDENCE AND JUDICIAL NOTICE

The FSIA "begins with a presumption of immunity" for a foreign sovereign. *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013). Thus, "[t]he plaintiff bears an initial burden of production to show an exception to immunity, such as § 1605A, applies." *Owens,* 864 F.3d at 784. Once that burden is met, "the sovereign bears the ultimate burden of persuasion to show the exception does not apply," *Bell Helicopter Textron,* 734 F.3d at 1183, by a preponderance of the evidence. *Simon v. Republic of Hungary*, 812 F.3d 127, 147 (D.C. Cir. 2016). "Therefore, if a plaintiff satisfies his burden of production and the defendant fails to present any evidence in rebuttal, then jurisdiction attaches." *Owens*, 864 F.3d at 784.

The FSIA requires only that a plaintiff "establish [] his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). This standard mimics a provision in Federal Rule of Civil Procedure 55(d) governing default judgments against the U.S. Government. Neither

---

[1] Plaintiffs' Counsel is continuing to investigate those attacks where it is unclear or currently unknown whether a killing resulted.

section 1608(e) nor Rule 55(d) "relieves the sovereign from the duty to defend cases." *Id.*

Moreover, section 1608(e) does not "require the court to demand more or different evidence than

it would ordinarily receive," indeed, "the quantum and quality of evidence that might satisfy a

court can be less than that normally required." *Owens*, 864 F.3d at 785 (internal citations omitted).

"This lenient standard is particularly appropriate for [an] FSIA terrorism case, for which firsthand

evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely

hostile sovereign." *Owens*, 864 F.3d at 785. That is why "Section 1608(e) does not require a court

to step into the shoes of the defaulting party and pursue every possible evidentiary challenge; only

where the court relies upon evidence that is both clearly inadmissible and essential to the outcome

has it abused its discretion." *Id.* at 785-786.

While the acts may involve underlying criminal conduct, FSIA is a *civil* remedy and, at

trial, Plaintiffs have the burden of a preponderance of the evidence:

> [W]e are mindful of the significant difference between a preponderance standard
> and a reasonable doubt standard. "Although the phrases 'preponderance of the
> evidence' and 'proof beyond a reasonable doubt' are quantitatively imprecise, they
> do communicate to the finder of fact different notions concerning the degree
> of confidence he is expected to have in the correctness of his factual
> conclusions." *In re Winship,* 397 U.S. 358, 370, 90 S.Ct. 1068, 25 L.Ed.2d 368
> (1970) (Harlan, J., concurring). Indeed, the reasonable doubt standard requires the
> fact-finder to enter "a subjective state of near certitude of the guilt of the
> accused." *Jackson v. Virginia,* 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560
> (1979). **A preponderance standard, in sharp contrast, requires merely that the
> fact-finder believe that the existence of a fact is more probable than the non-
> existence of that fact.**

*United States v. Smith*, 267 F.3d 1154, 1161 (D.C. Cir. 2001) (emphasis added). *See also*

*Barhoumi v. Obama*, 609 F.3d 416, 424 (D.C. Cir. 2010) ("Equally well settled, the preponderance

of the evidence standard 'simply requires the trier of fact to believe that the existence of a fact is

more probable than its nonexistence before [she] may find in favor of the party who has the

burden.'" *Concrete Pipe & Prods., Inc. v. Constr. Laborers Pension Trust,* 508 U.S. 602, 622

(1993)).  In a default setting, the burden isn't higher.  Rather, the standard is "relatively low" and, in fact, cannot exceed the preponderance burden standard.

> [T]he FSIA begins with a presumption of immunity, which the plaintiff bears the initial burden to overcome by producing evidence that an exception applies. (internal citations omitted).  If the plaintiff satisfies this "burden of production," "the defendant [ ] will bear the burden of persuasion to establish the absence of the factual basis by a preponderance of the evidence." (internal citations omitted). The meaning of "burden of production" here is not wholly self-evident, as that term usually refers to the amount of evidence a party must present to allow an issue to go to a jury—a concept not directly applicable in the jury-less context of FSIA cases. (internal citations omitted).  But that usual meaning suggests a burden akin to the requirement of "substantial evidence" in administrative law. *See Kay v. FCC*, 396 F.3d 1184, 1188 (D.C.Cir.2005) (noting that substantial evidence "is the amount of evidence constituting enough to justify, if the trial were to a jury, a refusal to direct a verdict" (internal quotation marks omitted)).  **The point is: the bar is relatively low.**  Yes, the existence of the burden of production means that the plaintiff must provide <u>some</u> evidence that could convince a factfinder of the jurisdictional fact in question.  But because the ultimate burden of persuasion lies with the defendant, in cases where the defendant offers little or no evidence of its own, even a meager showing by the plaintiff will suffice. […]  **The question, then, is simply whether the plaintiffs offered enough to satisfy their burden of production.**

*Owens v. Republic of Sudan,* 174 F. Supp. 3d 242, 276 (D.D.C. 2016), *aff'd*, 864 F.3d 751 (D.C. Cir. 2017), *certified question answered*, 194 A.3d 38 (D.C. 2018), and *vacated and remanded sub nom. Opati v. Republic of Sudan*, 206 L. Ed. 2d 904, 140 S. Ct. 1601 (2020), and *aff'd*, 924 F.3d 1256 (D.C. Cir. 2019) (emphasis added).  This well-established "lenient standard" is considered especially appropriate for FSIA terrorism cases, where courts apply "an unusual degree of discretion" that extends to admitting expert testimony given the difficulty in obtaining firsthand evidence of terrorist activities.

> [T]he D.C. Circuit has instructed that 'courts have the authority—indeed ... the obligation—to adjust evidentiary requirements to ... differing situations.' *Kim*, 774 F.3d at 1048 (cleaned up).  To be sure, courts must draw their 'findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence.' *Id.* at 1049 (cleaned up).  But uncontroverted factual allegations supported by admissible evidence may be taken as true.  *See Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015).  And § 1608(e) 'does not

require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge.' *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *vacated & remanded on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020).

*Hake v. Bank Markazi Jomhouri Islami Iran*, No. CV 17-114 (TJK), 2022 WL 4130837, at *4–5 (D.D.C. Sept. 12, 2022).

Moreover, "plaintiffs [may] prove their claims using evidence that might not be admissible in a trial." *Id.* at 785 (citing *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048-51 (D.C. Cir. 2014) (noting "courts have the authority — indeed, we think, the obligation — to adjust evidentiary requirements to differing situations" and admitting affidavits in a FSIA default proceeding)); *see also Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994) (a court may conduct an evidentiary hearing to evaluate a plaintiff's evidence, but FSIA § 1608(e) "does not actually demand a hearing or live testimony; it demands evidence."). Plaintiffs' evidence may be submitted without a hearing. *Owens*, 864 F.3d at 788-789 ("As long as the evidence itself is admissible, as expert testimony certainly may be, and the court finds it satisfactory, its form or type is irrelevant … [t]herefore the plaintiffs' 'failure' to present eyewitness testimony or other direct evidence is of no moment as to whether they have satisfied their burden of production."); *see also Owens*, 174 F. Supp. 3d at 280 ("[FSIA § 1608(e)] … does not actually demand a hearing or live testimony; it demands evidence.... Courts have accordingly recognized that FSIA plaintiffs seeking a default judgment can proceed by affidavit." (internal citations omitted)); *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 82 (D.D.C. 2006) ("In evaluating plaintiffs' proof, the court may accept as true the plaintiffs' uncontroverted evidence.... Plaintiffs' evidence may take the form of sworn affidavits." (internal citations and quotation marks omitted)).

Furthermore, a court may take judicial notice of any fact "not subject to reasonable dispute in that it is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Accordingly, this Court "may take judicial notice of related proceedings and records in cases before the same court." *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009). Indeed, "the FSIA does not require this Court to re-litigate issues that have already been settled" in previous decisions. *Id.* at 54. "Instead, the Court may review evidence considered in an opinion that is judicially noticed, without necessitating the re-presentment of such evidence." *Id. See also Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, at 60 (D.D.C. 2010); *Stethem v. Islamic Republic of Iran,* 201 F. Supp. 2d 78 (D.D.C. 2002) and *Allan v. Islamic Republic of Iran,* No. 1:17-cv-00338 (RJL), 2019 WL 2185037 (D.D.C. May 21, 2019) (granting nearly identical request to take judicial notice of evidentiary record in *Stethem supra.*)

There are prior evidentiary findings regarding Iran's material support to various terrorist groups through training, funding, and weapons, *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010); *Murphy v. Islamic Republic of Iran,* 740 F.Supp.2d 51, 58–59, No. 06 Civ. 596, 2010 WL 3732024, at *4 (D.D.C. Sep. 24, 2010); *Brewer v. Islamic Republic of Iran,* 664 F.Supp.2d 43, 50–51 (D.D.C.2009); *Estate of Heiser v. Islamic Republic of Iran,* 466 F.Supp.2d 229 (D.D.C. 2006); *Cabrera et al. v. Islamic Republic of Iran*, Case No. 1:19-cv-03835-JDB (Oct. 2021); *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40 (D.D.C. 2021), to groups for attacks involving "non-EFP" weaponry, *Roth v. Islamic Republic of Iran,* 651 F. Supp. 3d 65 (D.D.C. Jan. 17, 2023); *Brown v. Islamic Republic of Iran,* 687 F. Supp.3d 21 (D.D.C. July 27, 2023); *Stearns v. Islamic Republic of Iran*, 633 F. Supp. 3d 284, 295-96 (D.D.C. Oct. 3, 2022); *Fissler v. Islamic Republic of Iran,* No. CV 18-3122 (CKK), 2022 WL

4464873, at *1, 3 (D.D.C. Sept. 26, 2022); *Fritz, v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 63 (D.D.C. 2018); *Karcher v. Islamic Republic of Iran,* 396 F. Supp. 3d 12, 27–28, 42, 49 (D.D.C. 2019); *Karcher*, CV 16-232 (CKK), 2021 WL 133507 (D.D.C. Jan. 14, 2021); *Battles v. Islamic Republic of Iran*, No. 1:21-CV-179, 2022 WL 3443922, at *2–3 (S.D. Tex. Aug. 17, 2022). *See also Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48 (D.D.C. 2018); *Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33 (D.D.C. 2019); *W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117 (D.D.C. 2019); *Lee v. Islamic Republic of Iran,* 518 F. Supp. 3d 475 (D.D.C. 2021); *Roberts v. Islamic Republic of Iran*, 581 F. Supp. 3d 152 (D.D.C. Jan. 24, 2022); and *Estate of Christopher Brook Fishbeck et al., v. The Islamic Republic of Iran, et al.,* Case No. 18-cv-2248 (CRC); *Pautsch v. Islamic Republic of Iran,* No. 20-3859 (JDB), 2024 WL 3566132 (D.D.C. July 29, 2024); *Cabrera v. Islamic Republic of Iran*, No. 19-3835 (JDB), 2024 WL 3225942 (D.D.C. June 28, 2024); *Cabrera v. Islamic Republic of Iran*, No. 19-3835 (JDB), 2024 WL 4345784 (D.D. C. Sept. 30, 2024). Plaintiffs request that the Court take judicial notice of those findings pursuant to Federal Rule of Evidence 201(b) and submits the PowerPoint presentations that were utilized in the *Roth* and *Brown* matters to assist in illustrating attribution. *See Exs. 505, 508.* The *Roth* presentation was admitted into evidence in *Brown. See the 6/21/2023 Minute entry in Brown v. Islamic Republic of Iran, Case No. 1:21-cv-1308 (TNM).*

## FACTS

### I.    BACKGROUND

#### A.  <u>Iran's Role in the Region</u>

In 1979, the Supreme Leader of Iran established what became known as the Islamic Revolutionary Guard Corps ("IRGC"), which was designed to implement the Ayatollah's "vision for an Islamic theocratic government in Iran." *Lee,* 518 F. Supp. 3d at 482.  Over the years, Iran

built up combat forces composed of religious extremists and created "a fully functional militia backed by the Islamic Revolutionary Guard Corps-Qods Force" ("Qods Force").[2] *Id.* To preserve the ideals of the Islamic Republic, the Qods Force supports militias beyond its borders. *Frost*, 383 F. Supp. 3d at 39. Iran, of course, borders Iraq, Afghanistan, and Pakistan. Among other responsibilities, the Qods Force is charged with "cultivating and supporting pro-Iran proxies" in foreign countries and coordinating with these militant groups to conduct terrorist attacks. *Fritz*, 320 F. Supp. 3d at 59. The Qods Force "trains, advises and logistically supports terrorist and insurgent movements, and performs related clandestine and covert special operation activities, on behalf of the Iranian government." *Lee*, 518 F. Supp. 3d at 482. The Qods Force is responsible to and directed by the Supreme Leader of Iran. *Frost*, 383 F. Supp. 3d at 39.

In the early 1980s, a loose network of Shia militias seeking to transform Lebanon into an Islamic republic formed Hezbollah. *Fritz*, 320 F. Supp. 3d at 60. Iran and the IRGC were "provid[ing] critical assistance to newly emerging Hezbollah, which swore an oath of fealty to Iran." *Lee*, 518 F. Supp. 3d at 483. In exchange for Hezbollah's unwavering dedication to Iran and its revolutionary aims, Iran "bankroll[ed], arm[ed] and train[ed] Hezbollah." *Lee*, 518 F. Supp. 3d at 483. Hezbollah acts mainly at the direction of Iran. *Frost*, 383 F. Supp. 3d at 39. "Iran provides Hezbollah with as much as $700 million–$1 billion per year" in the form of cash, training, intelligence, and weapons. *Fritz*, 320 F. Supp. 3d at 60. Hezbollah envisions itself as "the sharp end of the spear [,] going where Iran tells it to go in defense of ... Shia [Muslims] around the world." *Fritz*, 320 F. Supp. 3d at 60. Indeed, Hezbollah has committed numerous terrorist attacks on Americans at the behest of Iran. *Fritz*, 320 F. Supp. 3d at 60.

By the early 1990s, Hezbollah started to train al-Qaeda on its tactics and techniques,

---

[2] The Qods Force is alternatively spelled Quds Force and/or referenced as IRGC-QF.

including IEDs, suicide bombings, and complex attacks and ambushes. *Ex. 174.* For example, in 1991, Ayman al Zawahiri, one of the top leaders of al-Qaeda, made a secret visit to Iran to ask for help in al-Qaeda's campaign to overthrow the government of Egypt. *Id.* While in Iran, al Zawahiri met with Imad Mughniyah, the terrorist operations chief of Hezbollah. *Id.* Mughniyah was acting as an agent of the Iranian state, where he lived for many years as he coordinated high profile terrorist attacks around the globe. *Id.* During these meetings, Mughniyah convinced al-Qaeda of the power of suicide bombing. *Id.* This was a change in mindset for al-Qaeda because suicide was prohibited by most Islamic clerics, but Mughniyah justified it as an appropriate act of a jihad warrior. *Id.*

In 1993, Osama bin Laden and al Zawahiri met with Mughniyah and other Iranian officials, including IRGC General Mohammed Baqr Zolqadr, to work on details of a terrorism alliance. *Id.* Following the meeting, bin Laden sent more terrorist operatives to Hezbollah training camps operated by Mughniyah and the IRGC both in Lebanon and Iran. *Id.* At these camps, Hezbollah instructors provided al Qaeda operatives, as well as members of various other Islamic terrorist organizations, with training in intelligence, security, and building explosive devices. *Id.* This terrorist training camp arrangement continued throughout the 1990s with Mughniyah coordinating the activities with Iranian government officials and the IRGC-QF. *Id.* The training focused on building stronger IEDs and shape charges. *Id.* Iran's Supreme Leader was aware, and approved, of the Iran-Hezbollah terrorist training program. *Id.*

The Qods Force trained, equipped, and financed Shia militias in Iraq and throughout the Middle East both directly and through Hezbollah. *Frost*, 383 F. Supp. 3d at 39. According to the U.S. Department of the Treasury, the Qods Force has supported militant groups including the Taliban, Hamas, Hezbollah, and Iraqi Shia militant groups. *Fritz*, 320 F. Supp. 3d at 59. By using

these groups as proxies, Iran has sought to achieve its goals in other regions while simultaneously denying responsibility for the actions of its proxies. *Id*. The State Department has designated Iran as a state sponsor of terrorism, and the Treasury Department has designated the IRGC's Qods Force as an entity providing support for terrorism. *Id*.

**B. Iraq**

In 2002, al Zarqawi and senior al-Qaeda operatives met with the Qods Force in Iran. *Ex. 174*. Iran's proxies were already operating in Iraq prior to 2003, when the United States and coalition forces launched Operation Iraqi Freedom and dismantled Saddam Hussein's regime. *Lee*, 518 F. Supp. 3d at 483.

In March 2003, the Qods Force freed many of the Sunni jihadists that Iran had been holding captive, unleashing them against the U.S. *Ex. 174*. The Qods Force then provided al-Zarqawi and his fighters funds and weapons and facilitated al-Zarqawi's entry into the bordering Iraqi Kurdistan and onto Baghdad to attack U.S. forces. *Id*. Al-Zarqawi recruited former Saddam regime fighters and foreign fighters moving into Iraq from Syria—becoming al-Qaeda's man on the ground. *Id*.

With Hussein out of power, Iran seized the "historic opportunity to reshape its relationship with Iraq and, in the process, increase its influence in the region." *Lee*, 518 F. Supp. 3d at 483. Iran sought to install "weakened decentralized and Shi'a-dominated" leadership in Iraq and therefore set out to "foster unity among Iraq's various Shia parties and movements so that [it] could consolidate Shia political control ... over the new Iraqi government." *Id*.

Iran also sought "to push the United States out of the Gulf region," including out of Iraq. *Fritz*, 320 F. Supp. 3d at 61. "If the United States were humiliated in Iraq and forced out of the region in disgrace, the thinking went, the Americans would be deterred from pursuing similar military interventions in the [Gulf] region in the future." *Fritz*, 320 F. Supp. 3d at 61. But,

while seeking "to bloody coalition forces in Iraq," Iran was "[c]areful not to provoke a direct confrontation with U.S. and coalition forces" and thus "trained [] and funded a variety of [Shia] militias and insurgent groups in an effort to bog down coalition forces in an asymmetric war of attrition." *Fritz*, 320 F. Supp. 3d at 61.

To achieve that goal, Iran developed numerous Shi'a proxies with a presence in Iraq.  Iran backed the Office of the Martyr Sadr, a movement that "spoke for Iraq's disenfranchised Shi'a" and was led by Muqtada al-Sadr.  *Lee*, 518 F. Supp. 3d at 483.  In 2003, the Office of the Martyr Sadr opened "an armed wing" called Jaysh al-Mahdi ("JAM").  *Id*.  Iran offered the movement and its armed wing "financing and weapons training," and the Qods Force "dispatched Hezbollah operatives ... to help establish JAM and provide it with logistical assistance."  *Id.*  Al-Sadr ultimately split JAM into different branches to address competing priorities and developed "Special Groups" that were specifically designed to attack American and coalition forces.  *Id.*  For example, Al-Sadr formed Saraya al-Salam, which like previous Shia militias, received training, weapons, and money from Iran through Hezbollah and the Quds Force to advance Iran's interests in Iraq.  *Frost*, 383 F. Supp. 3d at 40.  Saraya al-Salam made its headquarters in the Sadr City neighborhood of Baghdad, and it exerted exclusive control over that area.  *Id.* at 40.

While these Special Groups functioned independently from JAM, they were "funded, trained and armed by" IRGC "Qods Force operatives."  *Fritz*, 320 F. Supp. 3d at 62*.*  The Special Groups "plan[ned] and execut[ed] ... bombings, kidnappings, extortion, sectarian murders, illegal arms trafficking [,] and other attacks" against Iraqi civilians, Iraqi forces, and coalition forces.  *Id.*  The Special Groups were successful, and "the IRGC primarily used JAM as its proxy to conduct terror operations against U.S. and Coalition Forces in Iraq."  *Lee*, 518 F. Supp. 3d at 483.

Iran then recruited new leadership for a Special Group called Asayb al-Haq or "AAH." *Id.* The Supreme Leader of Iran, Ali Khomeini, "met with [Qais Khazali in Iran] and recruited him to lead [AAH]," which was to "operate without the knowledge or authorization of [Muqtada al-Sadr]." *Fritz*, 320 F. Supp. 3d at 62. AAH also "acted as an Iranian proxy in Iraq, carrying out the IRGC's agenda and promoting its interests." *Lee*, 518 F. Supp. 3d at 483. Qais Khazali also met with Qods Force officers "on multiple occasions" and his brother, Laith Khazali, effectively served as his deputy. *Fritz*, 320 F. Supp. 3d at 62.

Iran directed the formation of still another militia group—Kata'ib Hezbollah ("KH" or "Hezbollah Brigades")—in 2007. *Karcher*, 396 F. Supp. 3d at 25. Since 2007, Kata'ib Hezbollah had been "responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq," and earned the designation as a Foreign Terrorist Organization in June 2009. *Id.*

Iran also provided money and weapons to al Qa'ida in Iraq ("AQI"). *Ex. 174.* Iran even negotiated prisoner releases of AQI operatives. *Id.* In addition, Iran supported the Assad regime in Syria to maintain the "Shia Crescent" so it could move fighters and weapons to threaten Israeli and American interests. *Id.* Syrian intelligence officers not only facilitated al-Qaeda operations in Iraq, but the Syrian border became the principal conduit for foreign terrorists heading into Iraq to join AQI. *Id.*

Abu Musab al-Zarqawi, al-Qaeda's man in Iraq and the godfather of ISIS, received training and funds from the Qods Force in Iran before moving into Afghanistan and then heading al-Qaeda's terrorist operations in Iraq. *Id.* The Qods Force provided Zarqawi with funding, weapons, and transportation into Iraq to target U.S. troops. *Id.*

Through Hezbollah, Iran brought operatives "into Iran for training and smuggling weapons across the border into Iraq" and sent IRGC and Qods Force operatives to Iraq. *Lee*, 518 F. Supp.

3d at 483.  Iran also used its resources to support EFP attacks specifically: "one of Iran's primary form of material support to the Special Groups was financing, manufacturing and deploying EFPs." *Id*.  Iran funneled to Special Groups in Iraq EFPs that "were professionally manufactured and specifically designed to target U.S. and Coalition Forces' armor, such as armored patrols and supply convoys." *Id.*  Iran also backed its proxies with extensive financial resources; by August 2007, Iran, through IRGC and the Qods Force, was estimated to be "providing between $750,000 and $3 million worth of equipment and funding to Special Groups *every month*." *Id.*

Iranian arms, funding, and operatives flowed into Iraq through the Sheibani Network and other smuggling operations, while some Iraqi allies made the reverse trip to Iran for training. *Karcher*, 396 F. Supp. 3d at 23.  The Qods Force provided "Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, [and] mortars[,] [which] have killed thousands of [c]oalition and Iraqi [f]orces," as well as "explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devices (IEDs)... and are specially designed to defeat armored vehicles used by [c]oalition [f]orces." *Fritz*, 320 F. Supp. 3d at 63.  Iran smuggled the weapons into Iraq using supply routes called "ratlines," primarily for use by AAH.  *Id*.  On the Iraqi side, both Qais and Laith Khazali were involved in smuggling arms and artillery from Iran into Iraq.  *Id*.  Laith Khazali, for example, "was instrumental in acquiring surface-to-air missiles (SAMs), RPGs, bazookas and Stella missiles for [S]pecial [G]roups." *Id.*

At the behest of Iran, Hezbollah created a unit "whose sole purpose was to train Iraqi Shia militants," including AAH, to carry out attacks in Iraq directed at U.S. troops and others.  *Fritz*, 320 F. Supp. 3d at 63.  In 2005 or 2006, Hezbollah ordered Ali Musa Daqduq, a senior Hezbollah commander, to work with the Qods Force to "provide training and equipment" to the Special Groups, and to "organize the [S]pecial [G]roups in ways that mirrored how Hezbollah was

organized in Lebanon." *Id*. Daqduq, accordingly, traveled to Iraq, "met with the commander and the deputy commander of the ... Qods Force special external operations," and "was directed by [the] Qods Force to make trips in and out of Iraq and [to] report on the training and operations of the Iraqi [S]pecial [G]roups." *Fritz*, at 63-64. Daqduq ultimately made four such trips to "monitor [ ] and report[ ] on the training and arming of [S]pecial [G]roups in mortars and rockets, manufacturing and employment of [IEDs], and kidnapping operations." *Fritz*, at 64.

With Hezbollah's assistance, Iran provided "training at every level of the militant organizations that received assistance, from foot soldier to leadership." *Fritz*, at 64. The leaders of Shia militias, for example, received "administrative, logistics, financial, religious [,] and small unit tactics leadership training." *Id*. AAH members were also given training in engineering, artillery, intelligence, infantry, and kidnapping. *Id*. Much of the training occurred at camps in Iran. *Id*. The Qods Force would train "approximately 20 to 60 Iraqis at a time" in Iran and then send them back to Iraq. *Id*. These individuals, in turn, "passed on this training to additional militants inside Iraq," as part of "a 'train-the-trainer' program." *Id*. The Qods Force and Hezbollah also provided training inside Iraq. *Id*.

By 2007, the Treasury Department found that the Qods Force "provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians." *Karcher*, 396 F. Supp. 3d at 24. In 2011, the State Department found that Iran was responsible for the increase of lethal attacks on U.S. forces [in Iraq] and provided militants with the capability to assemble explosives designed to defeat armored vehicles. *Id*.

### C. **Afghanistan**

In addition to its activities in Iraq, Iran facilitated the movement of al-Qaeda operatives into Afghanistan and provided them with documents, identification cards, and passports. *Ex. 174*. Iran was a transit point for moving money, arms, and fighters to Pakistan and Afghanistan. *Id*.

According to the U.S. Department of the Treasury, the Qods Force has also supported militant groups including the Taliban. *Fritz*, 320 F. Supp. 3d at 59. The Qods Force is Iran's primary instrument for providing lethal aid to the Taliban. *Ex. 174*. The Qods Force provides weapons and financial support to the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan. *Id*.

Iran has arranged frequent shipments of small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107mm rockets, plastic explosives, and man-portable defense systems to the Taliban. *Ex. 174*. The Taliban have conducted training in Iran as well. *Id*. The Qods Force Ansar Corps, the IRGC command responsible for operations in Afghanistan, trained Taliban elements on small unit tactics, small arms, explosives, and indirect fire weapons, such as mortars, artillery, and rockets. *Id*. General Hossein Musavi was the commander of The Ansar Corps, which supported operations in Afghanistan. *Id*. In addition to supplying weapons, Iran has trained the Taliban in Iran on small unit tactics to include ambushes, mortar and rocket attacks, IEF, EFPs, sniper operations, and kidnapping operations. *Id*.

## II. **ATTACKS AT ISSUE**

### A. *Roth v. Islamic Republic of Iran,* **687 F. Supp. 3d (D.D.C. Jan. 17, 2023).**

### **Attack #1 (June 24, 2004, Baqubah, Iraq)**

Plaintiffs ████████ and ████████████ ("████" and "████") are nationals of the United States and ████████████ ("████") adult children who were born prior to the June 24,

2004 attack. *Exs. 177-178; Doc. 29, pp. 18-19.* ███ is a national of the United States and served in the US Army and was injured in an attack near Mufrek Traffic Circle in Western Baqubah, Iraq. *Doc. 29, pp. 18-19.* On June 24, 2004, ███ and his unit were traveling in a convoy of Bradley Fighting Vehicles in Baqubah, Iraq. *Id.* As the convoy neared the Mufrek Traffic Circle, they were ambushed by machine gun rounds, RPGs, mortars, and a daisy chain of IEDs. *Id.* A firefight ensued, requiring additional U.S. forces. *Id.* ███ was severely injured by the various blasts and weaponry during the attack. *Id.* During this attack, a fellow soldier in his unit, ███████, was killed. *Roth v. Islamic Republic of Iran*, 651 F. Supp.3d 65, 78 (D.D.C. Jan. 17, 2023).

In the *Roth* case, the Court already found that Iran was liable for Attack #1 in this matter, Attack #1 in *Roth*. *See* Exhibit 507; *Roth*, 651 F.Supp.3d, at *78. AQI was attributed to this attack based on the time, types of weapons, sophistication of the attack, and that AQI controlled the region. *Id.* Therefore, Defendant's material support was a substantial factor leading to Attack #1. *Id.; Ex. 174, p. 52.*

### B. IRAQ

#### i. Al Anbar Province

**Attack #2 (March 2004)**

Plaintiff ████████ ("███") is a national of the United States and served in the US Marine Corps. *Ex. 108; Doc. 29, pp. 152-153.* Sometime in March of 2004, ███ was on the Al Asad Air Based, Albaghdadi, Iraq, gathered with some fellow Marines near the barracks and chow hall hanging out. *Id.* At approximately 7:00 p.m., the base was ambushed by about three rockets that impacted about 200 yards from where ███ was standing. *Id.* ███ dove for cover as he watched a fellow Marine be directly impacted by one of the rockets, effectively blowing him to pieces and killing him. *Id.* ███ sustained injuries from the attack and has a 90% disability rating

from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 53.*

### Attack #3 (October 2004)

Plaintiff ███████████ ("█████") is a national of the United States and served in the US Army. *Ex. 106; Doc. 29, pp. 150-151.* Sometime in October of 2004, █████ was on the Al Asad Air Base when around 7:00 a.m. a VBIED detonated outside the base gate. *Id.* ████ responded to the blast to see if he could help any injured. *Id.* Upon arriving on the scene, ████ witnessed scattered body parts and blood everywhere. *Id.* The VBIED blast killed 16 and injured 40 others. *Id.* ██████ and his unit were responsible for collecting and cleaning up the human remains. *Id.* ██████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 54.*

### Attack #4 (November 11th or 12th, 2004)

Plaintiff ████████████ ("███████████") is a national of the United States and served in the US Army. *Ex. 69; Doc. 29, pp. 106-109.* From November 7 through December 23, 2004, █ ████████ was involved in the Battle of Fallujah in Iraq. *Id.* ███████████ main job was to transport medics to and from the battlefield and provide security. *Id.* On November 11 or 12, █████████ and his unit were traveling from FOB Ramadi to south Ramadi in a big push called Operation Phantom Fury to bring additional medics and resources to the battlefield in south Ramadi. *Id.* Just as █████████ and his unit entered the kill zone, the vehicle in front of █████████ took a direct RPG hit. *Id.* ██████████ and his unit spent the next 30 minutes securing the area and at some point, ██████████ hit his head on the .50 cal gun. *Id.* All of the soldiers in the vehicle that took the direct RPG hit were killed. *Id.* ██████████ sustained injuries from the attack and has a 100%

disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 54-55.* ███████ was also involved in Attack #s 60 and 62.

**Attack #5 (November 20, 2004)**

Plaintiff ███████████ ("█████") is a national of the United States and served in the US Army. *Ex. 111; Doc. 29, pp. 155-156.* On November 20, 2004, █████ was part of a special forces mission to retrieve US military vehicles from an attack earlier that day in an undisclosed location, south of Ramadi. *Id.* On their convoy back after securing the vehicles, their team was ambushed and forced into a chokepoint 5-10 miles east of Fallujah. *Id.* An IED was detonated, causing the vehicle that █████ was in to flip on its side. *Id.* █████ was violently thrown around the inside of the vehicle, and the gunner was ejected. *Id.* █████ and his unit then engaged in a 30–45-minute gun fight until their support team arrived from the opposite side of the city. *Id.* █████ took shrapnel in his buttocks and was shot in his left leg. *Id.* Despite his injuries, █████ continued to assist with those that were injured. *Id.* A Quick Reaction Force ("QRF") arrived, and evacuated █████ and his unit to safety. *Id.* During the attack, two were killed, two vehicles were destroyed, and about six others were injured. *Id.* █████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 55-56.*

**Attack #6 (July 2005)**

Plaintiff ███████████ ("█████") is a national of the United States and served in the US Army. *Ex. 68; Doc. 29, pp. 105-106.* Sometime in July of 2005, █████ was assisting in process of setting up FOB Tiger, Al-Qa'im, Iraq when the base was suddenly attacked by multiple mortar rounds. *Id.* █████ was near the front gate when he heard incoming mortars, and then very

large explosions. *Id.* Two mortars landed 200-300 yards from ▮▮▮▮. *Id.* ▮▮▮▮ then took cover in a nearby building fearing for his life. *Id.* There was also a VBIED outside the front gate. *Id.* The VBIED exploded, killing the driver of the vehicle. *Id.* ▮▮▮▮ sustained injuries from the attack and has a 90% rating disability from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 56-57.*

**Attack #7 (August 2005)**

Plaintiff ▮▮▮▮▮▮ ("▮▮▮▮") is a national of the United States and served in the US Army. *Ex. 7; Doc. 29, pp. 26-27.* In August of 2005, ▮▮▮▮ and his unit were in a M939 vehicle in a convoy on MSR Tampa (highway 1) heading toward Ramadi, Iraq from the Al-Taqaddum Air Base. *Id.* At around 3:00 a.m. and close to Ramadi, the gun truck that was about 10 feet in front of ▮▮▮▮' M939 vehicle was hit with an IED. *Id.* The IED explosion caused ▮▮▮▮ to be violently thrown around the gunner's hatch of his vehicle and hitting his head on the gunner's turret. *Id.* As a result, ▮▮▮▮ had a headache and ringing in his ears. *Id.* ▮▮▮▮ and his unit dismounted their vehicle and pulled security as a nearby convoy responded to the IED blast. *Id.* Two US soldiers were killed, and several others were injured by the IED blast. *Id.* ▮▮▮▮ sustained injuries from the attack and has a 70% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 57-58.* ▮▮▮▮ was also involved in Attack #16.

**Attack #8 (October 23, 2005)**

Plaintiff ▮▮▮▮▮▮▮ ("▮▮▮▮") is a national of the United States and served in the US Army. *Ex. 93; Doc. 29, pp. 136-137.* On October 23, 2005, ▮▮▮▮ was on the Al Asad Air Base, Haditha, Iraq when he was made aware of an incoming attack on the base. *Id.* ▮▮▮▮ then gathered a Quick Reaction Force to respond to the incoming attack. *Id.* As ▮▮▮▮ was about to

get in the front seat of the first vehicle in the convoy, the base was attacked by mortars. *Id.* One of

the mortars struck approximately 25-feet from ████ causing him to be catapulted into the air,

landing on a nearby bolder, and losing consciousness. *Id.* Upon regaining consciousness, ████

was transported to a medical tent for treatment. *Id.* While in transport ████ remembers passing

all the blown-up, dead bodies from the attack. *Id.* ████ sustained injuries from the attack and

has an 80% disability rating from the Veterans Administration. *Id.* Defendant's material support

or resources was a substantial factor leading to the attack. *Ex. 174, p. 58.*

### Attack #9 (March 2006)

Plaintiff ████ ("████") is a national of the United States and served in

the US Navy. *Ex. 173; Doc. 29, pp. 235-236.* Sometime in March 2006 at approximately 8 or 9

p.m., ████ was in his sleeping quarter modular unit on the Al Asad Air Base, Haditha, Iraq

relaxing when suddenly the base was ambushed with RPGs. *Id.* One of the RPGs hit a modular

unit that was approximately 75-100 yards from ████'s. *Id.* Then more mortars came in, hitting

other modular units on the base. *Id.* The blasts from the RPGs shook the modular unit that ████

was in and knocked out the windows causing him to lose his hearing for a minute or two and

fearing for his life. *Id.* Several other soldiers died in the RPG attack. *Id.* ████ injuries from the

attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material

support or resources was a substantial factor leading to the attack. *Ex. 174, p. 59.*

### Attack #10 (September 14, 2006)

Plaintiff ████ ("████") is a national of the United States and served in the US

Marines. *Ex. 40; Doc. 29, pp. 69.* On September 14, 2006, at approximately 4 p.m., ████ and

his unit were working on building the police station in Haditha City, Iraq, when there was a drive

by shooting at the police station. *Id.* ████ and the unit started a foot patrol around the police

station. *Id.* As they were conducting their foot patrol, ▮▮▮▮ was shot with a bullet that went through both of his legs. *Id.* ▮▮▮▮ bound his way back to the Humvee where the rest of the unit was located and was found by a medic. *Id.* The medic patched ▮▮▮▮ up and gave him medication which knocked him unconscious. *Id.* ▮▮▮▮ was medevacked from the area shortly after. *Id.* ▮▮▮▮ regained consciousness in Germany. *Id.* The attack resulted in the death of a couple of US Marines. *Id.* ▮▮▮▮ was also informed he had been shot with an AK-47. *Id.* ▮▮▮▮ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 59-60.*

### Attack #11 (December 24, 2006)

Plaintiff ▮▮▮▮▮▮▮ ("▮▮▮▮") is a national of the United States and served in the US Marine Corps. *Ex. 35; Doc. 29, pp. 62-63.* On December 24, 2006, ▮▮▮▮ was walking with his unit in downtown Anah, Iraq heading back to their base. *Id.* As ▮▮▮▮ walked past a bush, he noticed a double stacked IED in the bush about 10 feet away from him. *Id.* As ▮▮▮▮ was warning his fellow-soldiers, the IEDs were remotely detonated. *Id.* The blast from the IEDs threw ▮▮▮▮ about 15 feet into the air, bouncing off the wall of a nearby mosque, and knocking him unconscious. *Id.* Upon regaining consciousness, ▮▮▮▮ dragged an Iraqi policeman who was knocked unconscious to cover. *Id.* The Iraqi policeman died from the IED blast. *Id.* ▮▮▮▮ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 60-61.*

### Attack #12 (April 19, 2007)

Plaintiff ▮▮▮▮▮▮ ("▮▮▮▮") is a national of the United States and served in the

US Marines. *Ex. 59; Doc. 29, pp. 93-94.* ████ was assigned to the Iraqi Police Station in Saqlawiyah, Iraq. *Id.* On April 19, 2007, ████ and another Marine were posted on the south side of the building with another two Marines on the north side when insurgents drove a dump truck through the military access road on the north side of the building. *Id.* After the dump truck pulled into the entrance of the military compound in the Iraqi Police Station, the truck exploded, killing the driver. *Id.* ████ saw a fireball, and then was violently knocked to the ground, and the blast ripped off the whole back area of his post. *Id.* The Police Station was then attacked by mortars from schools that were located on either side of the Police Station, and small arms fire as ████ feared for his life. *Id.* ████ sustained injuries from the attack and has an 80% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 61-62.*

### ii. Al-Qadisiyyah Province

### Attack #13 (March 2010)

Plaintiff ████████ ("████") is a national of the United States and served in the US Army. *Ex. 60; Doc. 29, pp. 94-95.* ████ was on a Mission Recon Team who was assigned to go from base to help shut them down. *Id.* Sometime around March of 2010, ████ was traveling in a MRAP vehicle in a convoy from CSC Scania, Hasimiya, Iraq to Camp Echo, Diwaniya, Iraq. When they were about an hour outside of Camp Echo, the third vehicle in front of ████'s MRAP hit an EFP or IED destroying that vehicle, amputating the gunner's legs, and killing the lieutenant colonel inside that vehicle. *Id.* The attack was very traumatic for ████ because he knows that he could just as easily have been in the vehicle that was hit with the EFP/IED and injured or killed ████. *Id.* ████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources

was a substantial factor leading to the attack.  *Ex. 174, p. 62.*

### iii.  Babil Province

**Attack #14 (December 2004/January 2005)**

Plaintiff ███████████ ("████") is a national of the United States and served in the US Marine Corps. *Ex. 172; Doc. 29, pp. 234-235.* On the day of the attack, ████ was on FOB Chosin, Iskandryia, Iraq asleep in his quarters, when the base was suddenly attacked by rockets and mortars. *Id.* Some of which exploded near ████'s sleeping quarters. *Id.* During the attack, ████ feared for his life as he saw another Marine killed by the blasts. *Id.* ████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack.  *Ex. 174, pp. 62-63.*

**Attack #15 (January 23, 2005)**

Plaintiff ███████████ ("████") is a national of the United States and served in the US Army. *Ex. 1; Doc. 29, pp. 16-17.*  On January 23, 2005, █████ and his unit were at Checkpoint 14 in Iskandariya, Iraq when they were ambushed with mortars, a Vehicle Borne Improved Explosive Device ("VBIED"), and small arms fire. *Id.* The attack lasted for three days. *Id.* Following the attack, █████ and his unit were leaving Iskandariya, when a suicide bomber pulled up next to ████' vehicle and detonated his VBIED, killing the driver. *Id.* That sparked another ambush of small arms fire which lasted for several minutes. *Id.* █████ sustained injuries from the attack and has a 90% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack.  *Ex. 174, pp. 63-64.* █████ was also involved in Attack #37.

**Attack #16 (May 2005)**

Plaintiff ██████ was involved in another attack sometime in May of 2005. *Ex. 7; Doc. 29,*

*pp. 26-27.* On the day of the attack at around 2:00 p.m., ████ was coming from the cafeteria on FOB Iskandariyah, Iskandariya, Iraq when he heard the alarm for an incoming attack. *Id.* Suddenly, the base was attacked by multiple mortar rounds. *Id.* One of which exploded approximately 15-20 feet from ████ throwing him to the ground. *Id.* ████ took shrapnel to his vest and had cuts on his arms from the dust and debris caused by the blast. *Id.* After the blast, ████ ran for cover in a bunker, fearing for his life. *Id.* Several people died on base because of the mortar blasts including some Iraqi civilian workers, KBR contractors, and a few soldiers. *Id.* ████ sustained injuries from the attack and has a 70% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 64-65.* ████ was also involved in Attack #7.

    **iv.** <u>**Baghdad Province**</u>

**Attack #17 (February 16, 2004)**

Plaintiff ████████ ("████") is a national of the United States and served in the US Army. *Ex. 45; Doc. 29, pp. 75-76.* On February 16, 2004, ████ and his unit were traveling on highway 8 from Camp Falcon to the Bilad Police Precinct to conduct a prisoner head count. *Id.* ████ was in the lead vehicle as the gunner. *Id.* After ████'s vehicle pulled through a police checkpoint, an IED exploded and hit the vehicle behind ████'s vehicle. *Id.* The blast from the IED caused ████ to be thrown around the gunner's hatch of his vehicle. *Id.* A soldier in the vehicle that was hit with the IED died from the attack. *Id.* ████ sustained injuries from the attack and has an 80% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 65-66.*

**Attack #18 (April 4, 2004)**

Plaintiff ████████ ("████") is a national of the United States and served in the

US Army. *Ex. 15; Doc. 29, pp. 36-37.* On April 4, 2004, ██████ was on a recon mission in Sadr City, Iraq when the vehicle two to three in front of ██████ 's hit an IED. *Id.* The impact of the IED blast killed ██████ 's close friend, Specialist ██████ . *Id.* Anthony originally planned to be in the seat that Specialist ██████ was in that day and suffers survivor's guilt. *Id.* ██████ sustained injures from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 66.*

### Attack #19 (October 2004)

Plaintiff ██████████ ("██████") is a national of the United States and served in the US Army. *Ex. 149; Doc. 29, pp. 205-206.* Sometime in October of 2004, ██████ was on Camp Falcon, Baghdad, Iraq on guard duty in guard tower 12 which was located next to the main gate when the base was suddenly attacked by multiple mortar rounds and small arms fire. *Id.* One of the mortar rounds struck the base of guard tower 12 causing ██████ to be violently thrown into the steel beam behind him and immediately knocking him unconscious. *Id.* After ██████ regained consciousness, ██████ was assisted down from the tower and to a medic where he received medical treatment. *Id.* Two other soldiers died during the attack. *Id.* ██████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 66-67.*

### Attack #20 (January 2005)

Plaintiff ██████████████ ("██████") is a national of the United States and served in the US Air Force. *Ex. 24; Doc. 29, pp. 48-49.* Sometime in January of 2005, ██████ was in a convoy on MSR Tampa (highway 1), about 10 minutes north of Baghdad. *Id.* Harris was driving a tractor-trailer, without the trailer. *Id.* Suddenly, ██████ heard a large "boom," followed by mushroom cloud

of dust about a half-mile ahead. *Id.* ███ rushed to the scene of the explosion and discovered that one of the vehicles in the convoy got hit by a double IED. *Id.* The blasts from the IEDs killed two and severely injured other members of ███' unit. *Id.* After the attack, ███ and his unit were pulled off missions for three weeks for grief counseling. *Id.* ███ sustained injuries from that attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 67-68.*

**Attack #21 (July 30, 2005)**

Plaintiff ███ ("███") is a national of the United States and served in the US Army. *Ex. 158; Doc. 29, pp. 216-217.* On July 30, 2005, ███ was part of a mission escorting 15 fuel trucks from Talil, Iraq to LSA Anaconda. *Id.* ███ was the truck commander and was manning the gun in the lead Humvee. *Id.* At around 12:20 a.m., as they approached checkpoint 30 along MSR Tampa (highway 1) at the Baghdad International Airport, ███ noticed two vehicles stopped in the middle of the road, blocking the highway. *Id.* As Aponte and his unit approached the vehicles two VBIEDs exploded, killing the insurgents inside the vehicles, and immediately knocking ███ unconscious. *Id.* Upon regaining consciousness, ███'s unit was in a gunfight with the insurgents. *Id.* ███ sustained injuries from the attack and has a 100% disability rating with the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 68-69.*

**Attack #22 (April 7, 2006)**

Plaintiff ███ ("███") is a national of the United States and served in the US Army. *Ex. 41; Doc. 29, pp. 70-71.* On April 7, 2006, at approximately 9:13 a.m., ███ was on Camp Falcon, Baghdad, Iraq on gate guard and walking to the ammo point on the base when suddenly an incoming rocket hit the ammo dump. *Id.* ███ was about 400-500 meters from the

ammo dump when the rocket hit. *Id.* ███ immediately ran for cover in a nearby bunker, but the blast from the rocket knocked him unconscious before he could get there. *Id.* A nearby soldier carried ███ to the bunker. *Id.* ███ regained consciousness a few minutes later and remained in the bunker, fearing for his life for the remainer of the day and night, until the entirety of the ammo dump exploded, and it was safe to leave again. *Id.* Two guards who were guarding the ammo dump were killed because of the rocket attack. *Id.* ███ sustained injuries from the attack and has a 100% disability rating with the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 69.* ███ was also involved in Attack #55.

### Attack #23 (August 2006)

Plaintiff ███ ("███") is a national of the United States and served in the US Army. *Ex. 16; Doc. 29, pp. 38-39.* On the day of the attack, ███ was walking to the dining facility on Camp Falcon, Baghdad, Iraq when the base suddenly was attacked by mortars. *Id.* One of the mortars ignited the ammo supply point causing severe and violent explosions on the base for the next nine hours. *Id.* ███ found cover in his living quarters as the reverberations from the blasts broke the walls in his room. *Id.* ███ and other service members remained in his quarters in fear for their lives. *Id.* Several people died because of the attack. *Id.* ███ sustained injuries from the attack and has a 100% disability rating with the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 69-70.*

### Attack #24 (October 26, 2006)

Plaintiff ███ ("███") is a national of the United States and served in the US Army. *Ex. 34; Doc. 29, pp. 60-61.* On October 25, 2006, ███ and his unit were conducting a 12-hour joint patrol mission with the Iraqi National Police. *Id.* Sometime around noon, near the

intersection of highway 1 and highway 97 in Baghdad, they came upon an abandoned US Abrams Tank that was on a trailer. *Id.* ███ was on alert because the tank had blood spattered on the inside, and it's unusual to leave a take abandoned. *Id.* ███ and his unit were securing the perimeter when they were suddenly ambushed by small arms fire. *Id.* Bullets were flying by ███'s head as he feared for his life. *Id.* However, ███ couldn't return fire because he couldn't see where the bullets were coming from. *Id.* After about 5 minutes, an additional ambush, on a separate US military unit began, less than 600 yards away from ███ and his unit. *Id.* The other unit was hit by multiple IEDs, and then subsequent RPG and small arms fire. *Id.* ███ and his unit called in for air support. *Id.* The insurgents fled after air support arrived. *Id.* During the attack, multiple Iraqi citizens were killed by small arms fire from the insurgents. *Id.* ███ sustained injuries from the attack and has a 100% disability rating with the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 70-71.*

### Attack #25 (February 2007)

Plaintiff ███████ ("███") is a national of the United States and served in the US Army. *Ex. 96; Doc. 29, pp. 140-141.* Sometime in February of 2007, ███ was on Camp Taji, Taji, Iraq manning Force Protection Tower C17, near the Al Taji Commons when a firefight broke out below. *Id.* During the fight, a VBIED exploded directly under the tower that ███ was in, killing the driver of the vehicle. *Id.* The VBIED was approximately 30 feet below ███. *Id.* The blast from the VBIED threw ███ threw the air, bouncing off a porter potty, and descending another 10 feet, landing on a concrete slab, unconscious. *Id.* ███ was transported to the Camp Taji medical center, and then to Landstuhl, Germany for medical treatment. *Id.* ███ sustained injuries from the attack and has a 90% disability rating with the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 71-72.*

**Attack #26 (April 16, 2007)**

Plaintiff ███████████ ("██████") is a national of the United States and served in the US Army. *Ex. 48; Doc. 29, pp. 79-80.* On April 16, 2007, █████ and his unit were responding to a hotline call about suspicious activity around a power plant near a residential area in Baghdad. *Id.* After they arrived at the power plant, they saw two suspects jump over a wall so a few soldiers in ██████'s unit pursued the suspects on foot. *Id.* ██████ was the truck commander and ordered his driver to position their vehicle in a better position for their gunner to provide assistance to the soldiers that pursued the suspects. *Id.* Suddenly an IED exploded under ██████'s seat in the vehicle, flipping the vehicle over a few times, and landing on its roof. *Id.* The impact killed the gunner, crushed ██████'s legs, and knocked him unconscious. *Id.* Upon regaining consciousness, ██████ remained trapped under the vehicle for the next 30 minutes until a tank tow truck arrived and was able to free him. *Id.* ██████ was then medevacked for medical treatment. *Id.* ██████ sustained injures from the attack and has a 90% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 72-73.*

**Attack #27 (June 1, 2007)**

Plaintiff ███████████████ ("████████") is a national of the United States and served the US Army. *Ex. 38; Doc. 29, pp. 66-67.* On the day of the attack, ███████ and his unit were on Route Caprice doing route security. *Id.* Around 11 a.m. or noon, a few people were walking across the road to get to a nearby mosque (Al Rahkman Mosque), when one of the people tried to open the door of the Humvee in front of ██████. *Id.* The US soldier in that seat tackled the guy that tried to open the door who then detonated his suicide vest immediately killing the US soldier. *Id.* Approximately 15 second later, there was another suicide bomber who was shot by US military

forces causing his vest to also explode 50-yards in front of ███████. *Id.* ████████ sustained injuries from the attack and has a 100% disability rating with the Veterans Administration. *Id. See also Ex. 503.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 73-74.*

### Attack #28 (June 10, 2007)

Plaintiff ██████████ ("██████") is a national of the United States and served in the US Army. *Ex. 121; Doc. 29, pp. 168-169.* On June 10, 2007, ██████ was on a command center on the west side of a bridge over MSR Tampa (highway 1) about 20 miles south of Baghdad. *Id.* Around 4 p.m., ██████ noticed that the Iraqi Army was packing-up to leave for the day. *Id.* ██████ found that highly unusual because it was the middle of the afternoon, so he reported the suspicious activity to his superiors. *Id.* Suddenly, a truck pulled up underneath the bridge and command center, and detonated 10,000 pounds of explosives, causing the bridge and command center to collapse. *Id.* ██████ was blown in the air and fell to ground, approximately 25 feet below. *Id.* ██████ was covered in debris and rubble from the collapse of the bridge and command center and had to dig himself out. *Id.* Three soldiers were killed by the attack. *Id.* ██████ sustained injuries from the attack and has a 100% disability rating with the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 74.*

### Attack #29 (July 10, 2007)

Plaintiff █████████████ ("████████") is a national of the United States and served in the US Army. *Ex. 120; Doc. 29, pp. 167-168.* On July 10, 2007, ████████ was on Camp Rustamiyah, Baghdad, Iraq taking roster in a bunker that was below a tower gate. *Id.* Sometime around 3:35 p.m., a fuel tanker truck was suddenly attacked by a rocket approximately 50 feet from ██████'s position, immediately killing the US soldiers that were inside the truck. *Id.* The

blast from the explosion threw ████ in the air, landing on the ground, and in shock. *Id.* There

was a lot of dust, debris, fire, and smoke from the explosion. *Id.* The scene after the blast was

chaotic as people were running around screaming for help. *Id.* After the attack, ████ had a

severe headache, ringing in his ears, and anxiety. *Id.* ████ sustained injuries from the attack

and has a 90% disability rating from the Veterans Administration. *Id.* Defendant's material support

or resources was a substantial factor leading to the attack. *Ex. 174, p. 75.*

### Attack #30 (July 16, 2007)

Plaintiff ████████ ("████████") is a national of the United States and served

in the US Army. *Ex. 57; Doc. 29, pp. 91-92.* On July 16, 2007, ████ and his unit were on

Route Cobra on their way to a water treatment plant in the northwest corner of Baghdad. *Id.* ██

████ was on foot walking behind a small, armored tank. *Id.* Sometime around 12:00 and 1:00

p.m., the Iraqi soldier that was directly in front of ████ walked into a IED which exploded.

*Id.* The blast immediately killed the Iraqi soldier and caused ████ to be thrown to the ground

and knocked unconscious. *Id.* After the initial blast, ████ and his unit were also ambushed

by small arms fire. *Id.* After regaining consciousness, ████ joined his unit as they

neutralized the insurgents and returned to Camp Taji where ████ received medical

treatment. *Id.* ████ sustained injuries from the attack and has a 100% disability rating from

the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor

leading to the attack. *Ex. 174, pp. 75-76.*

### Attack #31 (February 19, 2008)

Plaintiff ████████ ("████") is a national of the United States and served in the

US Army. *Ex. 160; Doc. 29, pp. 219-220.* On February 19, 2008, ████ was on FOB

Rustamiyah, Baghdad, Iraq in the HQ building and working in the Morale, Welfare, and

Recreation ("MWR") room when he looked outside and saw dust coming up from gravel. *Id.* The next thing that ███████ recalls is being in the back of the room about 10 to 15 feet away where he had just been standing. *Id.* Ceiling materials fell which then knocked ██████ unconscious for a few minutes. *Id.* Upon regaining consciousness, ██████ realized that the base was ambushed by multiple mortar rounds, one of which hit the HQ building, blowing a hole in the wall of the room that ██████ was standing. *Id.* ██████ than ran across the FOB as more mortars were coming in. *Id.* In all, the base was attacked by about 12 mortars. *Id.* There were many injured, and one civilian MWR worker was killed by the mortar attack. *Id.* ██████ sustained injuries from the attack and has an 80% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 76.*

### Attack #32 (May 2008)

Plaintiff ██████████ ("██████") is a national of the United States and served in the US Army. *Ex. 44; Doc. 29, pp. 73-75.* Sometime in May of 2008, ██████ and his unit were doing a rotation in the Al-Amil neighborhood of Baghdad, Iraq when they were alerted to an EFP attack in the Al-Saydia neighborhood. *Id.* ██████ and his unit were first responders to the EFP attack. *Id.* Upon arriving at the scene of the EFP attack, ██████ saw that five of the soldiers were burned and only one was alive. *Id.* Four soldiers died in the EFP attack. *Id.* ██████ also provided medical services to civilians who were injured in the EFP explosion. *Id.* This attack was very traumatic on ██████. *Id.* ██████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 76-77.*

### Attack #33 (September 2008)

Plaintiff ██████████ ("██████") is a national of the United States and served in the

US Army. *Ex. 94; Doc. 29, pp. 137-138.* Sometime in September of 2008, ██████ was on the airfield at the Baghdad Airport waiting to board a helicopter when the base was suddenly attacked by RPGs. *Id.* ██████ was terrified for his life as he sought cover in the open airfield from the attack and found cover in a bunker. *Id.* Several of the RPGs landed close to 200-300 yard from ██████. *Id.* There were soldiers that were on the tarmac with ██████ that did not make it to the bunker and were killed by the RPG blasts. *Id.* There were four people killed on the tarmac by the RPG attack. *Id.* ██████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 77.*

**Attack #34 (January 2009)**

Plaintiff ██████████ ("██████") is a national of the United States and served in the US Army. *Ex. 104; Doc. 29, pp. 148-149.* Sometime in January of 2009, ██████ and his unit were in a convoy on a supply mission from a Joint Security Station ("JSS") to FOB Liberty, both in Baghdad. *Id.* ██████ was in the gunner's hatch of the vehicle he was in. *Id.* On the way back to the JSS, ██████ vehicle was hit by an IED. *Id.* The blast from the IED caused ██. ██████ to be thrown around the inside of his vehicle and lose consciousness. *Id.* Upon regaining consciousness, ██████ unit was in a fire fight with insurgents which ██████ joined as they fought back the insurgents. *Id.* The truck commander in ██████ vehicle was killed by the IED blast, along with a few other soldiers that were in other vehicles. *Id.* ██████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 78.*

**Attack #35 (January 18, 2009)**

Plaintiff ██████████ ("██████") is a national of the United States and served in the

US Army. *Ex. 31; Doc. 29, pp. 56-57.* On January 18, 2009, ███████ and his unit were on a mission to take a new Major to Alpha Company's Combat Outpost 799 in Al-Amin, Iraq. *Id.* ███████ was the gunner in the lead vehicle. *Id.* Around the intersections of Route Predators and Pluto, ███████ vehicle was hit by an EFP. *Id.* ███████ took severe shrapnel injuries from the EFP. *Id.* Staff Sergeant ████████████. was in the passenger seat of ████████ vehicle and was killed by the EFP blast. *Id.* ███████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 78-79.*

### Attack #36 (July 2009)

Plaintiff ████████████ ("███████") is a national of the United States who was employed as a civilian security officer with ████████. *Ex. 18; Doc. 29, pp. 40-41.* Sometime in July of 2009, at approximately 2:00-3:00 p.m., ████████ just left Abu Ghraib from dropping off a prisoner and was heading to Camp Victory when ████████ and his unit were suddenly ambushed by small arms fire. *Id.* One of the bullets hit ███████ in his chest plate armor, knocking him back and onto the ground. *Id.* After gathering himself, ████████ then re-engage in the small arms fight with multiple insurgents. *Id.* During the attack, two Army Quick Reaction Force soldiers were killed by small arms fire. *Id.* After an hour of consistent small arms fire, additional units arrived, and they were able to eliminate the threat. *Id.* ████████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 79-80.* ████████ was also involved in Attack #91.

### Attack #37 (July 2009)

Plaintiff ██████ was involved in another attack sometime in July of 2009. *Ex. 1; Doc. 29,*

*pp. 16-17.* On the day of the attack, ███ was with Headquarters on Camp Taji, Taji, Iraq monitoring cameras at the base. *Id.* At approximately 11:30 a.m., ███ saw a firetruck with a VBIED explode right outside the base, killing around 86 civilians. *Id.* There was nothing ███ could do. *Id.* He just had to sit there and watch the explosion, and the Quick Reaction Force respond to the attack. *Id.* ███ sustained injuries from the attack and has a 90% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 80.* ███ was also involved in Attack #15.

### Attack #38 (July 2009)

Plaintiff ███████ ("███") is a national of the United States and served in the US Army. *Ex. 53; Doc. 29, pp. 85-87.* Sometime in July of 2009, ███ was in a marketplace outside of FOB Justice, Kadhimiya, Iraq, when a suicide bomber detonated his vest. *Id.* The blast was large and caused structural damage to the marketplace and there were multiple human casualties. *Id.* After the attack, ███ feared for his life as he worked with our Iraqi counterparts to secure the scene of the attack. *Id.* The next day, ███ and his unit escorted a high-ranking officer to assess the damage of the scene and ███ recalls seeing the carnage left over from the attack. *Id.* ███ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 80.*

### Attack #39 (October 25, 2009)

Plaintiff ███████ ("██████") is a national of the United States and served in the US Army. *Ex. 135; Doc. 29, pp. 187-188.* On October 25, 2009, ███ and his unit were in a convoy on their way to a Key Leader Engagement at a Provincial Council Building in Baghdad, Iraq. *Id.* ███ and their unit were running late to the engagement. *Id.* At about 10:30 a.m.,

approximately 100 meters away from the Provincial Council Building, two VBIEDs exploded right outside the Provincial Council Building. *Id.* The blast caused ███████ to be thrown around the inside of the vehicle that he was in and hitting his head and various parts of his body. *Id.* After the blast, ███████ was in a daze, his ears were ringing, and his nose was bleeding. *Id.* The VBIEDs killed 120 people and injured 721 others. *Id.* The scene was very chaotic and there was death and destruction everywhere. *Id.* ███████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 81-82.*

## v. **Basra Province**

### Attack #40 (July 2005)

Plaintiff ███████████ ("███████") is a national of the United States and served in the US Navy. *Ex. 62; Doc. 29, pp. 96-98.* Sometime in July of 2005, ███████ was on Camp Bucca, Umm Qasr, Iraq asleep in his quarters when around 2:00 a.m., he was awoken by a large explosion. *Id.* A suicide bomber had driven a vehicle to the front gate of Camp Bucca and caused it to explode, approximately 300 yards from where ███████ was sleeping. *Id.* ███████ was disoriented, scared, in shock, and had ringing in his ears from the explosion. *Id.* ███████ was ordered to grab his gear and assess the situation. *Id.* While running to the scene of the explosion, ███████ slipped on some gravel tearing his ACL. *Id.* A US soldier and several US contractors and civilians were killed by the attack, along with the suicide bomber. *Id.* ███████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 82-83.* ███████ was also involved in Attack #88.

## vi. **Diyala Province**

### Attack #41 (October 2004)

Plaintiff ███████████ ("████") is a national of the United States and was employed as a Project Manager for ████████████ as part of their Captured Enemy Ammunition Program in Iraq. *Ex. 58; Doc. 29, pp. 92-93.* Part of ████ responsibilities was to locate and destroy recovered ammunition in Iraq. *Id.* Sometime in October of 2004, ████ and his team were charged with investigating a lot of ammunition that someone found in Baqubah, Iraq. *Id.* While traveling in a convoy to Baqubah, ████ and his team were in a town market in Khalis, Iraq when a car sped past ████ convoy and detonated a VBIED. *Id.* The VBIED killed the driver of the vehicle and some nearby locals. *Id.* ████ and his team were then ambushed by small arms fire, so they quickly turned their vehicle around to avoid injury as ████ feared for his life. *Id.* ████ sustained injuries from the attack and receives disability from the Social Security Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 83-84.* ████ was also involved in Attack #58.

### Attack #42 (December 9, 2004)

Plaintiff ███████████ ("██████") is a national of the United States and served in the US Army. *Ex. 116; Doc. 29, pp. 162-163.* On December 9, 2004, ██████ and his unit were in a convoy on a mission to transport inbound soldiers from Kuwait to LSA Anaconda, Balad, Iraq. *Id.* At around 5:00 p.m., the convoy was on MSR Dallas right before entering Baqubah, Iraq, when the vehicle in front of ██████ was hit by an IED. *Id.* In response, ██████ swerved his vehicle to avoid the explosion, causing his vehicle to roll over multiple times, violently throwing ████ around the inside of his vehicle, and knocking him unconscious. *Id.* When ████ regained consciousness, ██████ noticed the damage to his vehicle, there was a lot of yelling and screaming, and dust and debris everywhere. *Id.* ██████ also noticed that he had a lot of blood on him, had

two gashes on his legs, and his skin was hurting. *Id.* The medics then attended to ████
wounds. *Id.* The gunner in the vehicle that took a direct hit from the IED, died from the attack. *Id.*
████ sustained injuries from the attack and has a 100% disability rating from the Veterans
Administration and he receives disability from the Social Security Administration for his injuries.
*Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex.
174, pp. 84-85.*

### Attack #43 (December 16, 2004)

Plaintiff ████████████ ("████████") is a national of the United States and
served in the US Army. *Ex. 125; Doc. 29, pp. 173-175.* On December 16, 2004, ████ was
driving a Heavy Expanded Tactical Truck in a convoy from CSC Scania to FOB Cobra. *Id.*
Sometime around 10:30 or 11 a.m., ████ was on MSR Tamp (highway 1) approximately 3
miles from Baqubah when their convoy hit an IED. *Id.* The explosion caused ████ to hit his
head on the steering wheel and to lose his hearing. *Id.* Upon exiting the vehicle, ████ was
dizzy and had a headache. *Id.* The IED explosion also injured ████ gunner's right hand
and killed two civilians. *Id.* ████ sustained injuries from the attack and has a 100% disability
rating from the Veterans Administration. *Id.* Defendant's material support or resources was a
substantial factor leading to the attack. *Ex. 174, pp. 85-86.* ████ was also involved in Attack
#44.

### Attack #44 (January 2005)

Plaintiff ████ was involved in another attack sometime around January of 2005. *Ex.
125; Doc. 29, pp. 173-175.* ████ was part of a mission enforcing curfew in the city of
Khanaqin, near the Iranian border. *Id.* On the day of the attack, ████ was standing outside an
Iraqi Police station fueling his Humvee when a suicide bomber detonated his explosive vest. *Id.*

The blast caused █████ to be blown off his feet and into a concrete wall injuring his back. *Id.* After the attack, █████ found himself covered in the blood of the insurgent and an eleven-year-old Iraqi boy that █████ and his unit used as an interpreter. *Id.* The insurgent and boy were killed in the attack. *Id.* █████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 86.* █████ was also involved in Attack #43.

### Attack #45 (March 2005)

Plaintiff █████ ("█████") is a national of the United States and served in the US Navy. *Ex. 84; Doc. 29, pp. 126-127.* Sometime in March of 2005, █████ and his unit pulled over around the Mufrek Traffic Circle in Baqubah, Iraq for a break. *Id.* █████ dismounted from the turret in the Stryker vehicle that he was in, and another soldier took █████ place in the turret while he took a break. *Id.* Before █████ had a chance to walk away, the other solider was shot and killed by sniper fire, falling right in front of █████ on the ground traumatizing █████. *Id.* █████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 87.* █████ was also involved in Attack #57.

### Attack #46 (October 4, 2005)

Plaintiff █████ ("█████") is a national of the United States and served in the US Army. *Ex. 170; Doc. 29, pp. 231-232.* On October 4, 2005, █████ and his unit were in a convoy from LSA Anaconda to FOB Warhorse. *Id.* █████ was in the lead gun truck in the convoy. *Id.* At approximately 7:15 a.m., █████ and the convoy was at a small bridge, about 1,000 yards from FOB Warhorse, Baqubah, Iraq when a suspicious dump truck drove onto the bridge and detonated a VBIED, killing the driver of the dump truck. *Id.* █████ was witness

to the sight of the driver of the truck's body being blown up into pieces and shooting out of the truck which was very traumatic to him. *Id.* The blast also caused ▇▇▇ to experience ringing in his ears and hearing loss. *Id.* ▇▇▇ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 87-88.*

**Attack #47 (September 2008)**

Plaintiff ▇▇▇▇▇▇▇ ("▇▇▇") is a national of the United States and served in the US Army. *Ex. 164, Doc. 29, pp. 224.* Sometime in September of 2008, ▇▇▇ was working at a check point right outside FOB Grizzly, Al Khalis, Iraq when a local mayor named ▇▇▇▇ approached ▇▇r. *Id.* The mayor explained to ▇▇▇ that he had been threatened by terrorists because he had been seen talking to American soldiers and requested protection. *Id.* ▇▇▇ supervisors declined protection of the mayor. *Id.* ▇▇▇ was the one who had to tell the mayor that they were unable to provide protection. *Id.* ▇▇r learned later that night that Al Qaeda broke into the mayor's house, shot and killed the mayor and his three-year-old son. *Id.* The next day, the mayor's wife came to the checkpoint with their three-year-old son who had a gunshot wound in his back. *Id.* ▇▇▇ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 88-89.*

**vii.  Kirkuk Province**

**Attack #48 (June 2, 2004)**

Plaintiff ▇▇▇▇▇▇ ("▇▇▇") is a national of the United States and served in the US Army. *Ex. 19; Doc. 29, pp. 41-43.* On June 2, 2004, ▇▇▇ just returned to the Kirkuk Air Base, Kirkuk, Iraq when the base was suddenly attacked by rockets. *Id.* One of the rockets exploded in

an ammo dump on the base causing the weaponry within the ammo dump to explode. *Id.* ███ escaped to a bunker. *Id.* When ███ arrived at the bunker, the explosions caused ███ to be slammed against the ceiling of the bunker, and then to the ground, unconscious. *Id.* The explosions continued for three hours and could be seen from thousands of yards away. *Id.* ███ remained in the bunker being thrown around the bunker by the continued explosions. *Id.* As a result of the attack, several people were injured, and one U.S. civilian contractor was killed. *Id.* ███ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 89-90.*

**Attack #49 (July 16, 2005)**

Plaintiff ███████ ("███") is a national of the United States and served in the US Army. *Ex. 76; Doc. 29, pp. 117-118.* On July 16, 2005, ███ and his unit were providing route security on Route Cherry in an open area of the desert between Kirkuk and Tikrit. *Id.* ███ was the driver of the second Humvee. *Id.* Suddenly, the lead vehicle in the convoy took a direct hit by an EFP and then secondary blasts from the EFP. *Id.* The blasts from the EFP set the lead Humvee on fire, destroying the vehicle, and propelling shrapnel through the vehicle killing Sergeant First Class ███ and severely injuring Specialist ███ left foot, and Specialist ███ left leg. *Id.* The blast from the EFP also broke the review mirrors and flattened the tires of ███ vehicle. *Id.* Also, the blast caused ███ to be violently thrown around the inside of his vehicle causing him to immediately experience dizziness, vomiting, and ringing in his ears. *Id.* ███ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Oldham was also involved in Attack #63.

Plaintiff ███████ ("███") is a national of the United States and served in

the US Army. *Ex. 14; Doc. 29, pp. 35-36.* At the time of the July 16, 2005 EFP attack, ███

was patrolling a road between Erbil and Kirkuk, Iraq when ███ n and his unit were called to

help ███ unit that had been hit by the EFP. *Id.* While responding to the attack, ███

found his close friend, Sergeant First Class ███, in the passenger side of the enflamed

vehicle unresponsive. *Id.* ███ and his unit were unable to extinguish the fire. *Id.* However,

they pulled Sergeant ███ and two other injured service members out of the burning vehicle,

Specialists ███. *Id.* As a result of the attack, Sergeant ███ died from his injuries,

Specialist ███ lost part of his foot, and Specialist ███ suffered significant shrapnel wounds to

his left legs. *Id.* This attack was very traumatic to ███. *Id.* ███ sustained injuries from

the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's

material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 90.*

**Attack #50 (March 4, 2007)**

Plaintiff ███ ("███") is a national of the United States and served in the

US Army. *Ex. 130; Doc. 29, pp. 182-183.* On March 4, 2007, ███ and his unit were in a convoy

traveling from the Iraqi K1 Airfield to FOB Warrior on the other side of Kirkuk, Iraq. *Id.* ███

and his unit were taking our Iraqi counterparts to FOB Warrior to resupply. *Id.* At around 3:00

p.m. as they were driving through the city of Kirkuk, the lead vehicle was hit by an IED, causing

the driver of ███ vehicle to swerve their vehicle, rolling it multiple times, until it landed in a

nearby ditch. *Id.* ███ was violently thrown around the inside of his vehicle, causing him to

immediately experience ringing in his ears, hearing loss, a swollen face, bleeding from his mouth,

was dizzy, lightheaded, nauseous, had a headache, and had back and neck pain. *Id.* After getting

out of his vehicle, ███ reported to the scene of the IED blast and discovered that the lead

American vehicle took a direct hit on its passenger side. *Id.* SSG Daniel ███ was in the

passenger seat of the vehicle at the time of the IED blast. *Id.* SSG ███ was medevacked from the scene and died later that day from his injuries from the IED blast. *Id.* ███ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 90-91.*

**Attack #51 (April 16, 2008)**

Plaintiff ███████ ("███") is a national of the United States and served in the US Army. *Ex. 39; Doc. 29, pp. 67-69.* On the day of the attack, ███ and his unit were traveling from FOB Warrior to Patrol Base Doria. *Id.* As the unit was approximately five kilometers outside of FOB Warrior, Kirkuk, Iraq, ███ vehicle was hit with a mortar. *Id.* The vehicle ahead of ███ was then hit by and IED. *Id.* ███ and his unit were then ambushed by rockets. *Id.* ███ was the gunner in his vehicle at the time of the attack. *Id.* The repercussions from the blasts caused ███ to be thrown around the inside of his gunner's swing and hit his head on various parts of the vehicle and weaponry in the gunner's hatch. *Id.* The gunner in the lead vehicle that was hit by the IED, ███, sustained a shrapnel wound to his neck from the IED and was medevacked once they got to Patrol Base Doria. *Id.* ███ later died at Walter Reed Medical Center due to his injuries from the IED. Another soldier, Sergeant ███ was also killed during the attack by the mortar blasts. *Id.* ███ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 91-92.*

    **viii.**   **Najaf Province**

**Attack #52 (August 2004)**

Plaintiff ███████ ("███") is a national of the United States and served in the US Navy. *Ex. 28; Doc. 29, pp. 52-53.* ███ was stationed at FOB Duke when he and his

unit learned about an active battle in Najaf, Iraq. *Id.* ██████ and his unit were instructed to set-up a casualty collection post near the battle. *Id.* ██████ was not a medic, but he assisted with the wounded and killed Marines during this attack all the while his post continued to have incoming rocket, sniper, and small arms fire which was very traumatic to him. *Id.* ██████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 92.*

### Attack #53 (March 2006)

Plaintiff ██████████ ("██████") is a national of the United States and served in the US Army. *Ex. 152; Doc. 29, pp. 209-210.* Sometime in March of 2006, ██████ was part of a four-vehicle convoy that departed FOB Kalsu on a mission to deliver cash to FOB Duke. *Id.* The convoy was almost to FOB Duke, Najaf, Iraq when they stopped for a man crossing the street with goats when suddenly a IED exploded, flipping the first vehicle in the convoy in the air. *Id.* Then a series of other IEDs exploded causing ██████ to be violently thrown around the inside of the vehicle that he was in. *Id.* There were two killed during the attack. *Id.* ██████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 92-93.*

### ix. **Nineveh Province**

### Attack #54 (March 9, 2004)

Plaintiff ██████████ ("██████") is a national of the United States who served in the US Army. *Ex. 12; Doc. 29, pp. 32-33.* On March 9, 2004, ██████ was in the living support area on FOB Diamond Back, Mosul, Iraq, around 11:30 a.m. when a rocket impacted the roof of the building and hit approximately three feet from where ██████ was. *Id.* As a result of the blast, ██████l was immediately knocked unconscious for thirty minutes to an hour. *Id.* When

██████ woke up, he was in the hospital. *Id.* Upon regaining consciousness, ██████ noticed he had shrapnel wounds primarily in his right arm, and pieces of fiberboard debris stuck throughout his body in his eyes, nose, and ears. *Id.* A military contractor died as a result of the rocket attack. *Id.* ██████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 93-94.*

### Attack #55 (December 21, 2004)

Plaintiff ██████████ ("██████") is a national of the United States and served in the US Army. *Ex. 133; Doc. 29, pp. 185-186.* On December 21, 2004, ██████ was in the dining facility on FOB Marez, Mosul, Iraq. *Id.* ██████ placed his food on the table, leaned over to place his weapon on the floor when suddenly, an insurgent detonated his suicide vest in the middle of the dining facility. *Id.* ██████ remembers seeing an orange flame and then everyone being blown sideways, including ██████. *Id.* ██████ was hit with shrapnel in the back of his head, right side of his nose, chin, forehead, chest, and legs and suffered burns to the back of his head, a sucking chest wound and collapsed lungs. *Id.* ██████ was medevacked to LSA Diamondback where he lost consciousness. *Id.* ██████ woke up at Walter Reed Medical Center after a 19-day medically induced coma. *Id.* There were 14 US forces members, 4 US civilians, and 4 Iraqi civilians who were killed during the attack. *Ex. 489.* ██████ sustained injuries from the attack and has a 100% disability rating with the Veterans Administration. *Ex. 133.*

Plaintiff ██████ was also involved in the attack on FOB Marez on December 21, 2004. *Ex. 41; Doc. 29, pp. 70-71.* On the day of the attack, ██████ was operating a forklift on FOB Marez when suddenly the base was attacked by rockets. *Id.* ██████ heard a loud noise and the next thing he remembers is waking up in the medical tent bandaged up. *Id.* ██████ was told that

one of the rockets exploded near the forklift he was operating causing it to roll over. *Id.* Also, one of the rockets hit a truck, killing the Iraqi citizens inside the truck. *Id.* The truck and Iraqi citizens were on FOB Marez cleaning port-a-potties on base. *Id.* There were 14 US forces members, 4 US civilians, and 4 Iraqi civilians who were killed during the attack. *Ex. 489.* ███ sustained injuries from the attack and has a 100% disability rating with the Veterans Administration. *Ex. 41.* ███ was also involved in Attack #22. Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 94-95.*

### Attack #56 (July 2005)

Plaintiff ███████ ("███████") is a national of the United States and served in the US Army. *Ex. 92; Doc. 29, pp. 135-136.* Sometime in July of 2005, ███████ was outside the Pride West Police Station that was next to a hospital in Mosul, Iraq. *Id.* Sometime during the day, a suicide bomber went to the hospital and detonated his/her vest inside the hospital. *Id.* ███████ was about 30-50 yards away from the blast and was one of the first to respond to the scene. *Id.* ███ recalls the horrific sight of blood and dead bodies everywhere including infants who were killed in the attack. *Id.* ███████ sustained injuries from the attack and has a 100% disability rating with the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 95.*

### Attack #57 (January 2006)

Plaintiff ███ was involved in another attack sometime in January of 2006. *Ex. 84; Doc. 29, pp. 126-127.* On the day of the attack, ███ and his unit were on a foot security patrol in Rabia, Iraq, near the Syrian border when suddenly they were attacked by multiple mortar rounds. *Id.* One of the mortar rounds struck within a few feet of ███ sending him flying to the ground and briefly knocking him unconscious. *Id.* Upon regaining consciousness, ███ was suffering from a severe

headache and ringing in his ears. *Id.* As the unit's medic, ███ assessed the scene for those injured in the attack. *Id.* Several soldiers were killed during the attack. *Id.* ███ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 96.* ███ was also involved in Attack #45.

### x.  Saladin Province

### Attack #58 (May 2004)

Plaintiff ███ was involved in another attack sometime in May of 2004. *Ex. 58; Doc. 29, pp. 92-93.* On the day of the attack, ███ was on FOB Summerall, Baji, Iraq when the base was attacked at the front gate with a bomb. *Id.* ███ responded to the explosion to find about 23 deceased Iraqi citizens, some women, and children. *Id.* There were dead bodies and body parts thrown around everywhere which was very traumatic for ███. *Id.* ███ sustained injuries from the attack and receives disability from the Social Security Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 96-97.* ███ was also involved in Attack #41.

### Attack #59 (May 26, 2004)

Plaintiff ███████ ("███") is a national of the United States and served in the US Army. *Ex. 33; Doc. 29, p. 59.* On May 26, 2004, ███ and his unit were escorting Colonel ███████ to the main tactical operation center. *Id.* At around 8:00-8:30 a.m., ███ and his unit were entering the city of Tikrit, Iraq, and were right near the palace in Tikrit when an IED exploded in the median of the street as ███ Humvee went by it. *Id.* The blast from the IED caused ███ to be thrown around the gunner's hatch of the vehicle, snapping his head and neck back and forth. *Id.* ███ was immediately disoriented, had dizziness, ringing in his ears, and was

seeing stars. *Id.* At the time of the IED blast, an unknown soldier that was in an explosive ordinance disposal unit that was attached to ▮▮▮▮ unit for the mission, was sitting on a bench of a cargo truck, directly behind ▮▮▮▮. *Id.* The IED blast caused shrapnel to puncture through the soldier's Kevlar helmet, killing him instantly. *Id.* After the blast, ▮▮▮▮ also saw two civilians laying in the street, dead from the IED blast. *Id.* ▮▮▮▮ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 97-98.*

### Attack #60 (June 2004)

Plaintiff ▮▮▮▮ was involved in another attack sometime in June of 2004. *Ex. 69; Doc. 29, pp. 106-109.* On the day of the attack, ▮▮▮▮ was on LSA Anaconda, Balad, Iraq walking over to the internet café when the post-exchange, approximately 50-meters away, was attacked with two rockets. *Id.* ▮▮▮▮ was knocked to the ground and unconscious. *Id.* Upon regaining consciousness, ▮▮▮▮ was covered in dirt and disoriented but proceeded to assist with the wounded. *Id.* As a result of the attack, four people were killed and 21 were injured. *Id.* ▮▮▮▮ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 98-99.* ▮▮▮▮ was also involved in Attack #s 4 and 62.

### Attack #61 (July 2004)

Plaintiff ▮▮▮▮ ("▮▮▮▮") is a national of the United States and served in the US Army. *Ex. 87; Doc. 29, pp. 130-131.* Sometime in July of 2004, ▮▮▮▮ and his unit were dropping off supplies to a building in Samara, Iraq that was being used as a mini base. *Id.* Suddenly, a suicide bomber detonated his vest inside the building that ▮▮▮▮ was in. *Id.* The blast knocked ▮▮▮▮ off his feet and immediately suffered from a severe headache and his ears hurt. *Id.* As ▮▮▮▮ escaped

the building, fearing for his life, he saw multiple burned and dead bodies from the attack. *Id.* As a result of the attack, five to seven people died. *Id.* █████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 99-100.*

**Attack #62 (August 18, 2004)**

Plaintiff █████ was involved in another attack on August 18, 2004. *Ex. 69; Doc. 29, pp. 106-109.* On the day of the attack, █████ was on LSA Anaconda, Balad, Iraq providing security at the north entry control point when suddenly the gate was attacked by multiple mortars and rockets. *Id.* Two of █████' soldiers called over the radio that a mortar struck their position. *Id.* █████ then ran to their position to assist when another mortar hit on the other side of a HESCO barrier that █████ and the two other soldiers were behind. *Id.* The blast caused all three of them to be disoriented for a couple of minutes. *Id.* █████ then walked around the other side of the HESCO barrier to discover that a local national took a direct hit from the mortar and was killed. *Id.* As █████ helped the Iraq Coalition Diplomatic Committee guards load the body on a stretcher to remove him from the kill zone, █████ felt a tug on his leg of a young boy, approximately four-years-old, who had taken shrapnel wounds that separated his head and left arm from his shoulder. *Id.* █████ held the boy as he asked █████ to help him, but the boy died moments later █████' arms. *Id.* Immediately after this, █████ had to go assist on the other side of the base where two additional local nationals had been hit by mortars during the attack. *Id.* One of them had a severed spinal cord that was visible to █████, and the other had taken a piece of shrapnel to his abdomen. *Id.* █████ dressed their wounds and transferred them out of the kill zone. *Id.* The whole attack lasted less than ten minutes but felt like a lifetime to █████. █████ sustained injuries from the attack and

has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 100.* ██████ was also involved in Attack #s 4 and 60.

### Attack #63 (December 31, 2004)

Plaintiff ██████ was involved in another attack on December 31, 2004. *Ex. 76; Doc. 29, pp. 117-118.* On the day of the attack, ██████ was providing convoy security along Route Cherry in Tikrit, Iraq when an IED exploded approximately 20-feet in front of ██████ vehicle. *Id.* The blast caused ██████ to be thrown around the inside of his vehicle, giving him whiplash, and hitting his head on various parts of the vehicle. *Id.* The IED also killed multiple locals who were nearby at the time of the explosion. *Id.* ██████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 100.* ██████ was also involved in Attack #45.

### Attack #64 (January 5, 2005)

Plaintiff ██████ ("██████") is a national of the United States and served in the US Army. *Ex. 115; Doc. 29, pp. 160-162.* On January 5, 2005, ██████ was guarding the gate on the Balad Air Base, Balad, Iraq. *Id.* Due to a previous attack several days before on the base, there were two checkpoints set up. *Id.* The first one was manned by Iraqi soldiers. *Id.* The second checkpoint was about 100-meters past the first and was manned by a mix of Iraqi and American soldiers, including ██████. *Id.* Sometime around 8:00 to 10:00 a.m., a suspicious white car approached the first gate. *Id.* ██████ was informed that the car may be on the BOLO ("be on lookout") list so ██████ went to the bottom of the tower he was in to make sure gates were closed. *Id.* As ██████ approached the bottom of the tower, the car pushed through the front checkpoint and detonated his VBIED, killing the driver. *Id.* The blast from the VBIED caused

██████ to be thrown back several feet, knocking his helmet off his head, and sending him to the ground where he was knocked unconscious. *Id.* When ██████ regained consciousness, he recalls a fellow soldier standing over him talking to him, but he couldn't hear anything he was saying. *Id.* When ██████ was able to get up and look around, he remembers the distinct image of several Iraqi soldiers that had been split in half and killed by the gate cable wires that they were flung into due to the blast, blood everywhere, and people running around screaming by him which was very traumatic to him. *Id.* ██████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration and he receives disability from the Social Security Administration for his injuries. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 101-102.*

### Attack #65 (January 2005)

Plaintiff ██████ ("████") is a national of the United States and served in the US Army. *Ex. 86; Doc. 29, pp. 128-130.* On the day of the attack, ████ friend, Specialist ████ was killed by an IED approximately 50 miles from Baghdad International Airport. *Id.* ████ and his unit responded to the IED attack. *Id.* ████ recalls the sight of Specialist ████ mangled body as ████ assisted transporting ████ body from the scene of the attack back to the base for his freedom flight back to the states. *Id.* ████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 102-103.*

### Attack #66 (March/April 2005)

Plaintiff ██████ ("██r") is a national of the United States and served in the US Army. *Ex. 150; Doc. 29, pp. 206-208.* Sometime around March of April of 2005, ████ and his unit departed from LSA Anaconda on MSR Tampa heading towards Baghdad. *Id.* The unit was

approximately 30-40 miles southeast of LSA Anaconda searching for a house that they had intel on that was hiding a weapon cache. *Id.* The unit had narrowed down the target to five possible houses. *Id.* As ████ and his unit began to raid one of the suspected houses, they were ambushed by small arms fire from insurgents in a field outside of the house. *Id.* The insurgents pinned ████ and his unit down for several minutes of continued weapons fire as ████ feared for his life. *Id.* Several locals were killed during the firefight. *Id.* ████ sustained injuries from the attack and has a 90% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 103.*

### Attack #67 (July 2005)

Plaintiff ████ ("████") is a national of the United States and served in the US Army. *Ex. 162; Doc. 29, pp. 222-223.* Sometime in July of 2005, ████ and his unit were in a convoy escorting Third Country Nationals ("TCN") between FOB Speicher and LSA Anaconda. *Id.* At around noon or 1:00 pm, approximately 20 miles outside of FOB Speicher, one of the TCN vehicles that was two vehicles ahead of ████, hit an IED. *Id.* The explosion engulfed the TCN vehicle in flames, burning and killing the occupants of the vehicle. *Id.* The IED blast also reverberated throughout ████ vehicle causing ████ to have ringing in his ears, dizziness, lighted headed, and nauseous leading him to throw up. *Id.* ████ and his unit dismounted until the Quick Reaction Force arrived and cleared the scene. *Id.* ████ and his unit then secured the deceased, loaded them into his vehicle, and continued to LSA Anaconda. *Id.* ████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 104.*

### Attack #68 (October 26, 2005)

Plaintiff ███████████ ("████") is a national of the United States and served in the US Air Force. *Ex. 153; Doc. 29, pp. 210-211.* On October 26, 2005, ████ was on the Balad Air Base, Balad, Iraq working on an aircraft when the base was ambushed with multiple mortar rounds, three of which landed approximately 100 yards away from ████. *Id.* One of the mortar rounds killed another soldier right before ████ eyes. *Id.* ████ jumped off the aircraft he was working and ran for cover as the base continued to take on small arms fire for the next two minutes. *Id.* ████ was in shock and terrified as he witnessed the debris, dust, blood, and body parts from the attack. *Id.* ████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 104-105.*

### Attack #69 (January 27, 2007)

Plaintiff ███████████ ("████") is a national of the United States and served in the US Army. *Ex. 141; Doc. 29, pp. 195-196.* On January 27, 2007, ████ and his unit were enroute to a local Iraqi Police Station. *Id.* At around 3:30 p.m., approximately 15 minutes outside Tarmiyah, Iraq, an individual walked in front of ████ vehicle waiving his hands in the air which ████ recognized as the gesture to let him know there was an explosion. *Id.* As ████ grabbed his radio to warn the other vehicles, an IED detonated immediately knocking him unconscious. *Id.* When ████ regained consciousness, ████ noticed that he was trapped beneath his overturned vehicle and was taking small arms fire. *Id.* ████ also noticed that his head was bleeding, and his left arm was in a lot of pain. *Id.* Both the driver and gunner of ████ vehicle were killed during the attack. *Id.* ████ was medevacked from the scene after other soldiers spent nearly 30 minutes releasing ████ from his vehicle. *Id.* ████ sustained injuries from the attack

and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 105-106.*

### Attack #70 (September 2007)

Plaintiff ███████████ ("███████") is a national of the United States and served in the US Army. *Ex. 127; Doc. 29, pp. 178-179.* Sometime in September of 2007, at around 10:00 a.m., ███████ was on LSA Anaconda, Balad, Iraq walking towards the motor pool to perform daily maintenance when a VBIED detonated at the north gate of the base, killing the driver of the vehicle. *Id.* The VBIED blast knocked ███████ to the ground causing him to suffer disorientation, dizziness, nausea, and ringing in his ears. *Id.* ███████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 106-107.*

### Attack #71 (August 2009)

Plaintiff ███████████ ("███████") is a national of the United States and served in the US Army. *Ex. 64; Doc. 29, pp. 99-100.* Sometime in August of 2009, at around 4:30 p.m., ███████ was on the Balad Air Base, Balad, Iraq walking to the chow hall when he suddenly heard the "zing" of bullets flying over his head. *Id.* ███████ immediately hit the ground and started crawling to a bunker that was approximately 75-yards away as small arms fire continued to hit the ground near him. *Id.* Upon hearing the base sirens indicating an incoming attack, ███████ got up to run to the bunker. *Id.* ███████ nearly reached the bunker when a mortar exploded near him, slamming ███████ into the side of the bunker causing him to be disoriented. *Id.* Suddenly, a VBIED exploded at the entry gate, approximately 200-300 meters from ███████, killing the driver. *Id.* As ███████ laid on the ground outside the bunker, he remembers hearing the blood curdling screams of people nearby, seeing the silhouettes of bodies flying in the air, the smell of

burned flesh. *Id.* ███ laid outside the bunker in horror as people were dying around him. *Id.* Small arms and mortar fire continued. *Id.* ███ found cover in the bunker where he curled up in the fetal position fearing for his life until he heard the "all clear" from the attack. *Id.* ███ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 107-108.*

**C.** **Afghanistan**

**i.** **Helmand Province**

**Attack #72 (June 2006)**

Plaintiff ███ ("███") is a national of the United States and served in the US Army. *Ex. 50; Doc. 29, pp. 81-82.* Sometime in June 2006, ███ and his unit were near a village in or around Turkman Kalay, Afghanistan on a vehicle patrol when an IED exploded at the front of the vehicle ahead of his. *Id.* After that, a secondary IED exploded behind ███ vehicle. *Id.* The blasts jolted ███ around the inside of his vehicle and disabled it. *Id.* After the explosions, the unit was ambushed with small arms and RPG fire for the next three hours until a nearby troop got them out of there. *Id.* As they evacuated the area, the unit continued to take small arms fire. *Id.* Following the attack, ███ suffered significant back, neck, and hip pain. *Id.* Two people from the unit were medevacked and subsequently died as a result of the injuries they sustained from the attack. *Id.* ███ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration for his injuries. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 109-110.*

**Attack #73 (March 5, 2009)**

Plaintiff ███ ("███") is a national of the United States and served in the

US Army. *Ex. 9; Doc. 29, pp. 28-29.* On March 5, 2009, █████████ and his unit were right outside FOB Robinson, near the town of Sangin, Afghanistan, when they drove over an IED. *Id.* The blast caused ████████ to be thrown around the inside of the vehicle and hit his head, neck, back, and whole body against the inside of the vehicle. *Id.* As a result of the blast, ████████ vehicle was disabled. Subsequently, the unit was ambushed and entered a six-hour fight with insurgents armed with small arms, RPGs, and mortars. *Id.* During the ambush, ████████ witnessed a coalition soldier get hit by a mortar. *Id.* That soldier later died from his injuries from the mortar blast. *Id.* Following the attack, ████████ went back to FOB Robinson and slept. *Id.* When ████████ awoke, he was in so much pain he could not move. *Id.* ████████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 110.*

### ii. Kabul Province

### Attack #74 (June 2nd or 3rd, 2013)

Plaintiff ████████ ("████") is a national of the United States and served in the US Army. *Ex. 5; Doc. 29, pp. 23-24.* On June 2 or 3, 2013, █████ was in the gym at the US Central Command International Security Assistance Force Headquarters in Kabul, Afghanistan when the Taliban began attacking the building with rockets. *Id.* One of the rockets caused the building to fall apart, some of the windows fell off, and several walls caved in. *Id.* As the building was falling apart one of the rafters and several parts of the ceiling fell down on top of ████, fracturing some of his ribs, cracking open his head, and knocking him unconscious. *Id.* ████ remained unconscious for the next seven or eight days. *Id.* Other people were injured and killed because of the attack. *Id.* ████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration for his injuries. *Id.* Defendant's material support or resources was a substantial

factor leading to the attack. *Ex. 174, pp. 110-111.*

### iii.  **Kandahar Province**

**Attack #75 (July 2006)**

Plaintiff ████████████ ("██████") is a national of the United States and served in the US Army. *Ex. 81; Doc. 29, pp. 123-124.* ██████ and his unit were in Kandahar, Afghanistan, in route to a Dutch encampment. *Id.* The encampment was on a makeshift airfield which was set up as a staging area and refilling point. *Id.* ██████ was driving a chaplain in a Humvee on the airfield toward the encampment when they were suddenly attacked by eight to ten mortar rounds and small arms fire. *Id.* The vehicle ██████ was traveling in got hit by a mortar round causing him and the chaplain to be violently thrown around the inside of the vehicle. *Id.* ██████ thought he was going to die. *Id.* Multiple people died on the airfield as a result of the mortars and small arm fire. *Id.* After the attack, ██████ helped remove the bodies from the airfield and prepare them for transport. *Id.* ██████ was terrified and anxious after the attack. *Id.* ██████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration for his injuries. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 111.* ██████ was also involved in Attack #89.

**Attack #76 (August 2, 2009)**

Plaintiff ██████████ ("██████") is a national of the United States and served in the US Army. *Ex. 70; Doc. 29, pp. 109-110.* On August 2, 2009, ██████ and his unit were in Zhari, Afghanistan searching for weapons caches and pushing the Taliban out of the area when a nearby Platoon hit an IED killing three of their soldiers. *Id.* ██████ and his unit were sent out to support the hit Platoon. *Id.* Shortly after they got there, they were instructed to secure the far side of the landing zone. *Id.* Wright and his unit were securing the area on foot when a member of the unit,

███████, stepped on a pressure point IED killing him immediately and wounding six others nearby with concussions including █████ who was also bleeding from his ears. *Id.* As a result of the blast, one other soldier also suffered shrapnel wounds. *Id.* ██████ sustained injuries from the attack and has a 90% disability rating from the Veterans Administration as a result of his injuries. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 111-112.*

**Attack #77 (March 2010)**

Plaintiff ██████████ ("████████") is a national of the United States and served in the US Army. *Ex. 26; Doc. 29, pp. 51-52.* Sometime in March 2010, ████████ and his unit were performing route clearance outside the Saraposa Prison in Kandahar, Afghanistan. *Id.* ██████ was in the fifth or sixth vehicle of the eight to nine vehicle convoy in the gunner's position of an MRAP. *Id.* Around 1:00 or 2:00 p.m. the unit was approaching the Saraposa Prison when they noticed a white panel van on the side of the road, backed up in a ditch, on the side of the prison. *Id.* As they approached the van, a large VBIED detonated. *Id.* Due to the reverberations of the blast, ████████ was pushed forward and then backwards in the gunner's hatch causing him to hit his back, head, and entire body on the vehicle in the process. *Id.* ████████ subsequently dropped down into the gunner's hatch needing to rest for about five minutes after before he got out of the truck attempting to work with the medic and Afghan Army to help some nearby civilians that were hurt in the blast. *Id.* As ████████ was helping civilians, he found a little girl who was still alive despite having her head split in half. *Id.* ████████ attempted to help her and put her head back together as an Afghan soldier told him it was worthless. *Id.* Several civilians died in the VBIED attack. *Id.* ████████ sustained injuries from the attack and has an 80% disability rating from the Veterans Administration for his injuries. *Id.* Defendant's material support or resources was a substantial

factor leading to the attack. *Ex. 174, p. 112.*

### iv.  **Khost Province**

**Attack #78 (June 6, 2006)**

Plaintiff ███████ ("█████") is a national of the United States and served in the US Army. *Ex. 122; Doc. 29, pp. 169-170.* On June 6, 2006, ██████ and his unit were on a mission to inspect a local construction site in Khost, Afghanistan around 7:30 a.m. *Id.* The unit was about one mile from the gate of FOB Salerno, when a lieutenant let them know a blue station wagon they were on the lookout for had been seen pulling off onto the side of the road. *Id.* As the second vehicle of the three-vehicle convoy passed the blue station wagon, █████ saw the reverse lights of the station wagon light up and then a massive explosion. *Id.* The station wagon, containing 70 mortar rounds detonated violently, killing the driver of the station wagon. *Id.* The blast impacted the side of █████ vehicle and immediately knocked him unconscious. *Id.* When █████ regained consciousness he was ejected from the vehicle and his right leg had been caught by the vehicle door. *Id.* █████ remained stuck in the door as he was dragged approximately 50 meters while he yelled for the driver, Private █████ to stop the car. *Id.* The car eventually came to a stop after the tires exploded due to the heat. *Id.* When █████ looked in the vehicle, he realized █████ had been ejected from the vehicle as well. *Id.* The blast blew all of the vehicle doors open and caused severe burns to █████, Private █████s, and Specialist █████. *Id.* All three occupants of the vehicle, including █████, were medevacked from the area shortly after. *Id.* █████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration for his injuries. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 112-113.*

**Attack #79 (September 11, 2006)**

Plaintiff ███████████ ("█████") is a national of the United States who was employed as a truck driver by █████████████████████████████████████████ ("███") *Ex. 169; Doc. 29, pp. 230-231.* On September 11, 2006, ██████ was traveling to the front gate of FOB Salerno, Khost, Afghanistan to pick up local nationals who were standing in line to be screened by the military. *Id.* ██████ was about 50 yards from the front gate when a suicide bomber detonated at the gate. *Id.* The blast knocked ██████ off his feet onto the ground and caused him to hit his back, lose hearing, bleed from his ears, and vomit. *Id.* There were about 20 to 30 people killed from the blast including local civilians, contractors, and US service members. *Id.* ██████ sustained injuries from the attack. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 113.*

**Attack #80 (February 10, 2009)**

Plaintiff ███████████ ("███") is a national of the United States and served in the US Army. *Ex. 8; Doc. 29, pp. 27-28.* On February 10, 2009, ███ and his unit were in a convoy from Camp Clark to FOB Salerno, Khost, Afghanistan. *Id.* At around 10:00 a.m. the unit was about 300 yards from the FOB at a checkpoint when a truck detonated (VBIED) next to ██████ vehicle killing the driver ███████████ and the gunner Corporal ███████████ on impact. *Id.* The blast left a crater in the road. *Id.* ██████ immediately blacked out and was taken to the medical tent on FOB Salerno shortly after. *Id.* From FOB Salerno, he was taken to the hospital in Bagram, Landstuhl Germany, and then back to the United States within three days of the attack. *Id. See also Ex. 500.* ██████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration for his injuries. *Ex. 8.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 113-114.*

**Attack #81 (June 1, 2012)**

Plaintiff ██████████████ ("█████████") is a national of the United States and served in the US Army. *Ex. 138; Doc. 29, pp. 191-192.* On June 1, 2012, ███████████ was on FOB Salerno, Khost, Afghanistan preparing for a patrol when a massive explosion rocked the area and knocked him to the ground. *Id.* ██████████ ran to the nearest bunker as a command came over the speaker stating the FOB had been breached. *Id.* A VBIED had detonated about 400-yards away that was a dump truck filled with multiple explosives. *Id.* ██████████ ran to the front gate towards the breach point where he witnessed another insurgent running towards him who subsequently blew himself up about 10 feet from ███████████ vehicle and died. *Id.* ██████████ saw the insurgent rip in half while the attack continued. *Id.* Fourteen insurgents in a van armed with small arms, grenades, and RPGs proceeded into the base and the attack lasted for approximately thirty more minutes while ██████████ and others fought off the insurgents with small arms fires. *Id.* The attack destroyed half of the dining facility and injured numerous people on base. *Id.* ██████████ sustained injuries from the attack and has a 90% disability rating from the Veterans Administration for his injuries. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 114.*

## v. __Kunar Province__

**Attack #82 (November 27, 2004)**

Plaintiff ██████████ ("█████") is a national of the United States and served in the US Marines. *Ex. 52; Doc. 29, pp. 84-85.* On November 27, 2004, ██████ was on Camp Blessing, Dara-I-Pech District, Afghanistan. *Id.* Three days before on November 24, 2004, the base was warned of an incoming attempt to overrun the base within the next 24-48 hours. *Id.* Around 8:00 or 9:00 p.m. on November 27, the base came under a heavy attack with rockets, mortars, RPG, and small

arms fire. *Id.* The base was small and surrounded by mountains and the insurgents were firing at them from all directions in the dark. *Id.* Throughout the attack ▮▮▮ felt defenseless, and in fear for his life. *Id.* ▮▮▮ was manning a machine gun in the turret of a Humvee when a mortar struck directly next to it blasting him with rocks and dirt inside the Humvee. *Id.* ▮▮▮ evacuated the Humvee and moved to another post as the attack continued for two to three hours before air support came and killed most of the insurgents. *Id.* During the attack, several of the mortar and rocket rounds hit nearby houses or huts of Afghani civilians, killing them on impact. *Id.* After the attack, ▮▮▮ and his unit did recon in the area, and saw the bodies of the Afghani civilians who had been killed by the insurgents' mortars and rockets which was very traumatic to ▮▮▮. *Id.* ▮▮▮ sustained injuries from the attack and has a 70% disability rating from the Veterans Administration for his injuries. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 115.*

### vi.  Nangarhar Province

**Attack #83 (March 26, 2013)**

Plaintiff ▮▮▮ ("▮▮▮") is a national of the United States and served in the US Army. *Ex 137; Doc. 29, pp. 190-191.* On March 26, 2013, ▮▮▮ and his unit were on an undisclosed base in Jalalabad, Afghanistan. *Id.* K. Smith was in his sleeping quarters when a suicide bomber drove through the gate in a vehicle containing multiple VBIEDs and set them off. *Id.* The initial blast knocked ▮▮▮ off his bed, ruptured his eardrums, and caused the ceiling above him to collapse burying him in rubble and knocking him unconscious for an unknown amount of time. *Id.* Following the initial blast insurgents with suicide vests entered the gates and detonated themselves inside the FOB. *Id.* When ▮▮▮ regained consciousness, he was dizzy and could not see anything. *Id.* Eventually ▮▮▮ climbed his way out of the rubble and grabbed

his night goggles and rifles. *Id.* He noticed he had blood coming from his ears and his head was throbbing, but he struggled over to the hallway to check the status of the attack. *Id.* As he entered the hallway, he noticed people were running around panicking and bullets were flying along the back alley from the buildings nearby. *Id.* As he looked outside, he saw numerous deceased individuals and multiple body parts scattered everywhere and insurgents running around detonating themselves. *Id.* The base had been infiltrated and the attack continued for the next three hours before the base was secure. *Id.* Throughout the attack, the base was attacked with two 500-pound VBIEDs, six insurgents with suicide vets, RPGs, hand grenades, and small arms fire. *Id.* Six US service members and several Afghan police were killed as a result of the attack. *Id.* ▮ ▮ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration for his injuries. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 115-116.*

### Attack #84 (July 4, 2013)

Plaintiff ▮▮▮▮▮▮ ("▮▮▮▮") is a national of the United States and served in the US Army. *Ex. 118; Doc. 29, 164-165.* On July 4, 2013, ▮▮▮▮ and his unit were on a mission to liberate the people in a small village close to Jalalabad, Afghanistan that had been infiltrated by terrorists. *Id.* At approximately 5:00 a.m. the unit was attack with small arms fire. *Id.* ▮▮▮▮ noticed a member of another group within his unit, Private ▮▮▮▮ was shot and lying on the ground unconscious about 25 yards from ▮▮▮▮ . *Id.* ▮▮▮▮ got out of his vehicle and ran to give ▮▮▮ aid. *Id.* As ▮▮▮▮ was attempting to give him medical care, an RPG hit a few feet away from them. *Id.* The blast immediately knocked ▮▮▮▮ unconscious for about an hour and killed ▮▮▮ on impact. *Id.* When ▮▮▮▮ regained consciousness, he was covered in blood, dazed, confused, nauseous, and suffering a headache, ringing in the ears, and blurry

vision. *Id.* Another soldier nearby, Specialist ███████ was also injured from the RPG blast. *Id.* The attack continued for the next two to three days. *Id.* ███████ sustained injuries from the attack and has a 90% disability rating from the Veterans Administration from his injuries. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 116.*

### Paktika Province

### Attack #85 (August 23, 2008)

Plaintiff ███████ ("███████") is a national of the United States and served in the US Army. *Ex. 171; Doc. 29, pp. 232-233.* On August 23, 2008, ███████ and his unit were on COP Margah, Afghanistan. *Id.* ███████ was woken up in the middle of the night to the sound of small arms fire and mortars. *Id.* ███████ jumped out of bed, grabbed his gear, and ran to the wire of the base to see the enemy had the small base surrounded. *Id.* A small arms fire continued for approximately four hours during which time ███████ sustained burns to his face and both of his legs due to not having time to properly suit up prior to firing his weapon. *Id.* ███████ also suffered from ringing in his ears following the attack. *Id.* The base had to call in air support and one of the helicopters was shot down in the exchange, killing the US pilot. *Id.* ███████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration for his injuries. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 116-117.*

### Attack #86 (December 24, 2008)

Plaintiff ███████ ("███████") is a national of the United States and served in the US Army. *Ex. 148; Doc. 29, pp. 204-205.* On December 24, 2008, ███████ was on COP Margah, a few kilometers away from the Pakistan border, Afghanistan. *Id.* It was about 7:00 or 8:00 a.m. and ███████ was laying down to sleep following a 24-hour shift when the base was ambushed with

rockets. *Id.* One of the rockets hit about 40 feet from where ███ was laying down to sleep, directly impacting a fellow member of his unit, Corporal ████████████ vehicle. *Id.* ███ ran to see what was going on and pulled ████ out of the rubble to find he had a piece of shrapnel in his leg and rib cage, and a major laceration in his left arm that severed his artery. *Id.* As ███ tried to care for █████, he lifted his head, touching ██████ brain as he quickly noticed he had also suffered a significant shrapnel wound on the back of his head. *Id.* As █████ was trying to save ██████, he died. *Id.* Another member of the unit who was the driver of the vehicle, Private First Class █████ had also taken a piece of shrapnel from the rocket to his head. *Id.* Two other people who were nearby including Private ██████████ and an unknown Master Sergeant from the Airforce also suffered shrapnel wounds and were medevacked out of the area along with ██████. *Id.* ████ eventually lost his leg as a result of the attack. *Id.* ██████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration for his injuries. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 117.*

### Attack #87 (October 15, 2009)

Plaintiff ███████████ ("██████") is a national of the United States and served in the US Army. *Ex. 22; Doc. 29, pp. 46.* On October 15, 2009, ██████ and his unit were in the village of Mais, Afghanistan, just before the village of Segana, between Sharana and Khair Kot. *Id.* It was around 3:00 a.m. when the MRAP he was traveling in hit a landmine. *Id.* The blast caused the MRAP to lift off the ground throwing ██████ and others in the vehicle around the inside, and severely damaging it. *Id.* ███████ got out of the truck shortly after but was disoriented and fell down the hill, losing consciousness for an unknown period of time. *Id.* ██████ was taken back to FOB Rushmore for medical treatment following the attack. *Id.* The driver of the vehicle, Sergeant ███████ died due to complications with his injuries from the attack. *Id. See alo Ex. 496.* ████████

sustained injuries from the attack and has a 100% disability rating from the Veterans Administration for his injuries. *Ex. 22.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 117-118.*

**Parwan Province**

### Attack #88 (December 2006)

Plaintiff ███ was involved in another attack sometime in December of 2006. *Ex. 62; Doc. 29, pp. 96-97.* On the day of the attack, ███ and his unit were traveling through the Charikar District, Afghanistan, when a mother and child suddenly walked out into the road forcing them to stop. *Id.* The unit noticed the young boy, maybe ten years old, had a grenade attached to him as the child began walking towards them. *Id.* The unit yelled at the child to stop but he continued until another member of the unit shot him in the arm attempting to stop him, but ultimately detonating the grenade and killing the child immediately. *Id.* The blast occurred about 25 to 30 yards from ███ and immediately following the attack he suffered ringing in his ears, headaches, and the mental anguish of the death of the child was devastating to him. *Id.* ███ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration for his injuries. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 118.* ███ was also involved in Attack #40.

### Attack #89 (June 2007)

Plaintiff ███ was involved in another attack sometime in June of 2007. *Ex. 81; Doc. 29, pp. 123-124.* On the day of the attack, ███ was on the Bagram Airbase, Bagram, Afghanistan when several mortar round hit inside the base and impacted several areas including the chow hall. *Id.* ███ ran outside of his building to the chaos of multiple injured soldiers who were gushing blood, people who had lost limbs, and people who appeared to be suffering from

arterial bleeding. *Id.* ███ attempted to render medical aid to everyone he could but was no able to help everyone. *Id.* As a result of the mortar rounds, multiple US military personnel and civilians died. *Id.* Some people were killed immediately from the blasts. *Id.* Others died as they were waiting for aid, in transit to a medical facility, or later at a medical facility as a result of their injuries from the mortar rounds. *Id.* ███ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration for his injuries. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 119.* ███ was also involved in attack #75.

**Attack #90 (May 19, 2010)**

Plaintiff ███████ ("████") is a national of the United States and served in the US Army. *Ex. 103; Doc. 29, pp. 147-148.* On May 19, 2010, ███████ was on the Bagram Airbase, Bagram, Afghanistan around 3:30 to 4:00 a.m. when he woke up to the sound of mortars and small arms fire coming on base. *Id.* Terrorists were circling the base and shooting towards his sleeping quarters and eventually breached the gates. *Id.* Once they breached the gate the terrorists began using RPGs, plastic explosives, small arms fire, and suicide vests. *Id.* The area was covered in black smoke and ███████ could barely see what was going on. *Id.* ███████ attempted to run and seek cover in the midst of the attack but while doing so tripped, fell, and busted the back of his head open. *Id.* In total the base was under attack for about four to five hours. *Id.* The insurgents with suicide vests, died during the attack. *Id.* ███████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration for his injuries. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, pp. 119-120.*

**Attack #91 (May 19, 2011)**

Plaintiff ███████ was involved in another attack on May 19, 2011, now working for ████████████████████ and its subcontractor ████████████. *Ex. 18; Doc. 29, pp. 40-41.* On the day of the attack, ███████ was working in the clam shell tents on Bagram Airfield, Bagram, Afghanistan. *Id.* ███████ was in the first tent in a line of three when the third tent was hit by two mortar rounds sometime in the early afternoon. *Id.* ███████ and others responded to the blast in the third tent discovered three people from the Quick Reaction Strike ("QRS") team had been severely injured by the blast. *Id.* ███████ then assisted transporting the three injured people to a nearby bunker. *Id.* ███████ remained in the bunker for the next 45 minutes to an hour providing aid to the three injured QRS team members and fearing for his life as he did not know where the next mortar would land. *Id.* ███████ thought he was going to die that day. *Id.* After the "all clear," medics arrived at the bunker and transported the three injured QRS team members to a nearby hospital in Baghdad. *Id.* The three QRS team members later died as a result of their injuries from the mortar blasts. *Id.* ███████ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 120.* ███████ was also involved in Attack # 36.

### vii. Zabul Province

**Attack #92 (September 29, 2010)**

Plaintiff ████████████ ("███████") is a national of the United States and served in the US Army. *Ex. 42; Doc. 29, pp. 71-72.* On September 29, 2010, ███████ was on FOB Mizan, Mizan, Afghanistan leaving the chow hall when the base was suddenly ambushed by RPGs, artillery, and small arms fire. *Id.* One of the RPGs landed near ███████ knocking him on his back.

*Id.* A soldier on an observation post came running down yelling that there were around 100 insurgents coming. *Id.* ▋ ran and got his machine gun, ran up a tower, and engaged the insurgents attempting to ambush the base. *Id.* The firefight lasted for approximately 16 hours straight through which time ▋ remained in fear for his life. *Id.* Throughout the attack, several more RPG rounds hit near ▋ causing him to suffer from embedded gravel and shrapnel wounds. *Id.* During the attack, ▋ witnessed three of our Afghani National coalition forces killed by RPG rounds. *Id.* ▋ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 120-121.*

**Attack #93 (August 26, 2013)**

Plaintiff ▋ ("▋") is a national of the United States and served in the US Navy. *Ex. 144; Doc. 29, pp. 199-200.* On August 26, 2013, ▋ was on FOB Apache, Qalāt-e Ghilzay, Afghanistan in the trauma receiving tent when a 500-pound IED that was buried in the ground by the base's gate was remote detonated. *Id.* As a MRAP vehicle pulled up to the gate, the IED was detonated, ripping the MRAP in half and killing everyone in the vehicle. *Id.* ▋ was near the blast. *Id.* After the blast, ▋ and his team had numerous patients come into the receiving tent as they provided emergent medical care to those injured by the attack. *Id.* ▋ remembers that the scene after the attack was very chaotic and full of horrific images of the US service members and local citizens who were killed and brutally mutilated by the attack. *Id.* ▋ sustained injuries from the attack and has a 100% disability rating from the Veterans Administration. *Id.* Defendant's material support or resources was a substantial factor leading to the attack. *Ex. 174, p. 121.*

## ARGUMENT

This Court may enter default judgment when (1) it has subject-matter jurisdiction over the claim, (2) personal jurisdiction is properly exercised over Iran, and (3) the plaintiffs have presented satisfactory evidence to establish their claims against Iran, and (4) the plaintiffs prove the monetary damages they seek. *Winternitz v. Syrian Arab Republic*, No. CV 17-2104 (TJK), 2022 WL 971328, at *4 (D.D.C. Mar. 31, 2022)

Here, Plaintiffs submit evidence regarding the first three steps for the requisite default liability findings before proof of their damages.

## I.    THIS COURT HAS SUBJECT-MATTER JURISDICTION OVER THE CLAIMS AGAINST IRAN

While foreign states are generally immunized from jurisdiction, 28 U.S.C. § 1604, this Court has original jurisdiction in "nonjury civil action" seeking "relief *in personam* with respect to which the foreign state is not entitled to immunity …." 28 U.S.C. § 1330(a).  According to the Foreign Sovereign Immunities Act ("FSIA"):

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).  The FSIA is the "sole basis for obtaining jurisdiction over a foreign state in our courts."  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).

Plaintiffs seek money damages "for personal injury ... that was caused by" acts for which Iran, a foreign state, provided "material support or resources."  28 U.S.C. § 1605A(a)(1).  In the

operative complaint, Plaintiffs allege that Defendant was designated as a state sponsor of terrorism, [Docs. 29 and 31, ¶2], who provided material support or resources to its agents, including Hezbollah, the Islamic Revolutionary Guard Corps, the Taliban, al Qaeda, and others. [Docs. 29 and 31, ¶¶ 9, 10, 16-66]. *See also* Determination Pursuant to Section 6(i) of the Export Administration Act of 1979-Iran, 49 Fed. Reg. 2836 (Jan. 23, 1984). Armed with that material support and those resources, Defendant's agents then committed terrorist acts that caused personal injuries to Plaintiffs. [Docs. 29 and 31, ¶¶ 17, 38, 67-1497]. As a result, Plaintiffs seek damages for "their severe physical injuries, extreme mental anguish, pain and suffering, loss of solatium, and any economic losses …." [Docs. 29 and 31, ¶1503]. Because Plaintiffs' claims for damages arise from personal injuries caused by acts for which Defendant provided material support, Defendant does not enjoy foreign sovereign immunity.

## A. Plaintiffs' Standing to Bring Their Personal Injury Claims Under FSIA.

When a plaintiff seeks monetary damages "for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act," this Court shall hear the claim if: (1) "the foreign country was designated a state sponsor of terrorism" at the time of the act, due to the act, or within 6 months before the claim was filed, 28 U.S.C. § 1605A(a)(2)(A)(i)(I); (2) the claimant or the victim was a national, member of the armed forces, or an employee or contractor of the United States at that time of the act, 28 U.S.C. § 1605A(a)(2)(A)(ii)(I-III); and (3) the claimant afforded the foreign state a reasonable opportunity to arbitrate when "the act occurred in the foreign state …." 28 U.S.C. § 1605A(a)(2)(A)(iii). *See also Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13-14 (D.C. Cir. 2015).

### 1. Defendant Was Designated a State Sponsor of Terrorism at the Time of the Terrorist Acts.

Since January 19, 1984, the United States has designated Defendant as a state sponsor of terrorism. [Docs. 29 and 31, ¶2]. *See also Blais*, 459 F. Supp. 2d at 47. In this case, the terrorist acts occurred from 2004 to 2013. *Exs. 1, 5, 7, 8, 9, 12, 14, 15, 16, 18, 19, 22, 24, 26, 28, 31, 33, 34, 35, 38, 39, 40, 41, 42, 44, 45, 48, 50, 52, 53, 57, 58, 59, 60, 62, 64, 68, 69, 70, 76, 81, 84, 86, 87, 92, 93, 94, 96, 103, 104, 106, 108, 111, 115, 116, 118, 120, 121, 122, 125, 127, 130, 133, 135, 137, 138, 141, 144, 148, 149, 150, 152, 153, 158, 160, 162, 164, 169, 170, 171, 172, 173, 177, 178.* As a result, Defendant was a state sponsor of terrorism at the time of the acts. 28 U.S.C. § 1605A(a)(2)(A)(i)(I).

> **2. Plaintiffs Were Nationals of the United States and Either (1) Members of the Armed Forces; (2) Employees of the Government of the United States, or (3) an Individual Performing a Contract Awarded by the United States Government, Acting Within the Scope of the Employee's Employment at the Time of the Terrorist Acts.**

At the time of the terrorist attacks, all the Plaintiffs were nationals and were either members of the armed forces of the United States, employees of the government of the United States, or individuals performing a contract awarded by the United States government, acting within the scope of the employee's employment at the time of the attack. *Exs. 1, 5, 7, 8, 9, 12, 14, 15, 16, 18, 19, 22, 24, 26, 28, 31, 33, 34, 35, 38, 39, 40, 41, 42, 44, 45, 48, 50, 52, 53, 57, 58, 59, 60, 62, 64, 68, 69, 70, 76, 81, 84, 86, 87, 92, 93, 94, 96, 103, 104, 106, 108, 111, 115, 116, 118, 120, 121, 122, 125, 127, 130, 133, 135, 137, 138, 141, 144, 148, 149, 150, 152, 153, 158, 160, 162, 164, 169, 170, 171, 172, 173, 177, 178.* In addition to their sworn testimony, Plaintiffs who were members of the armed forces have submitted their DD Form 214 to confirm their service at the time of the terrorist attacks. *Id.* As a result, all Plaintiffs meet the requirements under 28 U.S.C. § 1605A(a)(2)(A)(ii)(I-III).

> **3. None of the Terrorist Acts Occurred Within Defendant's Boundaries.**

The terrorist attacks at issue occurred in Iraq and Afghanistan. [Docs. 29 and 31 ¶¶ 67-

1497]; *Exs. 1, 5, 7, 8, 9, 12, 14, 15, 16, 18, 19, 22, 24, 26, 28, 31, 33, 34, 35, 38, 39, 40, 41, 42, 44, 45, 48, 50, 52, 53, 57, 58, 59, 60, 62, 64, 68, 69, 70, 76, 81, 84, 86, 87, 92, 93, 94, 96, 103, 104, 106, 108, 111, 115, 116, 118, 120, 121, 122, 125, 127, 130, 133, 135, 137, 138, 141, 144, 148, 149, 150, 152, 153, 158, 160, 162, 164, 169, 170, 171, 172, 173, 177, 178.* None of the terrorist attacks occurred in Iran. *Id.* As a result, the requirement of "afford[ing] the foreign state a reasonable opportunity to arbitrate the claim" before bringing this action doesn't apply. 28 U.S.C. § 1605A(a)(2)(A)(iii). As a result, this Court may properly exercise subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1330(a).

### B. Material Support for an Extrajudicial Killing.

Plaintiffs' claims are also predicated on Defendant's "material support or resources" for an extrajudicial killing. 28 U.S.C. § 1605A(a)(l). An "extrajudicial killing" is a killing, that is deliberated and is not authorized by a previous judgment pronounced by a regularly constituted court or lawfully carried out under authority of a foreign nation. 28 U.S.C. § 1605A(h)(7) (citing Torture Victim Protection Act of 1991 (28 U.S.C. § 1350 section 3(a)); *Owens*, 864 F.3d at 770.

At this time, an extrajudicial killing requires a death. *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053 (D.C. Cir. 2024). The death of a Plaintiff, however, is not necessary. *Kenny v. Islamic Republic of Iran*, 2024 WL 4297682 at *5 (D.D.C. Sept. 26, 2024) ("Any terrorist attack that results in death of innocent victims, even if the Plaintiffs themselves were merely injured, can serve as the basis for recovery under § 1605A."); *Pautsch v. Islamic Republic of Iran*, 2024 WL 3566132 at *3 (D.D.C. July 29, 2024) ("Since at least one person died in the terrorist attacks that caused the injuries of seven of the eight survivors…, they accordingly maintain that this Court can exercise jurisdiction over their claims."). In another case, the Court granted liability against Iran for one Plaintiff who sustained injuries during an extended attack where two Afghani soldiers –

members of the Coalition Force were killed during the attack. *Cabrera v. Islamic Republic of Iran*, 2024 WL 3225942 (D.D.C. June 28, 2024). "Because the Syndicate intended to kill Coalition Force members, whether or not the member was American, the September 16, 2010 attack did not 'fail[ ] to kill any of its intended victims,' but rather successfully resulted in an extrajudicial killing. SPC Hempker's injuries were thus 'caused by an act of extrajudicial killing.'" *Id.* at *7 quoting, *Borochov*, 94 F.4th at 1056. The *Cabrera* court also found liability for that same extended attack where a US Soldier was injured in the same attack three hours after the two Afghan soldiers were killed. *Cabrera v. Islamic Republic of Iran,* 2024 WL 4345784 (D.D.C. September 30, 2024). "Given this evidence, the Court agrees that [Plaintiff's] injuries stemmed from the same attack in which the Syndicate committed an extrajudicial killing." *Id.* at *4.

The death of the insurgent by way of suicide bombing is likewise an extrajudicial killing. FSIA borrows from the Torture Victim Protection Act of 1991 to define "extrajudicial killing" as "a killing, that is *deliberated*…." (emphasis added). 28 U.S.C. § 1605A(h)(7) (citing Torture Victim Protection Act of 1991 (28 U.S.C. § 1350 section 3(a)). "'[D]eliberated' means 'carefully considered,'…or '[i]ntentional; premeditated; fully considered." *Hansen v. Islamic Republic of Iran*, 2024 WL 3026517 *4 (D.D.C. June 17, 2024). Furthermore, a "'deliberated' killing is simply one undertaken with careful consideration, not on a sudden impulse." *Lee*, 518 F. Supp. 3d at 492. In other words, an extrajudicial killing requires a killing with intent. Consequently, an insurgent who deliberately intends to kill his/her victims by suicide bombing, intends to kill himself/herself. When "a foreign state intentionally compels a suicide, the decedent's death might qualify as an 'extrajudicial killing.'" *Hansen*, 2024 WL 3026517 *4 (D.D.C. June 17, 2024).  Here, Defendant adopted suicide bombings as part of its training and tactics.  *Ex. 174.*

Based upon the evidence submitted, the attacks at issue all involved extrajudicial killings.

The evidence confirms that each attack involved deliberate and strategic killings or alternatively to take hostages. *Ex. 174, ¶¶ 194-529 and 535-623.* Each attack involved the death of members of the U.S. military, contractors, coalition forces, civilians, and/or suicide bombers. *Exs. 1, 5, 7, 8, 9, 12, 14, 15, 16, 18, 19, 22, 24, 26, 28, 31, 33, 34, 35, 38, 39, 40, 41, 42, 44, 45, 48, 50, 52, 53, 57, 58, 59, 60, 62, 64, 68, 69, 70, 76, 81, 84, 86, 87, 92, 93, 94, 96, 103, 104, 106, 108, 111, 115, 116, 118, 120, 121, 122, 125, 127, 130, 133, 135, 137, 138, 141, 144, 148, 149, 150, 152, 153, 158, 160, 162, 164, 169, 170, 171, 172, 173, 177, 178.* There is simply no evidence to suggest that any of these attacks were "on a sudden impulse;" rather, they were all part of a terror campaign to kill or alternatively take hostage. Finally, there is no evidence that the killings were authorized by a judgment of a regularly constituted court or were lawfully carried out under the authority of a foreign nation.

The FSIA next requires that an official or agent of Iran provided "material support or resources" to the people who carried out the attacks at issue. 28 U.S.C. § 1605A(a)(1). The FSIA adopted the following definition of "material support or resources":

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel ..., and transportation, except medicine or religious materials[.]

28 U.S.C. § 1605A(h)(3) (adopting the definition of 18 U.S.C. § 2339A(b)(1)). Here, the evidence contains numerous examples of Iran funneling material support through the IRGC and Qods Force to terrorist proxies in Iraq and Afghanistan. The Qods Force "is at least an agent of Iran, if not a part of the government such that individuals working for [the Qods Force] would be officials or employees of Iran." *Karcher*, 396 F. Supp. 3d at 55. This material support manifested as millions of dollars of funding, training, and advanced weaponry. *Lee*, 518 F. Supp. 3d at 493.

Plaintiffs must also show that Defendant's material support or resources "caused" their personal injuries. 28 U.S.C. § 1605A(c). That requires "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Owens*, 864 F.3d at 794. But the provision of material support does not need to "go directly for the specific act." *Id*. at 799. "[D]istrict courts need only determine whether a foreign government's material support was a proximate cause of a completed killing." *Borochov*, 94 F.4th at 1066. Because material support "is difficult to trace" and "is fungible," courts do not require either specific intent or direct traceability to establish the liability of material supporters of terrorism. *Id*.; *See also Boim v. Holy Land Foundation for Relief and Devel.*, 549 F.3d 685, 698 (7th Cir. 2008) (approving liability even when donations were made for non-terrorism purposes). "[W]here a foreign state routinely funnels money to a terrorist organization, a plaintiff need not establish that the material support or resources provided by a foreign state for a terrorist act contributed directly to the act from which the claim arises to satisfy his obligation under the [FSIA]." *Valencia v. Islamic Republic of Iran*, 774 F.Supp.2d 1, 12 (D.D.C. 2010) (internal quotation marks and citation omitted); *Cohen,* 238 F. Supp. 3d 71, 81 (D.D.C. 2017); *Murphy,* 740 F.Supp. 2d at 71; *see also*, *Haim v. Islamic Republic of Iran*, 784 F. Supp. 2d 1, 11 (D.D.C. 2011). Instead, there need only be evidence that Defendant's actions were a **"substantial factor in the sequence of events that led to the plaintiff[s'] injur[ies]," and that those injuries were "reasonably foreseeable or anticipated as a natural consequence of the defendant's conduct."** *Owens*, 864 F.3d at 794 (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013) (emphasis added)).

### 1.   Plaintiffs' Expert Analysis.

Plaintiffs' liability expert, Michael Pregent, confirms that Defendant's material support or resources resulted in the attacks at issue. *Ex. 174.* Pregent undertook a detailed analysis of each

attack, attributed each attack to a particular terrorist group(s), and submitted proof—in addition to the judicially-noticed factual findings—of how Defendant, through material support or resources, supported those particular terrorist group(s).  *Id.*

When reviewing the subject attacks, as he did in reviewing the attacks in *Roth v. Islamic Republic of Iran,* 651 F. Supp. 3d 65 (D.D.C. Jan. 17, 2023) and *Brown v. Islamic Republic of Iran,* 687 F. Supp.3d 21 (D.D.C. July 27, 2023), along with other cases, Pregent applied an even more stringent attribution methodology and analysis than he did while in combat advising the U.S. military and General Petraeus.  In *Roth,* Mr. Pregent testified with respect to the methodology as follows:

> **Q.** In this case [*Roth*], had, say, General Petraeus came to you and based on the information that you had available to you, would you have followed the same methodology in terms of analyzing the attributions of each specific attack that you did in this particular case?
>
> **A.** When I was in Iraq in 2007 with General Petraeus, we would look at the location of the attack and assign an attribution. This attack happened here. It's this group. It would be that easy, whether it was an EFP or whether it was an IED or a sniper attack.  It happened in this area, and it coincided with an operation -- an ongoing military operation to negate that specific threat. So it would be that simple.

*See Ex. 504, Tr. at 158:8-20.*[3]

While General Petraeus principally relied on the geographical location of an attack for the subject attacks, here, Mr. Pregent went even further by reviewing and analyzing additional information, including, but not limited to, other similar incidents in the area, weapons caches in the area, incident reports, declarations, and DD-214.  *See Ex. 504, Tr. at 13-16.*  For each of the subject attacks in this matter, Mr. Pregent opined that either Al Qaeda, Shia and Sunni terrorist groups or the Taliban carried out the attack and that Iran provided material support, either directly

---

[3] The Court in *Brown v. Islamic Republic of Iran,* 687 F. Supp.3d 21 (D.D.C. July 27, 2023) relied on Mr. Pregent's testimony regarding his attribution methodology in *Roth* in finding liability against Iran in the *Brown* matter. Ex. 508, Tr. at 4:7-5:1.

or indirectly.  *See Ex. 504, Tr. at 24:15-18, 27:24-25, 28:1-8, 163:6-24.*  Therefore, the evidence and methodology that Mr. Pregent relied on to base his conclusions, which are consistent with his prior testimony in *Roth*, are admissible and uncontroverted to establish that Iran is liable for the subject attacks.  And in sum, Plaintiffs have provided enough evidence to satisfy their burden of production that specific terrorist groups, supported by Iran, committed these specific Attacks.

## II.    THIS COURT HAS PERSONAL JURISDICTION OVER IRAN

"Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction ... where service has been made under section 1608 …."  28 U.S.C. § 1330(b).   While section 1608 details four possible methods of serving a foreign state, Defendant has "neither made a special arrangement for service with the plaintiffs, nor entered into any international convention governing service."  *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78 (D.D.C. 2017); [Docs. 39, 41].  Consequently, there were two remaining options to serve Defendant here.

First, a party shall serve a foreign state by "sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned …."  28 U.S.C. § 1608(a)(3).  If service cannot be made within 30 days, then a party shall serve a foreign state by requesting the Clerk of the Court to send the aforementioned package to "the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted."  28 U.S.C. § 1608(a)(4).

Here, Plaintiffs sent the necessary papers to Defendant via "mail requiring a signed receipt." [Doc. 17-19]. That complied with 28 U.S.C. § 1608(a)(3). Next, Plaintiffs transmitted the necessary papers to Defendant via diplomatic channels that complied with 28 U.S.C. §1608(a)(4). [Doc. 32, 34-35]. Because service on Defendant was proper, personal jurisdiction exists here.

### III.    IRAN IS LIABLE UNDER FSIA § 1605A(c) FOR ASSAULT, BATTERY, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Defendant is responsible for the consequences of providing support and resources to the terrorists who conducted the attacks. 28 U.S.C. § 1605A(a)(1). In addition, Defendant "shall be vicariously liable for the acts of its officials, employees, or agents." 28 U.S.C. § 1605A(c). Here, Plaintiffs submitted evidence that Defendant primarily acted through its Qods Force, its Ministry of Intelligence and Security ("MOIS"), and Lebanese Hezbollah to provide support and resources to the particular terrorists who injured Plaintiffs. *Ex. 174 (and corresponding attachments.)* "There is almost total 'overlap between the elements of § 1605A(c)'s cause of action and the terrorism exception to foreign sovereign immunity,' and a plaintiff that offers proof sufficient to establish a waiver of sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of law." *Salzman*, 2019 WL 4673761, at *15 (quoting *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017)); *see also Karcher*, 396 F. Supp. 3d at 59; *Allan v. Islamic Republic of Iran*, No. 17-cv-338, 2019 WL 2185037, at *6 (D.D.C. May 21, 2019); *Fritz*, 320 F. Supp. 3d at 86–87; *Lee*, 518 F. Supp. 3d at 495. As a result, there is more than satisfactory evidence to establish Defendant's liability.

#### a. Applicable Standard

"[T]he question whether a statute withdraws sovereign immunity is 'analytically distinct' from whether a plaintiff has a cause of action" for which the defendant may be found liable.

*Owens*, 864 F.3d at 807 (quoting *FDIC v. Meyer,* 510 U.S. 471, 484 (1994)). Each of the Plaintiffs in this case sues Iran under the federal private right of action Congress provided to eligible individuals under FSIA § 1605A(c). That section provides that a state sponsor of terrorism is liable, *inter alia*, "to a national of the United States," and all the Plaintiffs have proved they were U.S. citizens at the time of the attacks.

In addition, FSIA § 1605A(c) requires Plaintiffs "to prove a theory of liability" that justifies holding Iran liable for their injuries. *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 53-54 (D.D.C. 2012). Courts define the theory of "personal injury" needed to prevail on a §1605A(c) claim by looking to "well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions to define the elements and scope of these theories of recovery." *Oveissi, supra at 54; see also Fraenkel v. Islamic Repub. of Iran, et al.,* 892 F.3d 348, 353 (D.C. Cir. 2018).

As discussed, in this motion, Plaintiffs have presented overwhelming evidence that Iran provided material support for the attacks that caused Plaintiffs' harm. These terrorist acts include conduct that satisfies all the elements of the Plaintiffs' tort claims for assault, battery, and intentional infliction of emotional distress, according to the elements articulated by the Restatement (Second) of Torts. Am. Compl. ¶¶ 34-39. Family Member Plaintiffs bring claims for intentional infliction of emotional distress seeking solatium damages. All the Plaintiffs' evidentiary declarations attached to this Motion, make out the elements of the applicable tort theories that correspond to their claims, based on the specific facts of their unique experiences. *See Exs. 1, 5, 7, 8, 9, 12, 14, 15, 16, 18, 19, 22, 24, 26, 28, 31, 33, 34, 35, 38, 39, 40, 41, 42, 44, 45, 48, 50, 52, 53, 57, 58, 59, 60, 62, 64, 68, 69, 70, 76, 81, 84, 86, 87, 92, 93, 94, 96, 103, 104, 106,*

*108, 111, 115, 116, 118, 120, 121, 122, 125, 127, 130, 133, 135, 137, 138, 141, 144, 148, 149, 150, 152, 153, 158, 160, 162, 164, 169, 170, 171, 172, 173, 177, 178.*

### b. Plaintiffs Have Established Valid Theories of Recovery.

#### 1. The Plaintiffs Have Established Their Assault Claims.

"According to the Restatement (Second) of Torts, a defendant has committed an assault if 'he acts intending to cause a harmful or offensive contact with [a] person, or an imminent apprehension of such a contact' and the person is 'thereby put in such imminent apprehension." *Sutherland*, 151 F. Supp. 2d at 48 (quoting Restatement (Second) of Torts § 21(1) ("Harmful contact is that which results in 'any physical impairment of the condition of another's body, or physical pain or illness.")); Restatement (Second) of Torts § 15. On the other hand, "[a] bodily contact is offensive if it offends a reasonable sense of personal dignity." *See Id.* § 19.

Here, Iran is liable for assaulting the Plaintiffs who, as established by their declarations, were physically harmed and terrified by the terrorists' actions. The terrorists clearly intended to inflict that harm, and fear of harm, by using weaponry supplied and/or funded by Iran to target the soldiers, aiming weapons at the soldiers with the intent of killing and/or taking them hostage. *See generally, Exs. 1, 5, 7, 8, 9, 12, 14, 15, 16, 18, 19, 22, 24, 26, 28, 31, 33, 34, 35, 38, 39, 40, 41, 42, 44, 45, 48, 50, 52, 53, 57, 58, 59, 60, 62, 64, 68, 69, 70, 76, 81, 84, 86, 87, 92, 93, 94, 96, 103, 104, 106, 108, 111, 115, 116, 118, 120, 121, 122, 125, 127, 130, 133, 135, 137, 138, 141, 144, 148, 149, 150, 152, 153, 158, 160, 162, 164, 169, 170, 171, 172, 173, 177, 178.* This is further evident from the fact that there were several casualties because of these attacks.

Accordingly, Iran, as a provider of material support for these heinous acts, is liable for the pain and suffering caused by the assaults carried out by its terrorist agents in service of Iran's official foreign policy. *See Valore*, 700 F. Supp. 2d at 76 ("It is clear that defendants acted with

intent to cause harmful contact and the immediate apprehension thereof: *acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm.* Accepting these plaintiffs' uncontroverted assertions that they did, in fact, fear such harm because of the attack, the Court concludes that defendants are liable for assault.") (emphasis added); *Sutherland*, 151 F. Supp. 2d at 48-9.

## 2. The Plaintiffs Have Established Their Battery Claims.

Liability for battery arises when a defendant "acted 'intending to cause a harmful or offensive contact with … or an imminent apprehension of such a contact' by, those attacked and [ ] 'a harmful contact with' those attacked 'directly or indirectly result[ed].'" *Valore*, 700 F. Supp. 2d at 77 (alteration in original) (quoting Restatement (Second) of Torts § 13); *see also* Restatement (Second) of Torts § 18 (covering offensive contact that actually occurs). Again, "[h]armful contact is that which results in any physical impairment of the condition of another's body, or physical pain or illness." *Id.* (internal quotation marks omitted). Moreover, "[a] bodily contact is offensive if it offends a reasonable sense of personal dignity." Restatement (Second) of Torts § 19.

Here, Plaintiffs were shot, thrown, and injured, *inter alia*. *Exs. 1, 5, 7, 8, 9, 12, 14, 15, 16, 18, 19, 22, 24, 26, 28, 31, 33, 34, 35, 38, 39, 40, 41, 42, 44, 45, 48, 50, 52, 53, 57, 58, 59, 60, 62, 64, 68, 69, 70, 76, 81, 84, 86, 87, 92, 93, 94, 96, 103, 104, 106, 108, 111, 115, 116, 118, 120, 121, 122, 125, 127, 130, 133, 135, 137, 138, 141, 144, 148, 149, 150, 152, 153, 158, 160, 162, 164, 169, 170, 171, 172, 173, 177, 178.* The terrorists additionally destroyed soldiers' vehicles, barracks, and/or hiding places with both explosives and various weaponry. *Id.*: *see also Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 342 (D.D.C. 2016) ("'Harmful contact' … can be caused by contacting either another's person directly or an instrumentality that acts as an extension of the individual's person, *such as a car or airplane in which the individual is traveling* ....") (emphasis

added).  The terrorists killed persons directly next to or in contact with the Soldiers and Plaintiffs. (*See* Attacks 1, 5, 6, 13).  Thus, Iran, as the provider of material support for these intentional acts of physical harm, is liable for the pain and suffering caused by these acts of battery.  *Sutherland*, 151 F. Supp. 2d at 48; *Valore*, 700 F. Supp. 2d at 77.

### 3. The Plaintiffs Have Established Their Emotional Distress Claims.

"One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (citing Restatement (Second) of Torts § 46(1)). "***All acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror, in their targeted audience***: The more extreme and outrageous, the greater the resulting distress." *Stethem,* 201 F. Supp. 2d at 89 (D.D.C. 2002) (emphasis added); *see also* Restatement (Second) of Torts § 46, Comment (j) ("***Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that distress has existed.***") (emphasis added). Intentional infliction of emotional distress occurred if Defendant, "by extreme and outrageous conduct [,] intentionally or recklessly cause[d] severe emotional distress to" Plaintiffs.  *Akins v. Islamic Republic of Iran, 332 F. Supp. 3d 1, 35 (D.D.C. 2018)* (quoting Restatement (Second) of Torts § 46(1)).

Here, the Plaintiffs' declarations describe their various feelings of tremendous terror, fear, helplessness, dread, and severe anxiety wreaked on them because of being threatened and attacked. *See Exs. 1, 5, 7, 8, 9, 12, 14, 15, 16, 18, 19, 22, 24, 26, 28, 31, 33, 34, 35, 38, 39, 40, 41, 42, 44, 45, 48, 50, 52, 53, 57, 58, 59, 60, 62, 64, 68, 69, 70, 76, 81, 84, 86, 87, 92, 93, 94, 96, 103, 104,*

*106, 108, 111, 115, 116, 118, 120, 121, 122, 125, 127, 130, 133, 135, 137, 138, 141, 144, 148, 149, 150, 152, 153, 158, 160, 162, 164, 169, 170, 171, 172, 173, 177, 178.* The Plaintiffs' declarations describe the emotional suffering they have endured as a result of witnessing persons being killed directly next to or in contact with them during these attacks. *Id.* These deaths have included their colleagues, fellow soldiers, and innocent bystanders. *Id.* As described by each Plaintiff, each experienced severe distress while being deployed, attacked, and after returning home. *Id.* Thus, Iran, as the provider of material support to the terrorists, is liable for the pain and suffering caused by their acts of intentional infliction of emotional distress *Stethem,* 201 F. Supp. 2d at 87 (D.D.C. 2002); *see also Sutherland*, 151 F. Supp. 2d at 49-51 (Iran was liable for intentional infliction of emotional distress suffered by plaintiff because it funded and controlled Hezbollah.).

The Family Member Plaintiffs also have established their emotional distress claims. "Courts have uniformly held that a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families." *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 (D.D.C. 2005)*; see also Stethem,* 201 F. Supp. 2d at 89 (D.D.C. 2002); *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 9 (D.D.C. 2000) (the "'intent to create maximum emotional impact,' particularly on third parties, is terrorism's *raison d'être*").

Accordingly, even where a family member was not physically present during a terrorist attack, they may recover for claims of intentional infliction of emotional distress in FSIA terrorism cases. *Heiser*, 659 F. Supp. 2d at 27; *Valore*, 700 F. Supp. 2d at 80 ("One therefore need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result."); *Republic of Sudan v. Owens*, 194 A.3d 38, 45 (D.C. 2018) ("We see little need to enforce the presence requirement in IIED cases where the jurisdictional elements of §

1605A are satisfied and the plaintiff's severe distress arises from a terrorist attack that killed or injured a member of his or her immediate family."). Only immediate family members including one's spouse, parents, siblings, and children (or in rare cases other individuals residing in the victim's household who in other important respects were like a spouse, parent, sibling, or child to the victim) may recover. *Heiser*, 659 F. Supp. 2d at 28-29. Here, the Family Member Plaintiffs' declarations establish that they all qualify as immediate family members.

Those declarations also establish that all the Family Member Plaintiffs suffered from severe emotional distress because of the terrorists' intentional and reckless acts of terrorism. All Family Member Plaintiffs were forced to live nationally televised terrorists' activity in Iraq and Afghanistan, all the while fearing for their loved ones' lives. Some Family Member Plaintiffs had to endure this horror during the entire time that their loved ones were in unknown locations in Iraq and Afghanistan, while the injured Plaintiffs received medical treatment abroad far from their homes. *Exs. 1, 5, 7, 8, 9, 12, 14, 15, 16, 18, 19, 22, 24, 26, 28, 31, 33, 34, 35, 38, 39, 40, 41, 42, 44, 45, 48, 50, 52, 53, 57, 58, 59, 60, 62, 64, 68, 69, 70, 76, 81, 84, 86, 87, 92, 93, 94, 96, 103, 104, 106, 108, 111, 115, 116, 118, 120, 121, 122, 125, 127, 130, 133, 135, 137, 138, 141, 144, 148, 149, 150, 152, 153, 158, 160, 162, 164, 169, 170, 171, 172, 173, 177, 178.* These events resulted in severe emotional distress for all the Family Member Plaintiffs that unquestionably rises to an actionable level under the Restatement. *Stethem,* 201 F. Supp. 2d at 92 (D.D.C. 2002); *Sutherland*, 151 F. Supp. 2d at 43, 50-52 (acknowledging family members' anguished feelings, both during and after their loved one's release, and holding Iran liable for damages suffered for intentional infliction of emotional distress).

**CONCLUSION**

WHEREFORE, Plaintiffs request that this Court issue an Order GRANTING their Motion for Default Judgment against Iran as to liability and directing Plaintiffs on how to proceed regarding the presentation of evidence as to monetary damages.

DATED: January 24, 2025.

Respectfully submitted,

By: /s/ Bradley M. Lakin
    Bradley M. Lakin DC Bar No. AZ0019
    bradl@championsfortheinjured.com
    SL CHAPMAN, LLC
    10805 Sunset Office Drive, Suite 300
    St. Louis, MO 63127
    314.588.9300
    314.588.9302 fax