**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MICHAEL A. MORRIS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>ISLAMIC REPUBLIC OF IRAN,<br><br>*Defendant*. | Civil Action No. 23 - 1941 (LLA) |

**REDACTED MEMORANDUM OPINION AND ORDER**

This case arises out of ninety-two terrorist attacks on U.S. servicemembers in Iraq and Afghanistan from 2004 to 2013. ECF No. 29. Plaintiffs are U.S. servicemembers and military contractors who were injured in these attacks, their immediate family members, and their estates. They sue the Islamic Republic of Iran under the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A(c), seeking damages for their injuries from the attacks. After Iran failed to appear, the Clerk of Court entered a default. ECF No. 41. Plaintiffs now seek a default judgment on liability against Iran. ECF No. 55. For the reasons explained below, the court grants Plaintiffs' motion in part and denies it in part.

## I. BACKGROUND

More than 250 Plaintiffs filed this action in July 2023. ECF No. 1. They filed an amended complaint the following month, ECF No. 14, and the case was directly reassigned to the undersigned in December 2023, Dec. 15, 2023 Docket Entry. Plaintiffs filed a second amended complaint in April 2024. ECF No. 29. They effected service on Iran in October 2024, pursuant

to the FSIA. ECF No. 39; *see* 28 U.S.C. § 1608(a)(4). After Iran failed to enter an appearance or otherwise defend against this action, the Clerk of Court entered a default in December 2024. ECF No. 41. The following month, Plaintiffs filed a motion for default judgment regarding Iran's liability, ECF No. 45, which they subsequently supplemented, ECF No. 51.

In July 2025, another court in this district decided *Sibley v. Islamic Republic of Iran*, No. 23-CV-600, 2025 WL 1928036 (D.D.C. July 14, 2025), denying a default judgment motion against Iran largely because the plaintiffs' expert had failed to establish that Iran's provision of material support proximately caused the attacks at issue, *id.* at *4-15. Because Plaintiffs here rely on the same expert, former U.S. intelligence officer Michael Pregent, *see* ECF No. 46-83, the court held a hearing to address the *Sibley* decision, *see* July 29, 2025 Minute Order; Aug. 4, 2025 Minute Entry. This court identified in Mr. Pregent's report many of the same defects described in *Sibley*. *See* ECF No. 53, at 1. Accordingly, the court concluded that it required further information before it could render a decision and denied Plaintiffs' motion for default judgment without prejudice. *Id.* at 2. In October 2025, Plaintiffs filed a renewed motion for default judgment regarding liability. ECF No. 55.

In December 2025, 112 Plaintiffs voluntarily dismissed their claims without prejudice "to conduct further investigation into extrajudicial killing(s) that occurred in their subject attack(s)." ECF No. 59, at 1; *see* Jan. 6, 2026 Minute Order; *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1060 (D.C. Cir. 2024) (holding that an "extrajudicial killing" under the FSIA must result in a death other than the perpetrator of the attack). The court held an evidentiary hearing on April 9, 2026, in which Mr. Pregent testified about his methodology and the use of signature Iranian tactics in certain attacks. *See* Apr. 9, 2026 Minute Entry; ECF No. 63. The court directed Plaintiffs to file a supplemental presentation regarding the remaining attacks that were not discussed at the

hearing. *See* ECF No. 63, at 116:21-119:24. Plaintiffs filed a supplemental slideshow and other exhibits on April 14, 2026. *See* ECF Nos. 60, 60-1 to 60-9.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 55 provides for default judgments to "safeguard plaintiffs 'when the adversary process has been halted because of an essentially unresponsive party,'" and to protect "the diligent party . . . lest he be faced with interminable delay and continued uncertainty as to his rights." *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005) (quoting *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980)). A court may therefore "enter default judgment [under Rule 55(b)(2)] when a defendant fails to defend its case appropriately or otherwise engages in dilatory tactics." *Peak v. District of Columbia*, 236 F.R.D. 13, 15 (D.D.C. 2006); *see Keegel v. Key W. & Caribbean Trading Co.*, 627 F.2d 372, 375 n.5 (D.C. Cir. 1980).

A plaintiff must complete two steps to obtain a default judgment. *See* Fed. R. Civ. P. 55. First, the plaintiff must ask the Clerk of the Court to enter default based on the defendant's failure "to plead or otherwise defend" itself in response to the complaint. *Id.* R. 55(a). Second, after the Clerk of Court has entered default, the plaintiff must file a motion for default judgment and provide notice of the same to the defaulting party. *Id.* R. 55(b)(2). "Entry of a default judgment is not, however, 'automatic.'" *Sibley*, 2025 WL 1928036, at *2 (quoting *Mwani*, 417 F.3d at 6). The court has an "affirmative obligation" to determine whether it has subject-matter jurisdiction over the matter. *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996). The court must also "satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant." *Mwani*, 417 F.3d at 6.

A party seeking default judgment under the FSIA must "establish[] his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). This requirement "provides

foreign sovereigns a special protection akin to that assured the federal government by [Rule 55(e)]." *Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014). "[T]he FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014). Courts generally must draw their "findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence." *Id.* at 1049 (quoting *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 21 n.1 (D.D.C. 2001)). Courts may accept "[u]ncontroverted factual allegations that are supported by affidavits" as true, *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015), and they "have the authority—indeed, . . . the obligation—to 'adjust evidentiary requirements to differing situations,'" *Han Kim*, 774 F.3d at 1048 (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)).

## III. FINDINGS OF FACT

Plaintiffs allege that each of the terrorist attacks at issue was carried out by terrorist groups—al-Qaeda in Iraq ("AQI"), Shia terrorist groups, or the Taliban—that received material support from Iran. *See* ECF No. 55-1, at 15-69, 75-77; *see generally* ECF No. 29. They support their motion for default judgment with declarations, personal documents, and Mr. Pregent's expert testimony. ECF No. 55-1, at 76-77, 80; *see, e.g.*, ECF No. 55-15 (Mr. Pregent's amended report); ECF No. 60 (amended exhibit list); ECF No. 63 (April 9, 2026 hearing transcript). Plaintiffs also request that the court take judicial notice of "prior evidentiary findings regarding Iran's material support to various terrorist groups through training, funding, and weapons" in more than a dozen other FSIA cases, ECF No. 55-1, at 6-7, as well as PowerPoint presentations Mr. Pregent used in *Roth v. Islamic Republic of Iran*, 651 F. Supp. 3d 65 (D.D.C. 2023), and *Brown v. Islamic Republic*

*of Iran*, 687 F. Supp. 3d 21 (D.D.C. 2023), ECF No. 55-1, at 7; *see* ECF Nos. 46-91, 46-94. The court begins by addressing Plaintiffs' evidentiary requests before stating its factual findings.

### A. Evidentiary Issues

#### 1. Mr. Pregent

At the April 9, 2026 evidentiary hearing, the court recognized Mr. Pregent as an expert in military intelligence and counterterrorism under Federal Rule of Evidence 702. ECF No. 63, at 23:04-23:17. Mr. Pregent has testified and submitted reports about Iran's support for terrorism in at least twelve other FSIA cases in this district. ECF No. 55-15 ¶ 19; *see* ECF No. 63, at 23:10-23:15. The court will therefore base its findings of fact on Mr. Pregent's expert testimony.

#### 2. Judicial notice

The court may "judicially notice a fact that is not subject to reasonable dispute" if it "is generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The court "must take judicial notice if a party requests it and the court is supplied with the necessary information," but the court may also "take judicial notice on its own." *Id.* R. 201(c). "Because of the multiplicity of FSIA-related litigation in this jurisdiction, [c]ourts in this District . . . frequently take[] judicial notice of earlier, related proceedings." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010); *see Baker v. Islamic Republic of Iran*, No. 22-CV-2765, 2025 WL 2480075, at *5 (D.D.C. Aug. 28, 2025) ("Courts in FSIA cases routinely use Rule 201 to take judicial notice of factual evidence developed in other proceedings 'involving the same conduct by the same defendants.'" (quoting *Akins v. Islamic Republic of Iran*,

332 F. Supp. 3d 1, 11 (D.D.C. 2018))). While judicial notice may be taken of evidence submitted in other cases, "courts typically cannot take judicial notice of prior proceedings 'for the purpose of accepting the truth of the earlier court's findings and conclusions.'" *Sibley*, 2025 WL 1928036, at *15 (quoting *Rimkus*, 750 F. Supp. 2d at 171).

Many of the cases Plaintiffs request that the court judicially notice involve the same issues of fact present here—namely, Iran's provision of material support to AQI, Shia terrorist groups, and the Taliban during the same time period. *See, e.g.*, *Roth*, 651 F. Supp. 3d at 72, 77-86 (addressing attacks that occurred in Iraq and Afghanistan between 2003 and 2013 attributable to AQI, Shia terrorist groups, and the Taliban); *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48 (D.D.C. 2018) (concerning 2006 and 2007 attacks in Iraq committed by Shia militias). The court accordingly concludes that it is both "efficient and sufficiently protective of [Iran's] interests," *Baker*, 2025 WL 2480075, at *6 (quoting *Akins*, 332 F. Supp. 3d at 11), to take judicial notice of the evidence presented in the following cases: *Fritz*, 320 F. Supp. 3d 48; *Roth*, 651 F. Supp. 3d 65; *Brown*, 687 F. Supp. 3d 21; *Cabrera v. Islamic Republic of Iran* ("*Cabrera I*"), No. 19-CV-3835, 2022 WL 2817730 (D.D.C. July 19, 2022), *aff'd*, 2023 WL 1975091 (D.D.C. Jan. 27, 2023); *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40 (D.D.C. 2021); *Stearns v. Islamic Republic of Iran*, 633 F. Supp. 3d 284 (D.D.C. 2022); *Fissler v. Islamic Republic of Iran* ("*Fissler I*"), No. 18-CV-3122, 2022 WL 4464873 (D.D.C. Sep. 26, 2022), *amended by Fissler v. Islamic Republic of Iran* ("*Fissler II*"), 2026 WL 1162455 (D.D.C. Apr. 29, 2026); *Karcher v. Islamic Republic of Iran* ("*Karcher I*"), 396 F. Supp. 3d 12 (D.D.C. 2019); *Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33 (D.D.C. 2019); *Lee v. Islamic Republic of Iran* ("*Lee I*"), 518 F. Supp. 3d 475 (D.D.C. 2021); *Estate of Fishbeck v. Islamic Republic of Iran* ("*Fishbeck I*"), No. 18-CV-2248, 2023 WL 7448770 (D.D.C. Aug. 18, 2023); *Estate of Fishbeck v. Islamic*

*Republic of Iran* ("*Fishbeck II*"), No. 18-CV-2248, 2024 WL 1508894 (D.D.C. Feb. 23, 2024); *Estate of Fishbeck v. Islamic Republic of Iran* ("*Fishbeck III*"), No. 18-CV-2248, 2025 WL 2410090 (D.D.C. Aug. 20, 2025). The court will nevertheless "reach [its] own independent findings of fact." *Thole v. Islamic Republic of Iran*, No. 23-CV-793, 2024 WL 2208208, at *2 (D.D.C. May 16, 2024) (quoting *Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68, 75 (D.D.C. 2010)). The court also takes judicial notice of official public government websites. *See Owlfeather-Gorbey v. Avery*, 119 F.4th 78, 85 (D.C. Cir. 2024). Finally, the court declines to take judicial notice of Mr. Pregent's PowerPoint presentations used in *Roth* and *Brown*, given that their attack-specific information is unrelated to this suit and their remaining content largely overlaps with the materials Mr. Pregent has submitted in this case. *Compare* ECF Nos. 46-91, *and* 46-94, *with* ECF Nos. 60-3, *and* 60-9.

### B. Iran's Support for Terrorism

Based on the declarations, expert testimony, and exhibits submitted by Plaintiffs, as well as evidence from the judicially noticed cases, the court makes the following findings of fact.

Shortly after the Iranian Revolution in 1979, Iran's Supreme Leader, Ayatollah Ruholla Khomeini, established the Islamic Revolutionary Guard Corps ("IRGC") to "implement the Ayatollah's vision for an Islamic theocratic government in Iran." *Lee I*, 518 F. Supp. 3d at 482 (internal quotation marks omitted); *see* ECF No. 55-15 ¶¶ 33-34. The Quds Force is an arm of the IRGC "responsible for extraterritorial operations," ECF No. 55-15 ¶ 38, which has "supported militant groups including the Taliban, Hamas, and . . . the Lebanese Hezbollah . . . and Iraqi Shia militant groups," *Fritz*, 320 F. Supp. 3d at 59; *see* ECF No. 63, at 27:03-27:12. The United States designated Iran as a state sponsor of terrorism in 1984, *see State Sponsors of Terrorism*, U.S. Dep't

of State,[1] and designated the IRGC as a foreign terrorist organization in 2019, *see Foreign Terrorist Organizations*, U.S. Dep't of State.[2]

"Beginning in the early 1980s, [the] IRGC shaped the development and military capabilities of Lebanese Hezbollah[,] a militant Shi'a political party that wanted to oust Israeli forces from Southern Lebanon." *Karcher I*, 396 F. Supp. 3d at 23 (footnote omitted). Iran played a critical role in Hezbollah's development. "In exchange for Hezbollah's unwavering dedication to Iran and its revolutionary aims, Iran bankroll[ed], arm[ed], and train[ed] Hezbollah," *Lee I*, 518 F. Supp. 3d at 482 (alterations in original) (internal quotation marks omitted), providing as much as $700 million to $1 billion per year in the form of cash, training, intelligence, and weapons, *see Fritz*, 320 F. Supp. 3d at 60. Hezbollah "acts mainly at the direction of Iran," *Frost*, 383 F. Supp. 3d at 39, and has been "used by Iran as the 'tip of the spear' for the [Quds Force's] global operations," ECF No. 55-15 ¶ 53; *see* ECF No. 63, at 42:15-42:16 (describing Hezbollah as "the premier proxy for the IRGC Quds Force").

Courts in this district have thoroughly documented Iran's material support for terrorist groups in Iraq and Afghanistan through the Quds Force and Hezbollah. *See, e.g.*, *Roth*, 651 F. Supp. 3d at 74-77 (discussing the Quds Force's provision of lethal aid to proxies in Iraq and Afghanistan); *Baker*, 2025 WL 2480075, at *7-10 (describing Iran's provision of financial and other material support to the Taliban); *Selig*, 573 F. Supp. 3d at 52-55 (same); *Karcher I*, 396 F. Supp. 3d at 22-25 (discussing the Quds Force's and Hezbollah's funding and training of Shia militias in Iraq); *Lee I*, 518 F. Supp. 3d at 482-84 (same); *Fritz*, 320 F. Supp. 3d at 58-64 (same). The court summarizes those findings as relevant here.

---

[1] *Available at* https://perma.cc/QEC4-HHHM.

[2] *Available at* https://perma.cc/QTQ5-4Y32.

### 1. Iran's support for proxies in Iraq

Iran's proxies were already operating in Iraq when United States and coalition forces invaded Iraq in 2003 to overthrow Saddam Hussein's government. *See Roth*, 651 F. Supp. 3d at 74. "With Hussein out of power, Iran seized the historic opportunity to reshape its relationship with Iraq and, in the process, increase its influence in the region." *Lee I*, 518 F. Supp. 3d at 483 (internal quotation marks omitted). Specifically, "Iran sought to install weakened decentralized and Shi'a-dominated leadership in Iraq," *id.* (internal quotation marks omitted), and to "push the United States out of the Gulf region," *Fritz*, 320 F. Supp. 3d at 61 (internal quotation marks omitted). To that end, Iran established numerous Shia proxy groups in Iraq. In 2003, the Quds Force "dispatched Hezbollah operatives . . . to help establish" Jaysh al-Mahdi, which later split into branches called "Special Groups" that were designed to attack American and coalition forces. *Lee I*, 518 F. Supp. 3d at 483 (alteration in original); *see* ECF No. 55-15 ¶ 101. These Special Groups included Asa'ib Ahl al-Haq ("AAH") and Kataib Hezbollah ("KH"). *Karcher I*, 396 F. Supp. 3d at 23-25; *see* ECF No. 55-15 ¶¶ 55-75. "Iranian support—in the form of funding, weapons, and training—was critical to the success of the Special Groups, which otherwise would [have been] unable to conduct their terrorist attacks in Iraq." *Fritz*, 320 F. Supp. 3d at 62 (internal quotation marks omitted).

Iran supported the Special Groups through the provision of weapons, training, and funding. *See id.* at 62-64. Together, the Quds Force and Hezbollah were "heavily involved in identifying talent, recruiting, and training Special Groups." ECF No. 55-15 ¶ 103. Iraqi trainees were brought to training camps in Iran run by the Quds Force and Hezbollah. *Id.* ¶¶ 104-106; *see Fritz*, 320 F. Supp. 3d at 64 ("With Hezbollah's assistance, Iran provided training at every level of the militant organizations that received assistance, from foot soldier to leadership." (internal quotation marks

omitted)). Iran provided substantial financial support to the Special Groups: by 2007, the Quds Force was providing between $750,000 and $3 million worth of equipment and funding to the Special Groups every month. ECF No. 55-15 ¶ 109. Iran also supplied the Special Groups with advanced weapons—including Iranian-produced advanced rockets, sniper rifles, mortars, and explosively formed projectiles ("EFPs"). *See Fritz*, 320 F. Supp. 3d at 63. "[O]ne of Iran's primary forms of material support to the Special Groups was financing, manufacturing and deploying EFPs." *Lee v. Islamic Republic of Iran* ("*Lee II*"), No. 19-CV-830, 2026 WL 1243433, at *4 (D.D.C. May 6, 2026) (internal quotation marks omitted). The EFP is a "powerful [improvised explosive device ('IED')] that is capable of penetrating and destroying up-armored Humvees and other U.S. military vehicles." *Fissler II*, 2026 WL 1162455, at *1; *see* ECF No. 55-15 ¶ 58 n.31 (describing EFPs as "professionally manufactured and specifically designed to target U.S. and Coalition Forces' armor"); *Lee I*, 518 F. Supp. 3d at 484 ("[I]nsurgents' ability to defeat the United States' sophisticated countermeasures would not have been possible without the active involvement, training, equipment and support of the IRGC." (internal quotation marks omitted)).

While a predominantly Shia country, Iran also funded and armed Sunni militant groups in Iraq, including AQI, also known as the Zarqawi organization. *See Neiberger v. Islamic Republic of Iran*, No. 16-CV-2193, 2022 WL 17370239, at *7 n.7 (D.D.C. Sep. 8, 2022), *report and recommendation adopted*, No. 16-CV-2193, 2022 WL 17370160 (D.D.C. Sep. 30, 2022). AQI's founder, Abu Musab al-Zarqawi, received training from the Quds Force in Iran before moving into Iraq and Afghanistan. ECF No. 55-15 ¶ 122. The Quds Force provided the Zarqawi organization and its fighters funding, weapons, and transportation into Iraq to target U.S. troops. *Martino v. Islamic Republic of Iran*, No. 21-CV-1808, 2024 WL 6824393, at *7 (D.D.C. Sep. 30, 2024); *see*

ECF No. 55-15 ¶¶ 115-116. "Iran provided safe haven to Zarqawi and its leaders by permit[ting] Zarqawi recruits to transit Iranian territory and make use of safe houses in different parts of the country." *Neiberger*, 2022 WL 17370239, at *7 (internal quotation marks omitted). For example, Iran provided AQI operatives with documents and passports to facilitate their movement into Iraq. *Roth*, 651 F. Supp. 3d at 75. And Hezbollah, acting as "an arm of the IRGC Quds Force," ECF No. 63, at 41:20-41:22, trained both Sunni and Shia groups operating in Iraq to conduct attacks to kill U.S. personnel, *see id.* at 41:23-42:25.

**2. Iran's support for the Taliban**

Between at least 2006 and 2019, multiple terrorist groups operating in Afghanistan—most notably, the Taliban—formed a "terrorist syndicate." *Cabrera I*, 2022 WL 2817730, at *6; *see Baker*, 2025 WL 2480075, at *6-9. The Taliban is a Sunni militant group that controlled Afghanistan before the United States began its military operation there in 2001. *Selig*, 573 F. Supp. 3d at 52. Members of the syndicate shared a common goal: "to reestablish the Islamic Emirate of Afghanistan" by driving the United States and its allies out of Afghanistan. *Cabrera I*, 2022 WL 2817730, at *6.

Through the Quds Force, Iran provided material support to the Taliban in the form of arms, training, funding, and technology, including during the period that the attacks here occurred. *See Selig*, 573 F. Supp. 3d at 53-58; *Cabrera I*, 2022 WL 2817730, at *11-12. Iran funded the Taliban to support its attacks on U.S. forces and offered bounties to Taliban fighters who attacked Americans. ECF No. 63, at 97:14-97:17; *see Fissler II*, 2026 WL 1162455, at *2. And in 2011, the State Department reported that Iran had been arranging arms shipments to Taliban members since 2006, which included "rocket-propelled grenades [('RPGs')], mortar rounds, 107mm rockets, and plastic explosives." *Fissler II*, 2026 WL 1162455, at *2 (internal quotation marks

omitted); *see* ECF No. 55-15 ¶ 521 ("The U.S. Department of State has acknowledged Iran's role in supplying arms and training to the Taliban since at least 2006."); *see also id.* ¶¶ 522-540. The Quds Force also created camps to train Taliban fighters to use IEDs and vehicle-borne improvised explosive devices ("VBIEDs"). *Fissler II*, 2026 WL 1162455, at *2.

Based on the unrebutted expert testimony presented by Mr. Pregent and experts in other FSIA cases in this district, the court thus concludes that Iran provided material support in the form of funds, weapons, and training to AQI, Shia Special Groups AAH and KH, and the Taliban during the period that the attacks took place.

### C. Attacks

For reasons described *infra* Section IV.A, the court lacks subject-matter jurisdiction over claims (1) arising out of attacks that did not result in fatalities other than the terrorist who perpetrated them or (2) for which Plaintiffs have not adequately shown proximate cause. The court's factual background thus first focuses on the remaining twenty-one attacks involving signature Iranian weapons carried out by AQI, Shia Special Groups, or the Taliban, for which the court grants Plaintiffs' motion as to the servicemember Plaintiffs but not their immediate family members. *See infra* Section IV.C. The court then briefly addresses the eleven attacks that did not result in non-terrorist fatalities. Finally, for the attacks that fail for lack of proximate cause, the court will provide a few examples of the attacks at issue, but it will not address each individually.[3]

[3] The court notes that Plaintiffs have withdrawn their claims concerning Attacks #42 and 47, *see* ECF No. 55-1, at 37, 39, and the court will accordingly not address either.

**1. Extrajudicial killings with signature weapons**

*a. Attack #3: October 2004 in Anbar Province, Iraq – Plaintiff* [redacted]

In October 2004, Plaintiff [redacted] was serving as a Private First Class in the U.S. Marine Corps, stationed at Al Asad Air Base in Anbar Province, Iraq. ECF No. 55-12, at 1 ¶ 5; *see* ECF No. 29 ¶¶ 943, 945. Around 7:00 a.m., a VBIED detonated outside the base gate. ECF No. 55-12, at 1 ¶ 5. When Private First Class [redacted] arrived on the scene to help those who had been injured, he saw a "sea of red" with "scattered body parts and blood everywhere." *Id.* His unit was responsible for cleaning up after the attack, and he "remember[s] having to mark every single piece of human remain[s] with red flags" and collect all the remains. *Id.* The blast killed sixteen people and injured forty others. *Id.*

Private First Class [redacted] was subsequently diagnosed with post-traumatic stress disorder ("PTSD"), depression, and anxiety. *Id.* at 1-3 ¶¶ 7-8. He seeks damages for the "severe mental anguish and extreme emotional pain and suffering" caused by the attack. ECF No. 29 ¶ 949.

*b. Attack #27: June 1, 2007 in Baghdad Province, Iraq – Plaintiff* [redacted]

On June 1, 2007, Plaintiff [redacted] was serving as a Specialist in the U.S. Army, patrolling Route Caprice in Baghdad Province, Iraq. ECF No. 46-20, at 1 ¶ 6; *see* ECF No. 29 ¶¶ 393, 396. A crowd of people were walking to a nearby mosque when an individual attempted to open one of the doors of the Humvee directly in front of Specialist [redacted] ECF No. 46-20, at 1 ¶ 6. The servicemember in that seat tackled the individual, who then detonated his suicide vest, killing the servicemember. *Id.* About fifteen seconds later, another suicide bomber was shot by a servicemember, causing the suicide vest to detonate about fifty yards away from Specialist [redacted] *Id.*

Specialist [redacted] was subsequently diagnosed with a traumatic brain injury, PTSD, depression, anxiety, asthma, chronic bronchitis, and other medical conditions. *Id.* at 2-4 ¶¶ 8-9. He seeks damages for the "severe physical and mental anguish and extreme emotional pain and suffering" caused by the attack. ECF No. 29 ¶ 400.

*c. Attack #28: June 10, 2007 in Baghdad Province, Iraq – Plaintiff* [redacted]

On June 10, 2007, Plaintiff [redacted] was serving as a Specialist in the U.S. Army in Mahmudiyah, Iraq, about twenty miles south of Baghdad, conducting security overwatch near a highway. ECF No. 46-58, at 1 ¶ 5; *see* ECF No. 29 ¶¶ 1063-1064. Members of his unit took turns watching the route to ensure that no one was planting IEDs. ECF No. 46-58, at 1 ¶ 5. A suicide bomber in a dump truck filled with 10,000 pounds of liquid explosives detonated a VBIED directly below the command center where Specialist [redacted] and his unit were located. *Id.* The explosion caused the command center to collapse, throwing Specialist [redacted] onto the ground about twenty-five feet below. *Id.* at 1-2 ¶ 5. As he and others in his unit attempted to dig themselves out of the rubble, they were shot at with small-arms fire. *Id.* at 2 ¶ 5. Specialist [redacted] and five other servicemembers were severely injured in the explosion, and three servicemembers were killed. *Id.*

Specialist [redacted] was subsequently diagnosed with a traumatic brain injury, PTSD with major depressive disorder, multiple fractures, degenerative disc disease, and other medical conditions. *Id.* at 2-4 ¶¶ 8-10. He seeks damages for the "severe physical and mental anguish and extreme emotional pain and suffering" caused by the attack. ECF No. 29 ¶ 1069.

*d. Attack #32: May 2008 in Baghdad Province, Iraq – Plaintiff* [redacted]

In May 2008, Plaintiff [redacted] was serving as a Specialist in the U.S. Army in the al-Amal neighborhood in Baghdad Province, Iraq, when a group of nearby soldiers were hit by an EFP. ECF No. 46-25, at 1 ¶ 6; *see* ECF No. 29 ¶¶ 446, 448. Specialist [redacted] was one of the first responders to the scene, where he found five burned soldiers, four of whom had been killed. ECF No. 46-25, at 1 ¶ 6. The surviving soldier later died as well. *Id.*

Specialist [redacted] was subsequently diagnosed with PTSD, depression, anxiety, lumbar strain, and other medical conditions. *Id.* at 2-4 ¶¶ 10-12, 16. He seeks damages for the "severe physical and mental anguish and extreme emotional pain and suffering" caused by the attack. ECF No. 29 ¶ 452.

*e. Attack #35: January 18, 2009 in Baghdad Province, Iraq – Plaintiff* [redacted]

On January 18, 2009, Plaintiff [redacted] was serving as a Specialist in the U.S Army when his unit was hit by an EFP "near the intersection of route predators/plutos" in the Amin neighborhood in Baghdad Province, Iraq. ECF No. 46-16, at 1 ¶ 5; *see* ECF No. 29 ¶¶ 331-332. Specialist [redacted] suffered multiple shrapnel wounds, and another member of his unit, Staff Sergeant [redacted], was killed as a result of the EFP blast. ECF No. 46-16, at 1 ¶ 5.

Specialist [redacted] was subsequently diagnosed with a traumatic brain injury, deep tissue loss, PTSD, anxiety, hearing loss, and other medical conditions. *Id.* at 1-2 ¶¶ 7-9. Specialist [redacted] ex-wife, [redacted], and minor child, [redacted], seek damages for the "severe mental anguish, extreme emotional pain and suffering" caused by his injuries and the "loss of [his] society, companionship, comfort, advice, and counsel." ECF No. 29 ¶ 338.

*f. Attack #37: July 2009 in Baghdad Province, Iraq – Plaintiff* [redacted]

In July 2009, [redacted] was serving as a Sergeant First Class in the U.S. Army at Camp Taji in Baghdad Province, Iraq, monitoring security cameras at the base. ECF No. 46-1, at 1 ¶ 6; *see* ECF No. 29 ¶ 70. At around 11:30 a.m., an explosion went off outside the base when a firetruck rigged with a VBIED was remotely detonated. ECF No. 46-1, at 1 ¶ 6. Sergeant First Class [redacted] "just had to sit there and watch the explosion and aftermath through the video cameras." *Id.* Around eighty-six civilians died as a result of the blast. *Id.*

Sergeant First Class [redacted] was subsequently diagnosed with PTSD, depression, anxiety, and migraines. *Id.* at 2-4 ¶¶ 9-10. He seeks damages for the "severe physical and mental anguish and extreme emotional pain and suffering" caused by the attack. ECF No. 29 ¶ 74.

*g. Attack #38: July 2009 in Baghdad Province, Iraq – Plaintiff* [redacted]

In July 2009, Plaintiff [redacted] was serving as a Sergeant First Class in the U.S. Army. ECF No. 46-30, at 1 ¶ 5; *see* ECF No. 29 ¶¶ 523-524. His unit was in a marketplace outside of Forward Operating Base ("FOB") Justice in Kadhimiya District, Baghdad Province, Iraq, when a suicide bomber detonated his vest in the marketplace about a mile from where Sergeant First Class [redacted] was. ECF No. 46-30, at 1 ¶ 5. Sergeant First Class [redacted] ran over to the site immediately after the blast and found "numerous human casualties and structural damage." *Id.*

Sergeant First Class [redacted] was subsequently diagnosed with a traumatic brain injury, PTSD, depression, and other medical conditions. *Id.* at 2-4 ¶¶ 8-10. He seeks damages for the "severe physical and mental anguish and extreme emotional pain and suffering" caused by the attack. ECF No. 29 ¶ 530. Sergeant First Class [redacted] wife, [redacted], and children, [redacted], also seek damages for the "severe mental anguish, extreme

emotional pain and suffering" caused by his injuries and the "loss of [his] society, companionship, comfort, advice, and counsel." *Id.* ¶ 532.

*h. Attack #39: October 25, 2009 in Baghdad Province, Iraq – Plaintiff* [redacted]

On October 25, 2009, Plaintiff [redacted] was serving as a Major in the U.S. Army when he was on his way to the Provincial Council Building in Baghdad Province, Iraq. ECF No. 46-64, at 1 ¶ 5; *see* ECF No. 29 ¶¶ 1186-1187. His convoy included the second highest commanding officer of his brigade. ECF No. 46-64, at 1 ¶ 5. The convoy was about 100 meters away when two VBIEDs inside of a minivan and a twenty-six seat bus blew up right outside of the Provincial Council Building. *Id.* The blast violently threw Major [redacted] around inside his vehicle, causing him to hit his head and other body parts. *Id.* The attack killed 120 people and injured 721 others. *Id.*

Major [redacted] was subsequently diagnosed with a traumatic brain injury, PTSD, depression, anxiety, lumbar spondylosis, and other medical conditions. *Id.* at 2-4 ¶¶ 7-9. He seeks damages for the "severe physical and mental anguish and extreme emotional pain and suffering" caused by the attack. ECF No. 29 ¶ 1191. Major [redacted] wife, [redacted], also seeks damages for the "severe mental anguish, extreme emotional pain and suffering" caused by his injuries and the "loss of [his] society, companionship, comfort, advice, and counsel." *Id.* ¶ 1193.

*i. Attack #40: July 2005 in Basra Province, Iraq – Plaintiff* [redacted]

In July 2005, Plaintiff [redacted] was serving as a Petty Officer Third Class in the U.S. Navy, stationed at Camp Bucca in Umm Qasr, Iraq. ECF No. 46-35, at 1 ¶ 5; *see* ECF No. 29 ¶¶ 595, 597. While he was sleeping in his barracks around 300 yards from the front gate of the camp, Petty Officer Third Class [redacted] suddenly was awoken by a loud explosion. ECF

No. 46-35, at 1 ¶ 5. A suicide bomber had driven a vehicle into the camp, and the vehicle exploded at the front entrance. *Id.* Petty Officer Third Class [redacted] ran outside to assess the damage and slipped on gravel, causing him to injure his knee. *Id.* At least one U.S. soldier, three U.S. contractors, and several civilians perished in the attack. *Id.*

Petty Officer Third Class [redacted] was subsequently diagnosed with PTSD, anxiety, depression, tinnitus, and other medical conditions. *Id.* at 2-4 ¶¶ 7-8. He seeks damages for the "severe physical and mental anguish and extreme emotional pain and suffering" caused by the attack. ECF No. 29 ¶ 602.

*j. Attack #44: January 2005 in Diyala Province, Iraq – Plaintiff* [redacted]

In January 2005, Plaintiff [redacted] was serving as a Sergeant in the U.S. Army, National Guard, stationed at an Iraqi police station in Khanaqin, Iraq, near the Iranian border. ECF No. 46-60, at 1 ¶ 6; *see* ECF No. 29 ¶¶ 1095, 1097. He was outside fueling a Humvee when he heard a loud blast and was blown into the six-foot wall surrounding the police station. ECF No. 46-60, at 1-2 ¶ 6. He was covered in another person's blood and observed the remains of a human face on the ground. *Id.* at 2 ¶ 6. When Sergeant [redacted] went out of the police compound to secure the area, an Iraqi teenager told him that he was the brother of an eleven-year-old boy that Sergeant [redacted] unit had used as an interpreter. *Id.* The teenager said that a man had asked his brother to take him to the Americans to discuss the upcoming elections and led the brother to the gate of the police station, where the man then detonated a suicide vest he was wearing, killing himself and the eleven-year-old boy. *Id.*

Sergeant [redacted] was subsequently diagnosed with a traumatic brain injury, PTSD, bilateral hearing loss, and other medical conditions. *Id.* at 2-3 ¶¶ 8-12. He seeks damages for the "severe physical and mental anguish and extreme emotional pain and suffering" caused by the

attack. ECF No. 29 ¶ 1101. Sergeant [redacted] wife, [redacted], and children, [redacted], also seek damages for the "severe mental anguish, extreme emotional pain and suffering" caused by his injuries and the "loss of [his] society, companionship, comfort, advice, and counsel." *Id.* ¶ 1103.

*k. Attack #49: July 16, 2005 in Kirkuk Province, Iraq – Plaintiffs [redacted] and [redacted]*

On July 16, 2005, Plaintiff [redacted] was serving as a Private First Class in the U.S. Army, providing route security in the desert between Kirkuk and Tikrit, Iraq. ECF No. 46-40, at 1 ¶ 5; *see* ECF No. 29 ¶¶ 717-718. His unit was comprised of four Humvees, and an EFP hit the vehicle in front of him, which was led by Sergeant First Class [redacted]. ECF No. 46-40, at 1 ¶ 5. After the initial blast, several secondary explosions occurred, setting Sergeant First Class [redacted] Humvee on fire and killing him. *Id.*

Plaintiff [redacted] was serving as a Sergeant in the U.S. Army, patrolling a road between Erbil and Kirkuk, Iraq. ECF No. 46-7, at 1 ¶ 6; *see* ECF No. 29 ¶¶ 188, 190. He was called to help the unit that had been struck with an EFP, and when he arrived, he observed a Humvee on fire. ECF No. 46-7, at 1 ¶ 6. He found his close friend, Sergeant First Class [redacted] unresponsive in the passenger side of the Humvee. *Id.* at 1-2 ¶ 6.

Private First Class [redacted] was subsequently diagnosed with PTSD, depression, anxiety, chronic fatigue syndrome, hearing loss, and bilateral tinnitus. ECF No. 46-40, at 2-4 ¶¶ 8-9. Sergeant [redacted] was diagnosed with PTSD, depression, anxiety, lumbar strain, cervical strain, and other medical conditions. ECF No. 46-7, at 2-4 ¶¶ 8-9. Both seek damages for the "severe physical and mental anguish and extreme emotional pain and suffering" caused by the attack. ECF No. 29 ¶¶ 194, 723.

*l. Attack #55: December 21, 2004 in Ninewa Province, Iraq – Plaintiffs [redacted] and [redacted]*

On December 21, 2004, Plaintiff [redacted] was serving as a Sergeant First Class in the U.S. Army at FOB Marez in Mosul, Ninewa Province, Iraq. ECF No. 46-63, at 1 ¶ 5; *see* ECF No. 29 ¶¶ 419-420, 1171-1172. An insurgent entered the dining hall and detonated a suicide bomb, killing twenty-two people and wounding about eighty others. ECF No. 46-63, at 1 ¶ 5.

That same day, Plaintiff [redacted] was serving as a Sergeant in the U.S. Army, operating a forklift at FOB Marez. ECF No. 55-5, at 1 ¶ 4; *see* ECF No. 29 ¶¶ 419-420. The base came under rocket fire, and one rocket hit the forklift, causing it to roll over and rendering Sergeant [redacted] unconscious. ECF No. 55-5, at 1 ¶ 4. Another rocket hit a truck a couple hundred yards away from him, killing the Iraqi civilians inside the truck. *Id.*

Sergeant First Class [redacted] subsequently underwent surgery for a lacerated liver and stomach and was later diagnosed with a traumatic brain injury, PTSD, depression, anxiety, and several other medical conditions. ECF No. 46-63, at 2-3 ¶¶ 7-9. Sergeant [redacted] was diagnosed with a traumatic brain injury, PTSD, muscle spasms, migraines, rhinitis, and other medical conditions. ECF No. 55-5, at 2-3 ¶¶ 6-9. Both seek damages for the "severe physical and mental anguish and extreme emotional pain and suffering" caused by the attack. ECF No. 29 ¶¶ 425, 1177.

*m. Attack #56: July 2005 in Ninewa Province, Iraq – Plaintiff [redacted]*

In July 2005, Plaintiff [redacted] was serving as a Staff Sergeant in the U.S. Army, stationed outside the Pride West Police Station in Mosul, Iraq, next to a hospital. ECF No. 46-45, at 1 ¶ 5; *see* ECF No. 29 ¶¶ 841-842. A suicide bomber entered the hospital and detonated his vest, about thirty to fifty yards away. ECF No. 46-45, at 1 ¶ 5. Staff Sergeant [redacted] was one of

the first responders to the scene and observed "dead bodies everywhere" and "dead babies on the floor." *Id.*

Staff Sergeant [redacted] was subsequently diagnosed with PTSD, depression, anxiety, migraines, tinnitus, and other medical conditions. *Id.* at 1-2 ¶¶ 6-7. He seeks damages for the "severe physical and mental anguish and extreme emotional pain and suffering" caused by the attack. ECF No. 29 ¶ 846. Staff Sergeant [redacted] children, [redacted] and [redacted], also seek damages for the "severe mental anguish, extreme emotional pain and suffering" caused by his injuries and the "loss of [his] society, companionship, comfort, advice, and counsel." *Id.* ¶ 848.

*n. Attack #61: July 2004 in Salahadin Province, Iraq – Plaintiff* [redacted]

In July 2004, Plaintiff [redacted] was serving as a Corporal in the U.S. Army in Samara, Iraq. ECF No. 55-10, at 1 ¶ 5; *see* ECF No. 29 ¶¶ 806-807. As Corporal [redacted] was dropping off supplies in a building being used as a "mini base," a suicide bomber detonated explosives in the building. ECF No. 55-10, at 1 ¶ 5. As he was leaving, Corporal [redacted] observed multiple burned and dead bodies. *Id.* Five to seven people died from the attack. *Id.*

Corporal [redacted] was subsequently diagnosed with PTSD, depression, and anxiety. *Id.* at 1-2 ¶¶ 6-7, 10. He seeks damages for the "severe physical and mental anguish and extreme emotional pain and suffering" caused by the attack. ECF No. 29 ¶ 811.

*o. Attack #64: January 5, 2005 in Salahadin Province, Iraq – Plaintiff* [redacted]

On January 5, 2005, Plaintiff [redacted] was serving as a Sergeant in the U.S. Army, guarding the gate to Balad Air Base in Balad, Iraq. ECF No. 46-54, at 1 ¶ 5; *see* ECF No. 29 ¶¶ 1015-1016. Two checkpoints were set up near the gate, and Sergeant [redacted] was in

charge of the second checkpoint manned by both Iraqi and American soldiers. ECF No. 46-54, at 1 ¶ 5. As Sergeant [redacted] was investigating a white car approaching the gate suspiciously, the car pushed through the front checkpoint and detonated a VBIED, killing the driver instantly and knocking Sergeant [redacted] unconscious. *Id.* When Sergeant [redacted] regained consciousness, he observed several Iraqi counterpart soldiers "split in half and killed by the gate cable wires they were flung into due to the blast." *Id.*

Sergeant [redacted] was subsequently diagnosed with PTSD, depression, anxiety, back pain, and bilateral hearing loss. *Id.* at 2 ¶ 6. He seeks damages for the "severe mental anguish and extreme emotional pain and suffering" caused by the attack. ECF No. 29 ¶ 1020. Sergeant [redacted] wife, [redacted], also seeks damages for the "severe mental anguish, extreme emotional pain and suffering" caused by his injuries and the "loss of [his] society, companionship, comfort, advice, and counsel." *Id.* ¶ 1022.

*p. Attack #71: August 2009 in Salahadin Province, Iraq – Plaintiff* [redacted]

In August 2009, Plaintiff [redacted] was serving as a Sergeant in the U.S. Army, stationed at Balad Air Base in Balad, Iraq. ECF No. 46-36, at 1 ¶ 5; *see* ECF No. 29 ¶¶ 613-614. Sergeant [redacted] was on his way to eat dinner when he heard bullets flying over his head. ECF No. 46-36, at 1 ¶ 5. He immediately hit the dirt and started to crawl toward a bunker when he observed incoming fire around him. *Id.* A mortar then exploded near him, slamming him into the side of the bunker. *Id.* A VBIED then detonated outside the entrance of the base, a few hundred meters away from him. *Id.* Sergeant [redacted] watched as people died around him, and he remained frozen on the ground as small-arms fire and incoming mortar explosions continued outside. *Id.* at 2 ¶ 5.

Sergeant [redacted] was subsequently diagnosed with PTSD, depression, anxiety, migraines, bilateral hearing loss, tinnitus, and other medical conditions. *Id.* at 2-4 ¶¶ 6-7. He seeks damages for the "severe physical and mental anguish and extreme emotional pain and suffering" caused by the attack. ECF No. 29 ¶ 618.

*q. Attack #77: March 2010 in Kandahar Province, Afghanistan – Plaintiff* [redacted]

In March 2010, Plaintiff [redacted] was serving as a Specialist in the U.S. Army, performing a route clearance outside of Saraposa Prison in Kandahar Province, Afghanistan. ECF No. 46-14, at 1 ¶ 4; *see* ECF No. 29 ¶¶ 292-293. A large VBIED detonated as his convoy approached the prison, causing Specialist [redacted] to be thrown around inside his vehicle. ECF No. 46-14, at 1 ¶ 4. The attack killed several Afghan civilians. *Id.*

Specialist [redacted] was subsequently diagnosed with a traumatic brain injury, PTSD, depression, anxiety, headaches, hypertension, and other medical conditions. *Id.* at 1-4 ¶¶ 6-9. He seeks damages for the "severe physical and mental anguish and extreme emotional pain and suffering" caused by the attack. ECF No. 29 ¶ 297.

*r. Attack #79: September 11, 2006 in Khost Province, Afghanistan – Plaintiff* [redacted]

On September 11, 2006, Plaintiff [redacted] was working for Kellogg Brown & Root, Inc. as a contractor deployed to Afghanistan. ECF No. 57, at 1 ¶¶ 3-4, 6; *see* ECF No. 29 ¶¶ 1456-1457. Mr. [redacted] was on his way to the front gate of FOB Salerno in Khost Province when a suicide bomber detonated at the gate, about fifty yards away. ECF No. 57, at 1 ¶ 6. The explosion knocked Mr. [redacted] off his feet and caused blood to come out of his ears and nose. *Id.*

The bombing killed twenty to thirty people, including local civilians, contractors, and servicemembers. *Id.*

Mr. [redacted] was subsequently diagnosed with PTSD, anxiety, depression, tinnitus, and other medical conditions. *Id.* at 2 ¶¶ 9-10. He seeks damages for the "severe physical and mental anguish and extreme emotional pain and suffering" caused by the attack. ECF No. 29 ¶ 1462. Mr. [redacted] wife, [redacted], and child, [redacted], also seek damages for the "severe mental anguish, extreme emotional pain and suffering" caused by his injuries and the "loss of [his] society, companionship, comfort, advice, and counsel." *Id.* ¶ 1464.

*s. Attack #80: February 10, 2009 in Khost Province, Afghanistan – Plaintiff* [redacted]

On February 10, 2009, Plaintiff [redacted] was serving as a Staff Sergeant in the U.S. Army, completing a convoy escort from Camp Clark to FOB Salerno. ECF No. 46-4, at 1 ¶ 5; *see* ECF No. 29 ¶¶ 138-139. When Staff Sergeant [redacted] was a few hundred yards from FOB Salerno, a truck detonated next to his vehicle, immediately killing two servicemembers inside. ECF No. 46-5, at 1 ¶ 5.

Staff Sergeant [redacted] was subsequently diagnosed with a traumatic brain injury, PTSD, depression, anxiety, multiple fractures, bilateral hearing loss, and several other medical conditions. *Id.* at 2-3 ¶¶ 7-9. He seeks damages for the "severe physical and mental anguish and extreme emotional pain and suffering" caused by the attack. ECF No. 29 ¶ 144.

*t. Attack #83: March 26, 2013 in Nangarhar Province, Afghanistan – Plaintiff* [redacted]

On March 26, 2013, Plaintiff [redacted] was serving as a Chief Warrant Officer in the U.S. Army at an FOB in Jalalabad, Afghanistan. ECF No. 46-65, at 1 ¶ 5; *see* ECF No. 29 ¶¶ 1202-1204. While Chief Warrant Officer [redacted] was sleeping, a suicide bomber drove through

the FOB's gate and detonated two VBIEDs. ECF No. 46-65, at 1 ¶ 5. The explosion knocked Chief Warrant Officer [redacted] off his bed and caused the ceiling to collapse, burying him under the rubble and rendering him unconscious. *Id.* Six other insurgents later entered the base wearing suicide vests and armed with RPGs, hand grenades, and AK-47s, and several insurgents detonated themselves. *Id.* at 1-2 ¶ 5. The attack killed six military personnel, including two or three Afghan police. *Id.* at 2 ¶ 5.

Chief Warrant Officer [redacted] was subsequently diagnosed with a ruptured eardrum, a traumatic brain injury, PTSD, and tinnitus. *Id.* at 2-4 ¶ 8-10. He seeks damages for the "severe physical and mental anguish and extreme emotional pain and suffering" caused by the attack. ECF No. 29 ¶ 1208. Chief Warrant Officer [redacted] wife, [redacted], and children, [redacted], also seek damages for the "severe mental anguish, extreme emotional pain and suffering" caused by his injuries and the "loss of [his] society, companionship, comfort, advice, and counsel." *Id.* ¶ 1210.

*u. Attack #90: May 19, 2010 in Parwan Province, Afghanistan – Plaintiff* [redacted]

On May 19, 2010, Plaintiff [redacted] was serving as a Chief Warrant Officer in the U.S. Army, stationed at Bagram Air Base in Parwan Province, Afghanistan. ECF No. 46-49, at 1 ¶ 5; *see* ECF No. 29 ¶¶ 922-923. In the middle of the night, Chief Warrant Officer [redacted] woke up to the sound of mortars and small-arms fire around the perimeter of the base. ECF No. 46-49, at 1 ¶ 5. The insurgents breached the gates of the base and, once inside, used RPGs, plastic explosives, small-arms fire, and suicide vests. *Id.* As he sought to take cover,

Chief Warrant Officer [redacted] tripped and fell, hitting his head. *Id.* The attack lasted about five hours, killing the suicide bombers "along with people dressed in US Military uniforms." *Id.*[4]

Chief Warrant Officer [redacted] was subsequently diagnosed with a traumatic brain injury, PTSD, depression, anxiety, bilateral hearing loss, cervical and lumbar spine disease, and other medical conditions. *Id.* at 1-2 ¶ 7-9. He seeks damages for the "severe physical and mental anguish and extreme emotional pain and suffering" caused by the attack. ECF No. 29 ¶ 927.

**2. Attacks without evidence of an extrajudicial killing**

*a. Attack #6: July 2005 in Anbar Province, Iraq – Plaintiff* [redacted]

In July 2005, Plaintiff [redacted] was serving as a Specialist in the U.S. Army when he was injured in an attack on FOB Tiger in Anbar Province, Iraq. ECF No. 46-37, at 1 ¶ 6; *see* ECF No. 29 ¶¶ 647, 649. Specialist [redacted] was setting up FOB Tiger in the morning when the base was attacked with multiple mortars and one VBIED. ECF No. 46-37, at 1 ¶ 6. He was near the camp gate when he heard the mortars and the sound of very loud explosions, and two mortars landed a few hundred yards away from him. *Id.* The VBIED outside the front gate exploded, killing the driver of the vehicle. *Id.* Nothing in Specialist [redacted] declaration indicates that the attack killed any non-terrorists. *See generally id.*

*b. Attack #12: April 19, 2007 in Anbar Province, Iraq – Plaintiff* [redacted]

On April 19, 2007, Plaintiff [redacted] was serving as a Lance Corporal in the U.S. Marine Corps, assigned to the Iraqi Police Station in Saqlawiyah, Iraq. ECF No. 46-33, at 1 ¶ 5; *see* ECF No. 29 ¶¶ 573-574. He was at the south side of the building when insurgents sent a dump

---

[4] According to a news article cited by Mr. Pregent, the attack killed nine U.S. servicemembers and one American contractor. ECF No. 55-15 ¶ 733 n.239; *see Taliban Insurgents Attack Bagram Airbase in Afghanistan*, The Guardian (May 19, 2010), https://perma.cc/2EZK-SD4Y.

truck through the military access road on the north side of the station. ECF No. 46-33, at 1 ¶ 5. The truck then pulled into the entrance of the military compound in the station and exploded, killing the driver. *Id.* The explosion threw Lance Corporal [redacted] to the ground and wounded him. *Id.* His unit was then ambushed with small-arms fire and mortars from both sides of the compound. *Id.* Nothing in Lance Corporal [redacted] declaration indicates that the attack killed any non-terrorists. *See generally id.*

c. *Attack #15: January 20-23, 2005 in Babil Province, Iraq – Plaintiff* [redacted]

In January 2005, Sergeant First Class [redacted] unit was attacked with mortars for three consecutive days in Iskandariya, Iraq. ECF No. 46-1, at 1 ¶ 5; *see* ECF No. 29 ¶¶ 68-69. His unit was also attacked in a small-arms fight and by a VBIED. ECF No. 46-1, at 1 ¶ 5. On the third day, on their way from Iskandariya back to FOB Najaf, a suicide bomber pulled up next to the unit and detonated his VBIED. *Id.* The suicide bomber died in the explosion. *Id.* Sergeant First Class [redacted] unit then exchanged small-arms fire with insurgents nearby and killed two targets. *Id.* Nothing in Sergeant First Class [redacted] declaration indicates that the attack killed any non-terrorists. *See generally id.*

d. *Attack #21: July 30, 2005 in Baghdad Province, Iraq – Plaintiff* [redacted]

On July 30, 2005, [redacted] was serving as Sergeant First Class in the U.S. Army, escorting fuel trucks from Tallil, Iraq to Camp Anaconda in Balad, Iraq. ECF No. 46-74, at 1 ¶ 5; *see* ECF No. 29 ¶¶ 1374-1375. Sergeant First Class [redacted] was the truck commander for the lead Humvee, and around midnight, as the convoy approached a checkpoint at Baghdad International Airport, he observed two Humvees stopped in the middle of the highway. ECF No. 46-74, at 1 ¶ 5. The two VBIEDs detonated, killing the insurgents inside and immediately rendering

Sergeant First Class [redacted] unconscious. *Id.* He woke up to an intense gunfight with insurgents that had ambushed his convoy, which lasted for a few minutes. *Id.* Nothing in Sergeant First Class [redacted] declaration indicates that the attack killed any non-terrorists. *See generally id.*

*e. Attack #25: February 2007 in Baghdad Province, Iraq – Plaintiff* [redacted]

In February 2007, Specialist [redacted] was serving in the U.S. Army, manning a tower at Camp Taji in Baghdad Province, Iraq. ECF No. 46-48, at 1 ¶ 5; *see* ECF No. 29 ¶¶ 875-876. A firefight broke out below him, and a VBIED exploded directly under his tower, killing the driver of the vehicle. ECF No. 46-48, at 1 ¶ 5. The explosion immediately rendered Specialist [redacted] unconscious, and he was later told that the blast had ejected him into the air and thrown him down onto a concrete slab. *Id.* Nothing in Specialist [redacted] declaration indicates that the attack killed any non-terrorists. *See generally id.*

*f. Attack #41: October 2004 in Diyala Province, Iraq – Plaintiff* [redacted]

In October 2004, Plaintiff William [redacted] was working as a civilian contractor to the U.S. Army in Diyala Province, Iraq. ECF No. 46-32, at 1 ¶ 6; *see* ECF No. 29 ¶¶ 565, 567. While Mr. [redacted] convoy was heading to Baqubah, Iraq, a VBIED sped to the front of the convoy and detonated. ECF No. 46-32, at 1 ¶ 6. The suicide bomber had been attempting to blow up Mr. [redacted] convoy but "ended up killing his own people instead." *Id.* Mr. [redacted] convoy was subsequently ambushed by people shooting at them. *Id.* at 1-2 ¶ 6. Nothing in Mr. [redacted] declaration indicates that the attack killed any non-terrorists. *See generally id.*[5]

---

[5] While Plaintiffs allege in the amended complaint that Iraqi citizens were killed in this attack, No. 29 ¶ 567, Mr. [redacted] statement in his affidavit that the suicide bomber "ended up killing his own people instead," ECF No. 46-32, at 1 ¶ 6, fails to establish that the attack killed any non-terrorists.

*g. Attack #46: October 4, 2005 in Diyala Province, Iraq – Plaintiff* [redacted]

On October 4, 2005, Plaintiff [redacted] was serving as a Sergeant First Class in the U.S. Army, traveling from Camp Anaconda to deliver fuel tankers to FOB Warhorse. ECF No. 46-79, at 1 ¶ 5; *see* ECF No. 29 ¶¶ 1466-1467.[6] Sergeant First Class [redacted] was in the lead truck of his convoy, and when he reached a small bridge about 1,000 yards from the entrance of FOB Warhorse, a dump truck approached the convoy and drove onto the bridge. ECF No. 46-79, at 1 ¶ 5. A VBIED on the dump truck detonated, and the driver's severed head and limbs landed about ten meters in front of Sergeant First Class [redacted] *Id.* Nothing in Sergeant First Class [redacted] declaration indicates that the attack killed any non-terrorists. *See generally id.*

*h. Attack #70: September 2007 in Salahadin Province, Iraq – Plaintiff* [redacted]

In September 2007, Plaintiff [redacted] was serving as a Sergeant in the U.S. Army at Camp Anaconda in Balad, Iraq. ECF No. 55-13, at 1 ¶ 5; *see* ECF No. 29 ¶¶ 1122-1123. Sergeant [redacted] was on his way to perform daily vehicle maintenance when a VBIED "rammed into the north gate of the base" and "detonated 1,000 pounds of explosives, killing the driver of the vehicle." ECF No. 55-13, at 1 ¶ 5. Sergeant [redacted] and five other servicemembers sustained shrapnel wounds from the blast. *Id.* Nothing in Sergeant [redacted] declaration indicates that the attack killed any non-terrorists. *See generally id.*

---

[6] While the amended complaint contains allegations that this attack occurred on October 4, 2004, and that Sergeant First Class [redacted] was traveling from FOB Warhorse (in Baqubah, Iraq) to Camp Anaconda, ECF No. 29 ¶ 1467, the court accepts the facts presented in Sergeant First Class [redacted] sworn declaration, *see Mercado v. Carmel Partners Constr. LLC*, No. 22-CV-3083, 2024 WL 4253162, at *1 (D.D.C. Sep. 20, 2024) (referring to sworn declarations where the facts contained within "differ from the facts alleged in the Complaint, . . . except to the extent that any declaration seeks relief beyond that sought in the complaint" (internal quotation marks omitted)).

*i. Attack #78: June 6, 2006 in Khost Province, Afghanistan – Plaintiff* [redacted]

On June 6, 2006, Plaintiff [redacted] was serving as a First Sergeant in the U.S. Army, traveling to FOB Salerno in Khost Province, Afghanistan. ECF No. 46-59, at 1 ¶ 5; *see* ECF No. 29 ¶¶ 1071-1072. About one mile from the base, a suicide bomber detonated a VBIED, killing himself and causing First Sergeant [redacted] vehicle to catch fire. ECF No. 46-59, at 1 ¶ 5. The explosion ejected First Sergeant [redacted] and the driver from the vehicle, and First Sergeant [redacted] leg was caught in the door of the vehicle as the car dragged his body about fifty meters. *Id.* First Sergeant [redacted] suffered severe burns to his face. *Id.* at 2 ¶ 5. Nothing in First Sergeant [redacted] declaration indicates that the attack killed any non-terrorists. *See generally id.*

*j. Attack #81: June 1, 2012 in Khost Province, Afghanistan – Plaintiff* [redacted]

On June 1, 2012, Plaintiff [redacted] was serving as a Sergeant in the U.S. Army, talking to another soldier at FOB Salerno when a VBIED detonated about four hundred meters away. ECF No. 46-66, at 1 ¶ 5; *see* ECF No. 29 ¶¶ 1212-1214. Sergeant [redacted] drove to the breach point and witnessed an insurgent blow himself up about ten feet from him. ECF No. 46-66, at 1 ¶ 5. Around fourteen insurgents continued to attack the base with small-arms fire, grenades, and RPGs, destroying half of the dining facility and injuring numerous Americans. *Id.* Nothing in Sergeant [redacted] declaration indicates that the attack killed any non-terrorists. *See generally id.*

*k. Attack #88: December 2006 in Parwan Province, Afghanistan – Plaintiff* [redacted]

In December 2006, Petty Officer [redacted] was traveling through the Charikar District in Afghanistan when his convoy encountered a mother and her young son in the middle of the road. ECF No. 46-35, at 1 ¶ 6; *see* ECF No. 29 ¶ 598. The boy had a grenade attached to him, and as he approached Petty Officer [redacted] unit, the soldiers yelled at him to stop and then shot the boy in the arm when he continued walking toward them. ECF No. 46-35, at 1-2 ¶ 6. The gunshot caused the grenade attached to the boy to detonate, killing him instantly. *Id.* at 2 ¶ 6. Nothing in Petty Officer [redacted] declaration indicates that the attack killed any non-terrorists. *See generally id.*

**3. Examples of attacks lacking evidence of proximate causation**

*a. Attack #10: September 14, 2006 in Anbar Province, Iraq – Plaintiff* [redacted]

On September 14, 2006, Plaintiff [redacted] was serving as a Sergeant in the U.S. Marines, building a police station in Haditha City, Al Anbar Province, Iraq. ECF No. 46-22, at 1 ¶ 5; *see* ECF No. 29 ¶¶ 411-413. There was a drive-by shooting at the police station, and as Sergeant [redacted] was patrolling the area afterward, he was shot by a bullet that went through both of his legs. ECF No. 46-22, at 1 ¶ 5. Sergeant [redacted] was medically evacuated out of the area and was later told that the gunfight had continued, killing a pair of Marines. *Id.*

Sergeant [redacted] was subsequently diagnosed with PTSD, migraines, gunshot wounds, tinnitus, and nonlinear scars. *Id.* at 1-3 ¶¶ 6-8. He seeks damages for the "severe mental and physical anguish and extreme emotional pain and suffering" caused by the attack. ECF No. 29 ¶ 417.

*b. Attack #22: April 7, 2006 in Baghdad Province, Iraq – Plaintiff* [redacted]

On April 7, 2006, Sergeant [redacted] was guarding the gate at Camp Falcon when a rocket hit an ammunition dump about five hundred meters away. ECF No. 55-5, at 1 ¶ 5; *see* ECF No. 29 ¶ 421.[7] The blast rendered Sergeant [redacted] unconscious, and a nearby soldier carried him to a bunker. ECF No. 55-5, at 1 ¶ 5. For the next day-and-a-half, the soldiers remained in the bunker as rockets caused the entire ammunition supply to explode. *Id.* Sergeant [redacted] later learned that two soldiers who had been guarding the ammunition dump were killed by the rocket attack. *Id.*

As noted, [redacted] was also injured in Attack #55 on December 21, 2004, *see supra* Section III.C.1, and after both attacks, he was diagnosed with a traumatic brain injury, PTSD, muscle spasms, migraines, rhinitis, and other medical conditions, ECF No. 55-5, at 2-3 ¶¶ 6-9. He seeks damages for the "severe physical and mental anguish and extreme emotional pain and suffering" caused by both attacks. ECF No. 29 ¶ 425.

*c. Attack #30: July 16, 2007 in Baghdad Province, Iraq – Plaintiff* [redacted]

On July 16, 2007, Plaintiff [redacted] was serving as a First Sergeant in the U.S. Army, traveling on Route Cobra to a water treatment plan in the northwest corner of Baghdad, Iraq. ECF No. 46-31, at 1 ¶ 5; *see* ECF No. 29 ¶¶ 558-559. An Iraqi soldier directly ahead of him walked into an IED and died immediately. ECF No. 46-31, at 1 ¶ 5. The blast threw First Sergeant [redacted] onto the ground and knocked him unconscious for a few minutes. *Id.* After the blast, his unit took on small-arms fire. *Id.* An explosive ordinance team later recovered the IEDs

[7] The amended complaint contains allegations that the attack occurred on April 26, 2005. ECF No. 29 ¶ 421. As above, *see supra* n.6, the court accepts the date relayed in Sergeant [redacted] declaration.

and explosives from the site and, after analyzing them, determined that Taliban members embedded in villages off Route Cobra were responsible for the attack. *Id.*

First Sergeant [redacted] was subsequently diagnosed with a traumatic brain injury, PTSD, depression, anxiety, tinnitus, cervical sprain, injuries to his left neck and shoulder nerves, and other medical conditions. *Id.* at 2-4 ¶¶ 7-9. He seeks damages for the "severe mental and physical anguish and extreme emotional pain and suffering" caused by the attack. ECF No. 29 ¶ 563.

*d. Attack #31: February 19, 2008 in Baghdad Province, Iraq – Plaintiff* [redacted]

On February 19, 2008, Plaintiff [redacted] was serving as a Specialist in the U.S. Army, stationed on FOB Rustamiyah in Sadr District, Baghdad, Iraq. ECF No. 46-75, at 1 ¶ 5; *see* ECF No. 29 ¶¶ 1388-1389. Specialist [redacted] was standing in the doorway of the base's recreation room when an explosion abruptly threw him to the back of the room. ECF No. 46-75, at 1 ¶ 5. Ceiling material fell on his head, causing him to lose consciousness, and when he woke up, a sergeant instructed him to go to his room. *Id.* A dump truck across the street then shot a total of twelve mortars at the base. *Id.* The attack killed another worker in the recreation room and injured several soldiers, including Specialist [redacted] *Id.* at 1-2 ¶ 5.

Specialist [redacted] was subsequently hospitalized and spent more than a year in medical treatment before being discharged. *Id.* at 2 ¶ 5. He was diagnosed with a traumatic brain injury, PTSD, migraines, flat neck, spinal stenosis, sleep disorder, and several mental health conditions. *Id.* at 2-3 ¶¶ 6-8. Specialist [redacted] seeks damages for the "severe physical and mental anguish and extreme emotional pain and suffering" caused by the attack. ECF No. 29 ¶ 1393.

*e. Attack #74: June 2013 in Kabul Province, Afghanistan – Plaintiff* [redacted]

In June 2013, Plaintiff [redacted] was serving as a Major in the U.S. Army, working at the U.S. Central Command in the International Security Assistance Force Headquarters in Kabul, Afghanistan. ECF No. 46-2, at 1 ¶ 5; *see* ECF No. 29 ¶¶ 111-112. Rockets struck the base, causing the building to collapse. ECF No. 46-2, at 1 ¶ 5. One of the rafters and parts of the ceiling fell on Major [redacted] head, knocking him unconscious. *Id.* The attack injured and killed others on the base. *Id.*

The impact from the rafter fractured Major [redacted] skull and ribs, and he was subsequently diagnosed with a traumatic brain injury, neurocognitive disorder, PTSD, obstructive sleep apnea, tinnitus, and other medical conditions. *Id.* at 1-3 ¶¶ 7-9. Major [redacted] seeks damages for the "severe physical and mental anguish and extreme emotional pain and suffering" caused by the attack. ECF No. 29 ¶ 116. His wife, [redacted], also seeks damages for the "severe mental anguish, extreme emotional pain and suffering" caused by his injuries and the "loss of [his] society, companionship, comfort, advice, and counsel." *Id.* ¶ 118.

*f. Attack #84: July 4, 2013 in Nangarhar Province, Afghanistan – Plaintiff* [redacted]

On July 4, 2013, Plaintiff [redacted] was serving as a Specialist in the U.S. Army, participating in an operation to liberate people in a village near Jalalabad, Afghanistan. ECF No. 46-56, at 1 ¶ 5; *see* ECF No. 29 ¶¶ 1040-1042. Specialist [redacted] unit was attacked by small-arms fire and, as he was rendering aid to another servicemember who had been shot, an RPG hit a few feet away. ECF No. 46-56, at 1 ¶ 5. The blast knocked Specialist [redacted] unconscious, and when he woke up about an hour later, he saw that the RPG had killed the servicemember he had been treating and injured another soldier. *Id.*

Specialist [redacted] was subsequently diagnosed with PTSD, a traumatic brain injury, a cervical spine injury, and hearing loss due to the attack. *Id.* at 1-2 ¶¶ 6-8. In the amended complaint, Specialist [redacted] does not specify the damages he seeks. *See* ECF No. 29 ¶¶ 1039-1045.

## IV. DISCUSSION

In an FSIA case, default judgment as to liability may be entered when (1) the court has subject-matter jurisdiction over the claims, (2) the court has personal jurisdiction over the defendant, and (3) the plaintiffs have presented satisfactory evidence to establish their claims against the defendant. *See Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 75 (D.D.C. 2017). The court addresses each in turn. Because the court lacks subject-matter jurisdiction over claims arising out of seventy-one attacks, the court denies Plaintiffs' motion for default judgment without prejudice as to those claims. For the remaining attacks, the court concludes that Plaintiffs have cleared the FSIA's jurisdictional hurdles and grants their motion for default judgment as to Iran's liability with respect to the servicemember Plaintiffs, but not their family members.

### A. Subject-Matter Jurisdiction

Foreign states are generally immune from suit in federal court, subject to certain exceptions in the FSIA. *See* 28 U.S.C. § 1604; *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989) ("[T]he FSIA [is] the sole basis for obtaining jurisdiction over a foreign state in [U.S.] courts."). As relevant here, the FSIA's state-sponsored terrorism exception abrogates sovereign immunity in cases in which (1) "money damages are sought" (2) "against a foreign state for" (3) "personal injury or death that" (4) "was caused" (5) "by an act of torture, extrajudicial

killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." 28 U.S.C. § 1605A(a)(1); *see Borochov*, 94 F.4th at 1057.

Plaintiffs easily satisfy the first three criteria: they seek monetary damages for personal injuries, *see* ECF No. 29 ¶¶ 1, 1503, and Iran is a foreign state. Only some Plaintiffs, however, have established that their personal injuries were caused by extrajudicial killings and that Iran's provision of material support to a terrorist group caused the attacks that injured them. The court addresses each in turn.

**1. Extrajudicial killing**

The FSIA's terrorism exception permits recovery for "personal injury or death that was caused by an act of . . . extrajudicial killing." 28 U.S.C. § 1605A(a)(1). The FSIA incorporates the definition of "extrajudicial killing" in the Torture Victim Protection Act of 1991: "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Pub. L. No. 102-256, § 3(a), 106 Stat. 73; *see* 28 U.S.C. § 1605A(h)(7). Consistent with this language, courts permit a plaintiff to recover for injuries suffered during a terrorist attack in which another victim dies. *See Pautsch v. Islamic Republic of Iran*, No. 20-CV-3859, 2024 WL 3566132, at *4 (D.D.C. July 29, 2024) (noting that the terrorism exception "contemplates actions brought by a plaintiff who is injured by a terrorist attack that results in death, even if he himself was not the fatality"). The extrajudicial killing need not be of an American for the plaintiff to recover. *See, e.g.*, *Cabrera v. Islamic Republic of Iran* ("*Cabrera II*"), No. 19-CV-3835, 2024 WL 3225942, at *7 (D.D.C. June 28, 2024) (holding that the death of two Afghan soldiers during the terrorist attack that injured the plaintiffs constituted an extrajudicial killing); *Strauss v. Islamic Republic of Iran*, No. 22-CV-52, 2025 WL 740456, at *8 (D.D.C. Mar. 7, 2025) (holding that the

death of Iraqi civilians during the terrorist attack that injured the plaintiffs constituted an extrajudicial killing). However, the D.C. Circuit has held that the FSIA's terrorism exception does not apply to "attempted but uncompleted extrajudicial killings," and instead applies to only "act[s] [that] result[] in the death of *another*." *Borochov*, 94 F.4th at 1061, 1063 (emphasis added).

In *Borochov*, the plaintiffs alleged that they were injured when a terrorist rammed his car into a crowd at a bus stop in Jerusalem, Israel. *Id.* at 1057-58. A bystander then shot the attacker in self-defense, and the attacker died. *Id.* at 1058, 1062. The D.C. Circuit held that the plaintiffs' "injuries were not 'caused by an act of . . . extrajudicial killing' because the terrorist attack that injured them did not kill anyone." *Id.* at 1061 (alteration in original) (quoting 28 U.S.C. § 1605A(a)(1)). While the Court acknowledged that the attacker had died, it held that his death was not an extrajudicial killing because the "onlooker shot the perpetrator in self-defense, a killing that was not undertaken, much less 'deliberated'" by a state sponsor of terrorism. *Id.* at 1062. The Court further explained that the bystander's shooting had not caused the plaintiffs' injuries—the shooting had come after the terrorist rammed his car into the bus stop—such that proximate cause was also lacking. *Id.*

After *Borochov*, courts have held that a terrorist attack in which only the attacker is killed—such as a suicide bombing that causes no other deaths—is not an extrajudicial killing for purposes of the FSIA's terrorism exception. *See Cabrera v. Islamic Republic of Iran* ("*Cabrera III*"), No. 19-CV-3835, 2025 WL 1423739, at *7 (D.D.C. May 16, 2025) (explaining that "a killing is an act by one person done to another" and "require[s] a perpetrator who acts upon a distinct victim, not upon him or herself"); *see also Lee II*, 2026 WL 1243433, at *17 ("'[A]n act of . . . extrajudicial killing' must result in the taking of another's life and thus does not

reach . . . the death of an attacker." (second alteration in original) (quoting *Borochov*, 94 F.4th at 1061)). In *Cabrera III*, the court elaborated on *Borochov*, explaining that:

> When analyzing a terrorist attack under the FSIA, a court views the member of the terrorist organization who carried out the attack as acting on behalf of the organization, not as an actor independent of it. Never has this Court, or any other court, viewed the terrorist who pulled the trigger as distinct from the greater organization to which the foreign state in question provided material support. In other words, the individual terrorist is not separate from the terrorist organization itself. He is not "another," and thus his death cannot amount to an extrajudicial killing.

*Cabrera III*, 2025 WL 1423739, at *7. Plaintiffs nevertheless contend that attacks resulting in the death of a terrorist by way of a suicide bombing are extrajudicial killings. ECF No. 55-1, at 74. Like the plaintiffs in *Cabrera III*, they argue that suicide bombings deliberately cause the death of the suicide bomber, so they are "deliberated killings" within the meaning of the FSIA. *Id.*; *see Cabrera III*, 2025 WL 1423739, at *7.

The court disagrees. Under *Borochov*, an extrajudicial killing must result in the death of "another," and a terrorist who ends his own life does not kill "another" person. 94 F.4th at 1061. Moreover, as the *Cabrera III* court explained, a suicide bomber who acts on behalf of his terrorist organization is not independent of that organization, so his suicide bombing does not result in the death of "another." 2025 WL 1423739, at *7. While an involuntary suicide bomber—that is, someone forced by terrorists to wear and detonate a bomb against his will—may pose a different scenario, *see id.* at *7 n.9, the text of the FSIA and *Borochov* foreclose Plaintiffs' broad interpretation of extrajudicial killing to cover *any* suicide bombing.[8]

---

[8] By the same logic, an insurgent who only causes the death of members of his own terrorist organization, *see, e.g.*, ECF No. 46-32, at 1 ¶ 6 (suicide bomber "killing his own people" in Attack #41), or does so while acting in concert with other insurgents, *see, e.g.*, ECF No. 46-74,

(*continued on next page*)

Plaintiffs do not address *Borochov* or *Cabrera III*, which were both decided before they filed their renewed motion for default judgment. Instead, Plaintiffs rely on *Hansen v. Islamic Republic of Iran*, No. 22-CV-477, 2024 WL 3026517 (D.D.C. June 17, 2024), for the proposition that "[w]hen 'a foreign state intentionally compels a suicide, the decedent's death might qualify as an "extrajudicial killing."'" ECF No. 55-1, at 74 (quoting *Hansen*, 2024 WL 3026517, at *4). That is true as far as it goes, but a compelled suicide must nevertheless result in the death of a non-terrorist. For example, the *Hansen* court considered a hypothetical scenario where Iran imposed severe conditions of confinement on a civilian with the intention of forcing him to commit suicide. *See* 2024 WL 3026517, at *4. The civilian's suicide might constitute an extrajudicial killing if Iran "coerced" him into taking his own life. *See id.* ("This incorporation of suicide into 'extrajudicial killing' is, of course, a narrow exception because most suicides are volitional acts of a decedent that break the causal chain between a foreign state's act and a decedent's death."). Here, however, there is no indication that the suicide bombings were non-volitional acts. Rather, Plaintiffs allege that the suicide bombers acted with the intention of inflicting harm on others. *See, e.g.*, ECF No. 55-13, at 1 ¶ 5 (Attack #70 involving a VBIED that "rammed into the north gate of the base"). The court thus rejects Plaintiffs' assertion that attacks that resulted only in the death of a suicide bomber or another terrorist constitute extrajudicial killings. Accordingly, the court

---

at 1 ¶ 5 (detonation of two VBIEDs in Attack #21), does not cause the death of a "distinct victim," *Cabrera III*, 2025 WL 1423739, at *7.

denies Plaintiffs' motion with respect to claims arising out of the following attacks: Attacks #6, 12, 15,[9] 21, 25, 41, 46, 70, 78, and 81.[10]

One attack warrants further discussion. In Attack #88, Petty Officer [redacted] alleges that he was injured when a grenade attached to a young boy detonated in front of him. *See* ECF No. 46-35, at 1-2 ¶ 6. The grenade detonated after another American soldier shot the boy in the arm as the boy approached the soldiers despite multiple warnings to stop. *Id.* Only the boy wearing the grenade died. *Id.* While the boy may have intended to kill the soldiers, that is not enough to establish an extrajudicial killing. "Because the perpetrator did not kill anyone in the attack that injured [Petty Officer [redacted] no extrajudicial killing occurred, and neither could there have been material support for 'such an act.'" *Borochov*, 94 F.4th at 1060. The court accordingly denies Plaintiffs' motion as to Petty Officer [redacted] claim arising out of Attack #88.

### 2. Causation

Next, Plaintiffs must show that Iran's provision of material support caused the attacks that injured them. *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004). The FSIA requires only a showing of proximate cause. *Id.* Plaintiffs must show that (1) Iran's actions were "a 'substantial factor' in the sequence of events that led to [Plaintiffs'] injur[ies]," and (2) the injuries were "'reasonably foreseeable or anticipated as a natural

---

[9] This attack also involved the deaths of two insurgents who were shot by Sergeant First Class [redacted] unit, but those deaths, caused in self-defense by U.S. servicemembers, do not constitute extrajudicial killings. ECF No. 46-1, at 1 ¶ 5; *see Borochov*, 94 F.4th at 1062 (holding that a shooting of a terrorist in self-defense was not an extrajudicial killing).

[10] The court notes that Plaintiffs allege in the amended complaint that several civilians inside the base died in this attack, ECF No. 29 ¶ 1214, but Plaintiffs' only supporting affidavit, the declaration from Sergeant [redacted] does not mention any deaths, *see generally* ECF No. 46-66.

consequence' of [Iran's] conduct." *Owens v. Republic of Sudan*, 864 F.3d 751, 794 (D.C. Cir. 2017) (quoting *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013)). These "requirements are met 'where a state sponsor of terrorism provides material support that enhances a terrorist group's ability to attack, even where that support is not directly traceable to a specific attack.'" *Baker*, 2025 WL 2480075, at *18 (quoting *Cabrera I*, 2022 WL 2817730, at *39-40). Material support under the FSIA's terrorism exception can include "any property, tangible or intangible," financial assistance, "expert advice," "weapons," or organizational aid like "safehouses" and "false documentation." 18 U.S.C. § 2339A(b)(1); *see* 28 U.S.C. § 1605A(h)(3).

To demonstrate that Iran proximately caused the attacks, Plaintiffs rely solely on Mr. Pregent—specifically, his amended expert report, hearing testimony, and supplemental submissions. *See* ECF No. 55-1, at 76-77. They do not cite any evidence that a terrorist group claimed responsibility for any of the attacks, nor do they rely on any government investigations or military documents attributing an attack to a particular terrorist group. *Cf. Roth*, 651 F. Supp. 3d at 77 (stating that Mr. Pregent compared data for each attack to "official military reports of 'significant event[s] or significant activit[ies]' in the vicinity, called 'SIGACTS'"); *see also* ECF No. 63, at 19:21-20:06 (Mr. Pregent stating that he can no longer rely on SIGACTS due to a backlog and redactions in the WikiLeaks database). Plaintiffs maintain, however, that Mr. Pregent "applied an even more stringent attribution methodology and analysis than he did while in combat advising the U.S. military" by considering not only the geographic location of an attack but also "reviewing and analyzing additional information, including, but not limited to, other similar incidents in the area, weapons caches in the area, incident reports, declarations, and DD-214."[11]

[11] A DD-214 is a certificate discharging a servicemember from active duty. *See Brannum v. Lake*, 167 F. App'x 813, 815-16 (D.C. Cir. 2005).

ECF No. 55-1, at 76-77. The problem for Plaintiffs is that Mr. Pregent's amended expert report does not provide much, if any, of this additional information. Rather, as in *Sibley*, his treatment of the attacks is "cursory and rote." 2025 WL 1928036, at *6.

As noted, the court previously denied Plaintiffs' motion for default judgment based on factual deficiencies in Mr. Pregent's expert report, which largely overlapped with the deficiencies in Mr. Pregent's expert report in *Sibley*. ECF No. 53; *see Sibley*, 2025 WL 1928036, at *5-15. The court directed Plaintiffs to supplement Mr. Pregent's report to address these deficiencies and demonstrate that Iran's material support proximately caused the attacks. *See* ECF No. 53, at 2 (advising Plaintiffs to include "citations to the specific evidence relied on by Mr. Pregent"). Mr. Pregent subsequently filed an amended expert report, ECF No. 55-15, which added some general summaries of terrorist activity in the areas of Iraq and Afghanistan where attacks occurred, *see, e.g.*, *id.* ¶¶ 229-230. But the amended report's analysis attributing the sixty-nine Iraq attacks to Iran-backed terrorist groups is virtually identical to what Mr. Pregent presented previously. *Compare* ECF No. 55-15 ¶¶ 166-505, *with* ECF No. 46-83 ¶¶ 194-386, 392-396, 402-529.

For example, Mr. Pregent's entire analysis of Attack #7 is as follows:

> 195. [redacted] was involved in an IED attack in August 2005 while conducting a mounted patrol along Route Tampa heading towards Ramadi, Anbar Province Iraq. U.S[.] Casualties – KIAs.
>
> 196. The IED attack is a complex attack that requires expert explosives training, intelligence on the patterns of U.S. patrols and operations, rehearsals, and lethal aid. Through mapping and documentation, research confirmed that AQI was the dominant group in the area in 2005.
>
> 197. I attribute this attack to FTO al-Qaeda in Iraq (AQI) and its affiliates that benefited from IRGC-QF lethal aid and Foreign Fighter (FF) facilitation through IRGC-QF, Lebanese Hezbollah, and Syrian intelligence support networks.

> 198. The IRGC-QF provided easily accessible lethal aid to al-Qaeda and its affiliates and sustained their operations by pushing Foreign Fighters through established IRGC-QF Syrian facilitation routes into Iraq. The IRGC-QF and Lebanese Hezbollah made Lethal Aid available to AQI in Anbar Province to target American and Coalition Forces.
>
> 199. The IRGC-QF supported AQI and its affiliates in areas deemed not strategic to Iran in order to keep U.S. forces engaged – FIXED - in Sunni areas while the IRGC-QF used its proxy Shia militias to further Iran's strategic goals in areas vital to Iran's control and hold on post-Saddam Iraq.

ECF No. 55-15 ¶¶ 195-199 (emphasis omitted). His analysis is virtually identical for the other attacks in Iraq. Mr. Pregent attributes each to an Iran-backed terrorist group based on the attack method and, for all but Attacks #19, 23, 57, and 66, *see id.* ¶¶ 257-261, 276-280, 430-434, 577-580, because the attack occurred in an area where an Iran-backed terrorist group was the "dominant group" or had "primacy," *see, e.g.*, *id.* ¶¶ 166-167, 274. And while the amended report elaborates on the attacks in Afghanistan, *see id.* ¶¶ 565-797, Mr. Pregent provides nearly identical analysis for each attack.

The court accordingly held an evidentiary hearing to supplement Mr. Pregent's amended report. At the hearing, Mr. Pregent elaborated on the causal link between Iran's material support and the attacks involving signature Iranian weapons. The court then directed Plaintiffs to file a supplemental submission addressing causation for the remaining attacks, particularly those that Mr. Pregent did not label as "complex." *See* ECF No. 63, at 119:05-119:17. Plaintiffs submitted a slideshow similar to the one shown during the hearing, but it largely restates the analysis in Mr. Pregent's report. *See* ECF No. 60-9. And where the slideshow provides new information, it is unclear where the information comes from or how it demonstrates Iran's involvement.

Accordingly, based on Mr. Pregent's report and testimony, the court concludes that Mr. Pregent has adequately shown that Iran's material support to AQI, AAH, KH, or the Taliban

proximately caused the attacks involving signature Iranian weapons. But, for the remaining attacks, the court finds that there is insufficient record evidence to establish proximate cause. In lieu of holding another evidentiary hearing, the court will deny Plaintiffs' motion without prejudice and direct Plaintiffs to supplement the record for these attacks.

*a. Signature weapons*

At the evidentiary hearing, Mr. Pregent explained that in Iraq, VBIEDs were a "signature weapon used by Al-Qaeda" designed to cause mass casualties and that Iran's proxy Hezbollah trained AQI insurgents to build and employ VBIEDs against U.S. personnel. ECF No. 63, at 53:11-53:14; *see id.* at 53:11-54:21, 59:04-59:14, 63:20-63:23. Likewise, suicide bombings were an "Al-Qaeda signature tactic," and personnel-borne improvised explosive devices ("PBIEDs"), also known as suicide vests, required a high level of expertise to construct. *Id.* at 63:13-65:10. It is well established that "AQI and other [Sunni terrorist groups] were among the only groups in Iraq that had the resources and training to construct massive IEDs." *Flores v. Islamic Republic of Iran*, No. 22-CV-1512, 2025 WL 2719429, at *6 (D.D.C. Sep. 24, 2025) ("'Zarqawi and his forces were the foremost employers of suicide terrorism in Iraq,' making [suicide vehicle-borne improvised explosive device ('SVBIED')] attacks against U.S. forces a common AQI tactic."); *see Fissler I*, 2022 WL 4464873, at *3 (calling VBIED attacks "a hallmark of Iranian involvement"). PBIEDs are also "strong indicators that an attack [in Iraq] was an AQI/Sunni (as opposed to a Shia) attack from 2003 to 2011." ECF No. 55-15 ¶ 159. Mr. Pregent thus attributes the suicide bombings and VBIED attacks in Iraq to AQI. ECF No. 63, at 35:04-35:08. And, as explained *supra* Section III.B.1, Iran provided material support to AQI that "increased its overall ability to commit terrorist acts." *Flores*, 2025 WL 2719429, at *4.

Similarly, for the VBIED attacks and suicide bombings in Afghanistan, Mr. Pregent explained that the Quds Force trained the Taliban to carry out VBIED attacks, *see* ECF No. 55-15 ¶¶ 526, 531-532, 538; ECF No. 63, at 108:05-108:18; *see also Hammons v. Islamic Republic of Iran*, No. 19-CV-2518, 2023 WL 5933340, at *13 (D.D.C. July 24, 2023), *report and recommendation adopted*, 2023 WL 6211248 (D.D.C. Sep. 25, 2023). And "[b]ut for Iranian training . . . , the Taliban would not have participated in . . . suicide attack[s]." ECF No. 55-15 ¶ 548. And as with AQI, Iran's material support for the Taliban increased the group's operational capacity to commit terrorist attacks. *See supra* Section III.B.2; *Baker*, 2025 WL 2480075, at *19 ("The fact that the money was received by Taliban leadership and then distributed to fighters undoubtedly increased the organizational capacity of the Taliban as a whole to carry out terrorist attacks."). Accordingly, Plaintiffs have put forth sufficient evidence showing that Iran's support was a "substantial factor" in the attacks involving the use of VBIEDs and PBIEDs—Attacks #3, 27, 28, 37, 38, 39, 40, 44, 56, 61, 64, 71, 77, 79, 80, 83, and 90—and that the consequences of its support were "reasonably foreseeable." *Owens*, 864 F.3d at 794.

Additionally, Mr. Pregent's testimony and the judicially noticed cases establish that Iran's material support to Shia Special Groups AAH and KH proximately caused the EFP attacks in Iraq. Mr. Pregent explained at the hearing that EFPs were a signature tactic of AAH and KH and were "developed by Lebanese Hezbollah and introduced into the Iraq theater." ECF No. 63, at 71:11-71:25; *see id.* at 72:05-72:12 ("[The EFP is] a trained tactic taught by the IRGC Quds Force and Lebanese Hezbollah . . . [and] [t]he militia that carried out the attack was created, funded, directed, armed, [and] trained by the IRGC and Lebanese Hezbollah."); ECF No. 55-15 ¶ 138 (describing EFPs as the "primary signature weapon of choice for . . . Special Groups"). The Quds Force "centralized its EFP supply operations to KH and AAH cells, to ensure their proper

use against U.S. forces and minimize Iraqi casualties." ECF No. 55-15 ¶ 145; *see* ECF No. 63, at 39:20-40:08 (explaining that Iran provided EFPs only to KH and AAH).

Courts in this district have accordingly found that "identification of the weapon as an EFP *all but* necessitates the inference that Iran was responsible." *Karcher I*, 396 F. Supp. 3d at 30; *see, e.g.*, *Driscoll v. Islamic Republic of Iran*, No. 20-CV-622, 2023 WL 4892710, at *12 (D.D.C. June 27, 2023) ("From 2005 through 2011, 'there were no other manufacturers, producers, distributors, or suppliers of [EFPs] other than the Islamic Republic of Iran and its non-state agent and proxy, Hezbollah, and/or IRGC-QF Proxies in Iraq.'"), *report and recommendation adopted sub nom. All Plaintiffs Represented by Driscoll v. Islamic Republic of Iran*, 2023 WL 5932974 (D.D.C. July 13, 2023); *Finger v. Islamic Republic of Iran*, No. 23-CV-927, 2025 WL 2694821, at *5 (D.D.C. Sep. 22, 2025) (explaining that "Iran has a long track record of facilitating terror attacks in Iraq, particularly by providing Shi'a militias with EFPs"). Accordingly, the court concludes that Iran's support was a "substantial factor" in the attacks involving the use of EFPs—Attacks #32, 35, and 49—and that the consequences of its support were "reasonably foreseeable." *Owens*, 864 F.3d at 794.[12]

The court separately addresses three attacks involving signature weapons that raise additional issues.

*Attack #13.* Plaintiff [redacted] states in his declaration that in March 2010, as his unit was traveling to Camp Echo in Diwaniya, Iraq, "an IED *or* EFP exploded," hitting the third

[12] Mr. Pregent also attributes Attack #52 to Shia Special Groups based in part on the "signature weapon used." ECF No. 55-15 ¶ 409. But he does not explain what "signature weapon" was used, and Plaintiff [redacted] describes only rocket, sniper, and small-arms fire in his declaration. *See* ECF No. 46-15, at 1 ¶ 5. Accordingly, the court does not analyze Attack #52 as an attack involving a signature weapon.

vehicle in front of Sergeant [redacted] ECF No. 55-8, at 1 ¶ 6 (emphasis added). Mr. Pregent's amended expert report attributes the attack to Shia Special Groups. ECF No. 55-15 ¶¶ 225-227. Given the uncertainty around whether this attack involved an IED or an EFP, the court flagged this attack for Plaintiffs' counsel at the hearing. *See* ECF No. 63, at 120:20-120:21. Plaintiffs submitted a supplemental slideshow in which Mr. Pregent changes his assessment to conclude that AQI committed this attack. ECF No. 60-9, at 17. He bases this attribution on "the attack method, complexity of the IED or EFP, complexity of the attack which required intelligence on the patterns of U.S. patrols and operations, rehearsals, and lethal aid and the location of the attack in the Al-Qadisiya Province which AQI dominated at the time as a tactic to keep U.S. troops in the area." *Id.* Mr. Pregent provides no explanation for his conflicting assertions that Shia Special Groups had "primacy in the area of operation where the attack occurred," ECF No. 55-15 ¶ 227, and that AQI "dominated" the province at the time of the attack, ECF No. 60-9, at 17. Perhaps Mr. Pregent means that AQI committed the attack if it involved an IED and that Shia Special Groups committed the attack if it involved an EFP. As discussed further *infra* Section IV.A.2.c, however, Mr. Pregent provides scant evidence supporting his claims that a group dominated a particular area in Iraq at a particular time. The court thus lacks confidence in Mr. Pregent's assessments regarding Attack #13 given his conflicting assessments of which insurgent group dominated the area and the absence of any explanation for the change in his assessment. And while both AQI and Shia Special Groups received material support from Iran, *see supra* Section III.B, the court cannot reasonably conclude based on the record evidence that *either* of these groups committed the attack given the deficiencies in Mr. Pregent's submissions. The court accordingly lacks sufficient information to determine liability for Attack #13.

*Attack #55*. Two Plaintiffs bring claims arising out of Attack #55, a December 21, 2004 attack on FOB Marez. First Class Sergeant [redacted] alleges he was injured after a suicide bomber detonated a PBIED in the dining hall of FOB Marez. ECF No. 46-63, at 1 ¶ 5. Mr. Pregent attributes this attack to AQI based on the use of an AQI signature tactic, ECF No. 55-15 ¶¶ 421-422; *see* ECF No. 63, at 86:17-89:05, but other courts in this district have concluded that Ansar al-Islam ("AAI")—also known as Ansar al-Sunna ("AAS")—committed the dining hall suicide bombing at FOB Marez, *see Martino*, 2024 WL 6824393, at *32-33 (citing AAS's claim of responsibility and history of using suicide bombers in similar environments, as well as official U.S. government reports attributing the dining hall attack to AAS). Indeed, in *Fishbeck II*, the court referred to the attack as "one of the worst terrorist attacks against Coalition Forces" that was "perpetrated by the Sunni terrorist organization Ansar al Sunna (aka Ansar al Islam)" based on an expert report by Mr. Pregent himself. 2024 WL 1508894, at *5. Here, Mr. Pregent does not acknowledge his seemingly conflicting testimony in *Fishbeck II*, nor do Plaintiffs address these other courts' conclusions. The court nevertheless takes judicial notice of the evidence presented in *Martino* establishing that AAI committed this attack and that Iran provided material support to AAI, *see* 2024 WL 6824393, at *8-9, and independently concludes that Iran proximately caused this attack.[13]

[13] The court notes that, in addition to Attack #55, Plaintiffs failed to identify at least one other attack that has been addressed by other courts in this district. The courts in *Karcher* and *Stearns* found Iran liable for Attack #35, a January 2009 EFP attack in Baghdad. *Karcher v. Islamic Republic of Iran* ("*Karcher II*"), No. 16-CV-232, 2021 WL 133507, at *58 (D.D.C. Jan. 14, 2021); *Stearns*, 633 F. Supp. 3d at 321. Even though Plaintiffs requested that the court take judicial notice of both these cases, as well as the *Fishbeck* line of cases, *see* ECF No. 55-1, at 6-7, they did not address these courts' treatment of Attacks #35 and 55. In subsequent briefing, Plaintiffs should identify any overlap between the remaining attacks and attacks addressed in other FSIA suits.

Another Plaintiff, Sergeant [redacted] also brings a claim based on Attack #55, but the court lacks sufficient evidence to conclude that Sergeant [redacted] was injured in the same attack as Sergeant First Class [redacted] or to determine liability for the attack. Sergeant [redacted] states that on December 21, 2004, while he was operating a forklift on FOB Marez, the base came under rocket fire, and one rocket hit the forklift, causing it to roll over and rendering Sergeant [redacted] unconscious. ECF No. 55-5, at 1 ¶ 4. Another rocket also hit a truck a couple hundred yards away from him, killing the Iraq civilians inside the truck. *Id.* While it is plausible that the suicide bombing and rocket attacks on FOB Marez were part of a coordinated attack by the same insurgent group on December 21, 2004, Sergeant [redacted] declaration makes no reference to the suicide bombing in the dining hall, nor does Sergeant First Class [redacted] declaration refer to rocket attacks. Additionally, while Sergeant First Class [redacted] states that the suicide bombing occurred around lunch time, *see* ECF No. 46-63, at 1 ¶ 5, Sergeant [redacted] declaration does not provide any information about when the rocket attacks on FOB Marez began, *see generally* ECF No. 55-5. Without more information, the court cannot infer that the same Iran-backed insurgent group is responsible for both attacks. And Mr. Pregent's attribution analysis for Attack #55 focuses on the signature weapon used by the suicide bomber and does not separately address the rockets that injured Sergeant [redacted] *See* ECF No. 55-15 ¶¶ 421-422. Accordingly, the court concludes it lacks sufficient information to determine liability as to Sergeant Travis's claim arising out of Attack #55.

*Attack #58*. [redacted] states in his declaration that in May 2004, an insurgent drove a vehicle to the front of FOB Summerall in Baiji, Iraq and detonated the car. ECF No. 46-32, at 1 ¶ 5; *see* ECF No. 29 ¶ 566. While his allegations suggest a signature AQI attack method—a VBIED—Mr. Pregent's analysis of Attack #58 appears to describe a different attack altogether,

referring to an "indirect-fire attack" on FOB Summerall. ECF No. 55-15 ¶ 438. Given this discrepancy, the court declines to determine liability for the attack on this record.

* * *

In sum, the court concludes that Plaintiffs have established proximate cause for Attacks #3, 27, 28, 32, 35, 37, 38, 39, 40, 44, 49, 55 (with respect to First Class Sergeant [redacted] 56, 61, 64, 71, 77, 79, 80, 83, and 90. But it denies Plaintiffs' motion without prejudice as to Attacks #13, 55 (with respect to Sergeant [redacted] and 58.

*b. Remaining attacks*

Mr. Pregent attributes the remaining attacks to an Iran-backed terrorist group based on the tactics, methods, and weapons used in the attacks, and because the attacks occurred in areas controlled by a terrorist group supported by Iran. But defects in Mr. Pregent's amended expert report and testimony preclude the court from determining liability for these attacks. Accordingly, the court will deny Plaintiffs' motion without prejudice as to claims arising out of Attacks #1, 2, 4, 5, 7, 8, 9, 10, 11, 14, 16, 17, 18, 19, 20, 22, 23, 24, 26, 29, 30, 31, 33, 34, 36, 43, 45, 48,[14] 50, 51, 52, 53, 54, 57, 59, 60, 62, 63, 65, 66, 67, 68, 69, 72, 73, 74, 75, 76, 82, 84, 85, 86, 87, 89, 91, 92, 93, and 94.

*Location*. First, with respect to the forty-three remaining attacks in Iraq, Mr. Pregent concludes that the terrorist group to which he attributes each attack was the "dominant group" or had "primacy" in the area at the time the attack occurred. *See, e.g.*, ECF No. 55-15 ¶¶ 215, 254-255. As in *Sibley*, however, Mr. Pregent "provides no evidence—only his say-so—that" a

[14] Plaintiffs' counsel clarified at the evidentiary hearing that Mr. Pregent's amended expert report erroneously referred to this attack as a PBIED attack. ECF No. 63, at 94:13-94:17; *see* ECF No. 55-15 ¶ 390.

given group dominated a certain area around the time of an attack. 2025 WL 1928036, at *6. As noted, Mr. Pregent did not meaningfully supplement his expert report with respect to the Iraq attacks in response to the court's order, ECF No. 53—presumably because *Sibley* concerned only attacks in Afghanistan. Instead, for most of the remaining attacks in Iraq, Mr. Pregent provides the same boilerplate assessment: "Through mapping and documentation, research confirmed that [AQI or IRGC-QF backed militias were] the dominant group in [the region] in [the relevant year]." *See* ECF No. 55-15 ¶¶ 167, 173, 182, 186, 196, 202, 206, 210, 215, 233, 243, 249, 254, 263, 282, 292, 311, 326, 335, 369-370, 379, 390, 398, 404, 417, 443, 449, 459, 463, 473, 482, 488, 492-493. He does not provide or cite this mapping and documentation, cite any sources, or explain how or why he ruled out other insurgent groups that might have been operating in the area. For other attacks, Mr. Pregent's amended expert report attributes the attacks to Shia Special Groups based in part on "their primacy in the area of operation where the attack occurred," without any substantiation.[15] *Id.* ¶¶ 274, 308, 316, 324, 409, 412. And for Attacks #22 and 29, Mr. Pregent's supplemental slideshow states a different conclusion than what he states in his amended report, *see infra* p. 60. Without any supporting evidence, the court cannot evaluate Mr. Pregent's conclusions. *See* Fed. R. Evid. 702 (explaining that an expert opinion must be "based on sufficient facts or data," be "the product of reliable principles and methods," and "reflect[] a reliable application of the principles and methods to the facts of the case").

[15] For the remaining attacks in Iraq—Attacks #19, 23, 57, and 66—Mr. Pregent's amended expert report does not include any location analysis, *see* ECF No. 55-15 ¶¶ 257-261, 276-280, 430-434, 477-480, but his supplemental slideshow states that "AQI dominated" the area at the time "as a tactic to keep U.S. troops in the area," ECF No. 60-9, at 22, 25, 41, 48—again, without any substantiation.

To be sure, "it is sometimes 'possible to attribute an attack to a particular [insurgent] group based solely on geography and time because, at certain times and in specific locations, one [such] group had such an overwhelming presence that it is highly likely that group carried out any attacks there.'" *Sibley*, 2025 WL 1928036, at *6 (alterations in original) (quoting *Cabrera I*, 2022 WL 2817730, at *13). But Plaintiffs must provide "satisfactory" evidence to substantiate such attributions. 28 U.S.C. § 1608(e); *see Sibley*, 2025 WL 1928036, at *7 ("If Plaintiffs are to rest their evidentiary case in part on which insurgent group controlled (or carried out most anti-coalition attacks within) a given location at a given time, they must substantiate that claim."); *see, e.g.*, *Martino*, 2024 WL 6824393, at *11 (explaining AQI's control of an area based on the presence of its training facilities and equipment). And unlike experts in other FSIA cases, Mr. Pregent makes no attempt to discuss the political and military dynamics on the ground to support his conclusion that a certain group had primacy in Iraq. In *Flores*, for example, the court credited an expert report that engaged in a "granular analysis of attacks in specific neighborhoods, explaining how geographic and temporal factors indicate AQI or other [Sunni terrorist group] responsibility for particular incidents." 2025 WL 2719429, at *8. In contrast, Mr. Pregent's determinations that AQI was the "dominant group" in Baghdad Province "treat[] Baghdad as a monolith" and are devoid of any granularity. *Cf. id.* at *7 ("Rather than relying on conclusory labels, unsupported geographic assertions, or an arbitrary constellation of dates, [the expert's] comprehensive treatment of the conflict's evolution provides the kind of evidence that enables courts to make informed determinations about complex insurgency dynamics."); *see also Fishbeck III*, 2025 WL 2410090, at *6 ("[I]t is hard to credit the notion that Al-Qaeda was the controlling force in a massive area like Anbar Province.").

As for the fifteen remaining attacks in Afghanistan, while Mr. Pregent's amended expert includes some additional information about the Taliban's activities in various regions, Mr. Pregent ultimately provides scant evidence substantiating his claims that the Taliban dominated the province in which an attack occurred. Mr. Pregent classifies the area in which most attacks occurred as a Taliban "stronghold," *see, e.g.*, ECF No. 55-15 ¶ 573, which he defined at the hearing as a "permissive environment for an insurgency group to plan, resource and conduct attacks," ECF No. 63, at 22:19-22:21; *see* ECF No. 60-8 (stating that a "stronghold" is "defined by function—control and freedom of action"). As an initial matter, Mr. Pregent's definition of a "stronghold" does not clearly preclude the possibility of another insurgent group operating in the same area. But even assuming that any terrorist attack that occurred in a Taliban "stronghold" is attributable to the Taliban, Mr. Pregent does not adequately substantiate his assertions about certain provinces being Taliban strongholds. His amended report cites isolated anecdotes and sources that do not clearly establish that the Taliban had the ability to "consistently plan operations, move fighters and [material], and execute attacks without meaningful disruption." ECF No. 60-8. Moreover, Mr. Pregent neither considers how the Taliban's dominance in a given province may have shifted over time nor acknowledges the possible limitations of the evidence before him. *See Sibley*, 2025 WL 1928036, at *7 (contrasting Mr. Pregent's "definitive representations that a given area was a [Taliban] stronghold" with another expert's assessment in *Cabrera I* that expressed candor about the occasional "dearth of information about Taliban activities in certain provinces during some periods" (internal quotation marks omitted)).

For example, with respect to Kabul Province—where Attack #74 occurred in June 2013—Mr. Pregent merely states that "[t]he Taliban's presence in Kabul province was one of active insurgency, characterized by attacks and widespread human rights abuses, as documented by the

U.S. Department of State. While not in direct control of the capital, the group used improvised explosive devices (IEDs), car bombs, and suicide attacks in and around Kabul." ECF No. 55-15 ¶ 586. This barebones assessment lacks any temporal limitations and is insufficient for the court to conclude that Kabul was a Taliban "stronghold" in June 2013 as Mr. Pregent asserts. *Id.* ¶ 593. Likewise, as relevant to Attacks #92 and 93, Mr. Pregent provides no citation for his conclusion that Zabul Province was "a Taliban stronghold" from 2010 to 2013 and a "critical transit route" for Taliban insurgents. *Id.* ¶ 770.

Even where Mr. Pregent substantiates his assertions that a province was a Taliban stronghold, his analysis falls short. Mr. Pregent attributes Attack #72 to the Taliban based in part on his conclusion that the "Taliban resurgence in Afghanistan began in 2006 with the Taliban reestablishing its primacy in Helmand Province." *Id.* ¶ 565. But the source Mr. Pregent cites for this proposition discusses the Taliban's efforts to eliminate Afghan government officials and threaten schools in Helmand and other provinces. *See* Antonio Giustozzi, *Koran Kalashnikov and Laptop: The Neo-Taliban Insurgency in Afghanistan* 102-105 (2008); ECF No. 55-15 ¶ 565 n.217. While this account certainly demonstrates the Taliban's campaign to build an insurgency in Helmand Province during the relevant period, the court is not persuaded that it shows the Taliban "had such an overwhelming presence that it is highly likely that group carried out any attacks there" in June 2006. *Cabrera I*, 2022 WL 2817730, at *13.

Finally, for a few attacks, Mr. Pregent concludes that the Taliban "maintained an operational capacity to conduct attacks" in the area where an attack occurred, rather than a "stronghold." *See, e.g.*, ECF No. 55-15 ¶ 767. But again, Mr. Pregent does not provide his basis for those findings or explain how he distinguishes a "stronghold" from "operational capacity." The court accordingly declines to adopt Plaintiffs' attributions of the remaining fifty-eight attacks

based on Mr. Pregent's largely unsubstantiated assertions that the attacks occurred in areas dominated by Iran-backed terrorist groups.[16]

*Attack method*. The court also does not find Mr. Pregent's reliance on attack method—specifically the "complexity" of an attack—sufficient to implicate Iran for the remaining attacks. As the *Sibley* court explained, "the tactics and weaponry used in an attack can sometimes be powerful—even dispositive—evidence that a particular organization perpetrated it and that [Iran] materially supported it." 2025 WL 1928036, at *8. Indeed, the use of EFPs and sophisticated IEDs like VBIEDs and PBIEDs compels the inference of Iranian involvement for some of the attacks here. *See supra* Section IV.A.2.a.

Mr. Pregent asserts that a "complex attack" shows Iranian responsibility because only terrorist groups receiving lethal aid from Iran and its proxies would have been capable of carrying out such attacks. *See* ECF No. 63, at 7:20-8:12, 16:25-18:21, 37:01-37:09. But Mr. Pregent does not provide a consistent definition for what constitutes a "complex attack," and his theory of liability would seemingly apply to virtually any attack that successfully targeted the U.S. military during the entirety of the United States' presence in Iraq and Afghanistan. *See Fishbeck I*, 2023

---

[16] The court notes that Iran-backed groups' operational dominance in various parts of Iraq and Afghanistan during the relevant period has been well-documented by other courts. *See, e.g.*, *Martino*, 2024 WL 6824393, at *12 (explaining AQI's dominance in parts of Anbar Province from 2004 to 2007); *Baker*, 2025 WL 2480075, at *12 (finding that the Taliban originated in Kandahar Province and "claimed responsibility for numerous other attacks against U.S. and NATO troops in this region in close proximity to" the attack at issue). But the court is not a "pig[] hunting for truffles buried in briefs" or judicially noticed cases. *Bein v. Islamic Republic of Iran*, No. 21-CV-2160, 2026 WL 809794, at *3 (D.D.C. Mar. 24, 2026) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)), *report and recommendation adopted sub nom. Deuley v. Islamic Republic of Iran*, 2026 WL 1212253 (D.D.C. May 4, 2026). At minimum, Plaintiffs must direct the court to the specific facts they wish for the court to judicially notice and explain the relevance of those facts to their suit.

WL 7448770, at *2 (discussing the court's "struggles to discern any meaningful limiting principle" to Mr. Pregent's theory).

Mr. Pregent explains that a "complex attack" requires intelligence planning, logistical support, rehearsals, and "pattern analysis of U.S. movements to make those attacks effective." ECF No. 63, at 7:20-8:01; *see* ECF No. 55-15 ¶ 24. In his post-hearing submission, he defines a "complex attack" as "a coordinated insurgent operation involving multiple actors, resources, and tactics, planned and executed in phases to achieve a deliberate tactical or strategic effect against a selected target." ECF No. 60-8. A "standard complex attack," according to Mr. Pregent, is an attack involving multiple weapons systems, such as an IED combined with small-arms fire, mortars, or rockets. *See* ECF No. 63, at 8:10-8:19, 37:01-37:04; ECF No. 55-15 ¶ 24. But at the hearing, Mr. Pregent also asserted that an attack is also "complex" if it is "effective" at targeting U.S. forces and "require[d] preparation"—a definition so capacious that it would apply to virtually every attack at issue. ECF No. 63, at 120:06-120:15. While some courts have attributed "complex attacks" to AQI using a narrower definition, *see, e.g.*, *Flores*, 2025 WL 2719429, at *10 (defining a "complex attack" as one "integrating small-arms combat with explosives"); *Roth*, 651 F. Supp. 3d at 89 (defining a "complex attack" as one that involved multiple weapons systems, was sustained over a long time, and required advanced planning), the court is troubled by the breadth of Mr. Pregent's definition and finds that Mr. Pregent has not sufficiently linked all attacks falling under that definition to Iranian support.

The court is particularly skeptical of Mr. Pregent's boilerplate assessments of attacks involving isolated rockets, mortars, and small-arms fire as "complex." Mr. Pregent states that these attack methods required expert training. *See, e.g.*, ECF No. 55-15 ¶ 172 (mortar and rocket attacks); *id.* ¶ 379 (sniper operation). But Mr. Pregent "does not explain why the attack methods

he highlights should be attributed to [a specific] insurgent group, nor why such method should, more importantly, implicate Iran." *Sibley*, 2025 WL 1928036, at *9. Consider, for example, Attack #10, which involved a shooting near a police station in Haditha City, Anbar Province, Iraq. *See* ECF No. 46-22, at 1 ¶ 5. Mr. Pregent does not explain why the attack was a complex ambush or, more importantly, why that compels the conclusion that AQI—and Iran's support to that group—caused the attack. *See* ECF No. 55-15 ¶¶ 209-213. And with respect to isolated RPG attacks, Mr. Pregent provides *no* explanation of why an Iran-backed group would bear responsibility, other than the generic assessment that such an attack "required intelligence on the patterns of U.S. patrols and operations." ECF No. 60-9, at 14; *see* ECF No. 55-15 ¶¶ 205, 323.[17]

Likewise, Mr. Pregent appears to classify all IED attacks as "complex" because placement of an IED requires advanced planning, including monitoring and security around the placement, rehearsals, and intelligence. *See* ECF No. 55-15 ¶ 149. But courts have declined to attribute IED attacks in Iraq to a group based solely on that attack method, given that "[o]ther groups and individuals obviously employed IEDs, which were ubiquitous in Iraq." *Fishbeck III*, 2025 WL 2410090, at *6; *see Fishbeck I*, 2023 WL 7448770, at *12 (finding that Mr. Pregent's analysis of an IED attack failed to establish AQI's responsibility). Indeed, Mr. Pregent acknowledged at the hearing that attribution of an IED attack depends on the location of the attack. ECF No. 63, at 35:04-35:08. In light of the issues with Mr. Pregent's geographical and temporal analysis described above, the court cannot conclude that Iran is liable for all the isolated IED attacks.

---

[17] For Attack #33, Mr. Pregent also attributes the attack to Shia Special Groups because the attack on a large American base "was likely to put pressure on the Iraqi Government to push back against the U.S. Status of Forces Agreement (SOFA) and make concessions to Iran," which was a "common tactic ahead of a U.S. Presidential election." ECF No. 55-15 ¶ 323. But he fails to connect this possible motivation for the attack to Shia Special Groups in particular, as opposed to another insurgent group.

Even for the attacks involving multiple weapons systems—a kind of "complex attack" some other courts have attributed to Iran-backed groups, *see, e.g.*, *Flores*, 2025 WL 2719429, at *10; *Roth*, 651 F. Supp. 3d at 89—Mr. Pregent does not sufficiently explain why those attacks should be attributed to AQI, Shia Special Groups, or the Taliban. Consider, for example, Attack #31, an attack involving an IED, direct fire, and mortars. ECF No. 46-75, at 1 ¶ 5. Mr. Pregent attributes the attack to Shia Special Groups, stating that the attack was "complex" because it "involved multiple types of weaponry, gunfire from multiple directions, and multiple insurgents," was lengthy, and occurred on a U.S. military base. ECF No. 55-15 ¶ 316. Such an attack was "coordinated and required the pre-operational placement of a large IED with the purpose of breaching the perimeter wall during the assault on the base." *Id.* But—for this attack and others—Mr. Pregent does not explain why these characteristics make it likely that Shia Special Groups committed the attack. Similarly, Mr. Pregent classifies Attack #84, which involved small-arms fire and RPGs, as "complex" because it involved multiple types of weaponry and multiple different insurgents, lasted for multiple days, and caused at least one servicemember to die. *Id.* ¶ 696. But, here too, he does not explain why the Taliban, as opposed to another insurgent group, would have been responsible for such an attack. And while Mr. Pregent describes Nangarhar Province, where Attack #84 occurred, as an "active theater for Taliban insurgency and counter-insurgency operations" at the time of the attack, *id.* ¶ 680, he does not explain whether any other insurgent groups were operating in the area or had the capacity to execute a similar attack.

In short, Mr. Pregent's broad definition of a "complex attack" encompasses not only attacks involving multiple weapons systems but also drive-by shootings and small-arms-fire attacks. This definition fails to "effectively narrow[] the universe of terrorist organizations that

could be responsible for any particular act." *Flores*, 2025 WL 2719429, at *10. Plaintiffs have thus failed to satisfactorily demonstrate that an Iran-backed group committed these "complex attacks."

*Other issues.* Finally, the court notes that parts of Mr. Pregent's amended expert report can only be described as sloppy or inconsistent, making it difficult for the court to conclude that Mr. Pregent engaged in an individualized analysis of each attack.

First, some of Mr. Pregent's attribution analyses do not match the descriptions of the attacks in Plaintiffs' declarations. Take Attack #74, a June 2013 rocket attack in Kabul, Afghanistan. ECF No. 46-2, at 1 ¶ 5. Mr. Pregent attributes the attack to the Taliban based on the "attack method, *the complexity of the IED attack*, and the location of the attack in the Taliban stronghold of Kabul Province." ECF No. 55-15 ¶ 593 (emphasis added). But Attack #74 did not involve an IED. Similarly, Mr. Pregent's analysis of Attacks #82, 86, and 91 also refer to "the complexity of the IED attack" even though those attacks did not involve IEDs. *See* ECF No. 55-15 ¶¶ 676, 720, 767.

And for at least one additional attack—Attack #30—Mr. Pregent's attribution conflicts with the Plaintiff's own attribution. First Sergeant [redacted] states in his declaration that an IED detonated in front of him on July 16, 2007, while he was traveling on Route Cobra in Baghdad, Iraq. ECF No. 46-31, at 1 ¶ 5. According to First Sergeant [redacted] an explosives team later recovered the IED from the site and, after analyzing it, determined that Taliban members embedded in villages off Route Cobra were responsible for the attack. *Id.* Mr. Pregent attributes the attack to AQI and does not address First Sergeant [redacted] statement about Taliban responsibility. Instead, Mr. Pregent restates the same boilerplate language used for other IED attacks. ECF No. 55-15 ¶ 311 ("The IED attack is a complex attack that requires expert explosives

training, intelligence on the patterns of U.S. patrols and operations, rehearsals, and lethal aid."). Mr. Pregent's failure to explain the discrepancy between his assessment and that of First Sergeant [redacted] is curious given that the Taliban did not operate in Iraq. *See generally Baker*, 2025 WL 2480075, at *7-8. To be sure, al-Qaeda and the Taliban maintained a close relationship, and al-Qaeda supported the Taliban's operations in Afghanistan, *see id.* at *8-9; *Cabrera I*, 2022 WL 2817730, at *10, but Mr. Pregent's failure to acknowledge First Sergeant [redacted] reference to the Taliban does not inspire confidence in his assessment.

Next, Mr. Pregent provides conflicting assessments for some attacks between his amended expert report and supplemental slideshow. His amended report attributes Attacks #22 and 29 to Shia Special Groups based partly on the groups' "primacy in the area of operation where the attack occurred." ECF No. 55-15 ¶¶ 274, 308. His slideshow, however, attributes the same attacks to AQI based in part on "the location of the attack[s] in the Baghdad Province which *AQI dominated at the time*." ECF No. 60-9, at 24, 28 (emphasis added). Mr. Pregent does not provide any explanation for the change in his findings, and while both groups received material support from Iran, these inconsistencies undermine the court's confidence in Plaintiffs' evidence.

Finally, the court separately addresses Attack #1, which the court in *Roth* and *Brown* attributed to Iran. *See Roth*, 651 F. Supp. 3d at 78-79, 89-90; *Brown*, 687 F. Supp. 3d at 35, 41. This attack involved an ambush of machine guns, RPGs, mortars and a "daisy chain of IEDs" near Mufrek Traffic Circle in Baqubah, Iraq on June 24, 2004. ECF No. 55-1, at 15-16. At an evidentiary hearing in *Roth*, Mr. Pregent explained that the attack was "so sophisticated that only AQI could have carried [it] out at the time because other militias were not yet operating with this level of strategy, accuracy, or coordination." 651 F. Supp. 3d at 90. The court in *Roth* accordingly attributed the attack to AQI and found Iran liable for the attack. *See id.* at 78-79. Mr. Pregent later

addressed this attack in *Brown*, stating that an Iran-backed terrorist group called "Jamaat al-Tawhid wa al-Jihad" took credit for the attack. 687 F. Supp. 3d at 33, 41. Mr. Pregent did not, however, substantiate this claim of responsibility in *Brown*. *See* First Amended Expert Report of Michael Pregent ¶¶ 108-110, *Brown*, No. 21-CV-1308, ECF No. 34-3. The *Brown* court nevertheless attributed the attack to Iran based on Mr. Pregent's assessment. 687 F. Supp. 3d at 41. Before this court, Mr. Pregent testified that the attack had "the signatures of a Lebanese Hezbollah trained event." ECF No. 63, at 52:05. Given Mr. Pregent's failure to explain how he has now arrived at a *third* different conclusion, and given that a substantiated claim of responsibility would be highly probative in determining liability, the court lacks confidence in Mr. Pregent's attribution of responsibility on Attack #1.

* * *

In sum, Plaintiffs have not yet adequately shown that Iran's provision of material support proximately caused Attacks #1, 2, 4, 5, 7, 8, 9, 10, 11, 14, 16, 17, 18, 19, 20, 22, 23, 24, 26, 29, 30, 31, 33, 34, 36, 43, 45, 48, 50, 51, 52, 53, 54, 57, 59, 60, 62, 63, 65, 66, 67, 68, 69, 72, 73, 74, 75, 76, 82, 84, 85, 86, 87, 89, 91, 92, 93, and 94, and the court denies default judgment without prejudice as to claims arising out of those attacks. But the court concludes that Plaintiffs have satisfied the FSIA's causation standard for claims arising out of Attacks #3, 27, 28, 32, 35, 37, 38, 39, 40, 44, 49, 55 (as to Sergeant First Class [redacted] 56, 61, 64, 71, 77, 79, 80, 83, and 90, and it proceeds to the remaining jurisdictional prerequisites for these claims.

*c. Remaining conditions*

The FSIA establishes three additional conditions that "must be met for the terrorism exception to apply" for purposes of conferring subject-matter jurisdiction. *Borochov*, 94 F.4th at 1057. First, the foreign state must have been designated as a state sponsor of terrorism at the

time the attack occurred or as a result of the attack. 28 U.S.C. § 1605A(a)(2)(A)(i). Second, at the time of the attack, either a victim of the attack or the claimant in the suit must be an American national, a member of the U.S. armed forces, or an employee or contractor for the U.S. government acting within the scope of their employment. *Id.* § 1605A(a)(2)(A)(ii). Finally, if "the act occurred in the foreign state against which the claim has been brought," the claimant must give the foreign state a "reasonable opportunity" to arbitrate before filing a lawsuit. *Id.* § 1605A(a)(2)(A)(iii).

The remaining Plaintiffs satisfy these conditions. Iran has been designated as a state sponsor of terrorism since 1984. *See supra* n.1. And the victims of the attacks and claimants are all U.S. citizens. ECF No. 29 ¶¶ 942 (Attack #3), 392 (Attack #27), 1062 (Attack #28), 445 (Attack #32), 330 (Attack #35), 67 (Attack #37), 522 (Attack #38), 1185 (Attack #39), 594 (Attack #40), 1094 (Attack #44), 716 (Attack #49) (Private First Class [redacted]), 187 (Attack #49) (Sergeant [redacted]), 1170 (Attack #55) (Sergeant First Class [redacted]), 840 (Attack #56), 805 (Attack #61), 1014 (Attack #64), 612 (Attack #71), 291 (Attack #77), 1455 (Attack #79), 137 (Attack #80), 1201 (Attack #83), 921 (Attack #90); *see* ECF No. 55-1, at 79. The third requirement does not apply because the attacks occurred in Iraq and Afghanistan, not Iran. The court thus concludes that the court has subject-matter jurisdiction under 28 U.S.C. § 1605A over Plaintiffs' remaining claims.

### B. Personal Jurisdiction

Under the FSIA, "[p]ersonal jurisdiction over a foreign state shall exist as to every claim" for which an exception to its sovereign immunity applies and "where service has been made under section 1608." 28 U.S.C. § 1330(b). "In other words, under the FSIA, subject matter jurisdiction plus service of process equals personal jurisdiction." *GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 811 (D.C. Cir. 2012) (internal quotation marks omitted).

The FSIA "provides four methods of service in descending order of preference." *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015); *see* 28 U.S.C. § 1608(a). First, a plaintiff may effect service "by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state." 28 U.S.C. § 1608(a)(1). If no such arrangement exists, a plaintiff may effect service "by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents." *Id.* § 1608(a)(2). If a plaintiff cannot serve the foreign state under the first two methods, then he must attempt to effect service "by sending a copy of the summons and complaint and a notice of suit," along with a "translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state." *Id.* § 1608(a)(3). If, after thirty days, a plaintiff cannot serve the foreign state under the third method, the plaintiff must pursue service through the U.S. Department of State. *See id.* § 1608(a)(4). Specifically, the plaintiff must send two copies of the summons and complaint and a notice of suit, along with translations of each into the foreign state's official language, "by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State." *Id.* Then, the Secretary must "transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted." *Id.*

Here, the first two methods for effecting service were unavailable to Plaintiffs because no special arrangement governs service between Plaintiffs and Iran, and Iran is not a party to an international convention on service of judicial documents. *See Boothe v. Islamic Republic of Iran*, No. 22-CV-1747, 2026 WL 809887, at *11 (D.D.C. Mar. 24, 2026). Nor could Plaintiffs effect

service under the third method, as "American carriers do not deliver mail to Iran." *Id.*; *see* ECF No. 21, at 1. After attempting the third method, ECF Nos. 17 to 20, Plaintiffs filed a second amended complaint, ECF No. 29. They then effected service of the second amended complaint through diplomatic channels under the fourth method. *See* ECF Nos. 32 to 35. The State Department transmitted the relevant documents to Iran's Ministry of Foreign Affairs through the Embassy of Switzerland and confirmed that the papers were delivered to Iran in October 2024. ECF No. 39, at 1. Accordingly, Plaintiffs effectively served Iran under 28 U.S.C. § 1608(a)(4), and this court has personal jurisdiction over Iran.

### C. Liability

Plaintiffs seek relief under Section 1605A(c) of the FSIA. *See* ECF No. 29 ¶¶ 1498-1508. That provision creates a private right of action against a state sponsor of terrorism "for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages." 28 U.S.C. § 1605A(c).

Because there is "almost total 'overlap between the elements of [Section 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity,' . . . a plaintiff that offers proof sufficient to establish a waiver of foreign sovereign immunity under [Section] 1605A(a) has also established entitlement to relief as a matter of federal law." *Fritz*, 320 F. Supp. 3d at 86-87 (quoting *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017)); *see Karcher v. Islamic Republic of Iran* ("*Karcher II*"), No. 16-CV-232, 2021 WL 133507, at *67 (D.D.C. Jan. 14, 2021) (explaining that Section 1605A(c) "creates a cause of action for the same conduct that gives rise to subject-matter jurisdiction under the terrorism exception to sovereign immunity"). The FSIA provides that any U.S. national, members of the armed forces, employee

or contractor of the U.S. government, and legal representative of any such person, may recover damages from a foreign state. *See* 28 U.S.C. § 1605A(c). "Importantly, Section 1605A(c) also creates vicarious liability 'for the acts of [Iran's] officials, employees, or agents,' in this case, the IRGC and its leadership, Hezbollah, and Iraqi proxies." *Karcher II*, 2021 WL 133507, at *67 (quoting 28 U.S.C. § 1605A(c)).

The remaining Plaintiffs' claims fall into two categories: (1) U.S. servicemembers injured in the acts of extrajudicial killings that Iran materially supported, and (2) the family members of those injured servicemembers.

The first category comprises twenty-two Plaintiffs: [redacted] (Attack #3), [redacted] (Attack #27), [redacted] (Attack #28), [redacted] (Attack #32), [redacted] (Attack #35), [redacted] (Attack #37), [redacted] (Attack #38), [redacted] (Attack #39), [redacted] (Attack #40), [redacted] (Attack #44), [redacted] (Attack #49), [redacted] (Attack #49), [redacted] (Attack #55), [redacted] (Attack #56), [redacted] (Attack #61), [redacted] (Attack #64), [redacted] (Attack #71), [redacted] (Attack #77), [redacted] (Attack #79), [redacted] (Attack #80), [redacted] (Attack #83), and [redacted] (Attack #90). *See supra* Section III.C.1. Their claims "derive from the injuries or deaths of members of the U.S. armed forces." *Karcher II*, 2021 WL 133507, at *68. "'Given the factual and legal overlap,' this court's finding of 'subject-matter jurisdiction over each of these Plaintiff's claims also establishes their entitlement to relief under 28 U.S.C. § 1605A(c)." *Lee II*, 2026 WL 1243433, at *21 (quoting *Karcher II*, 2021 WL 133507, at *68); *see Fritz*, 320 F. Supp. 3d at 86-87. The court thus concludes that Iran is liable for these Plaintiffs' injuries under 28 U.S.C. § 1605A(c).

The second category of claims includes the immediate family members of U.S. servicemembers injured in the attacks: [redacted], ECF No. 29 ¶¶ 337-338 (Attack #35); [redacted], *id.* ¶¶ 531-532 (Attack #38); [redacted], *id.* ¶¶ 1192-1193 (Attack #39); [redacted], *id.* ¶¶ 1102-1103 (Attack #44); [redacted], *id.* ¶¶ 847-848 (Attack #56); [redacted], *id.* ¶¶ 1021-1022 (Attack #64); [redacted], *id.* ¶¶ 1463-1464 (Attack #79); and [redacted], *id.* ¶¶ 1209-1210 (Attack #83). These Plaintiffs seek solatium damages under an intentional infliction of emotional distress theory of liability. *See id.* ¶¶ 1504-1508. Under the common law of torts, courts in this district have concluded that family members may recover for emotional distress under Section 1605A(c) if "'(1) they are members of a victim's immediate family,' and (2) if 'the defendant's conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present.'" *Karcher II*, 2021 WL 133507, at *68 (alteration in original) (quoting *Rezaian v. Islamic Republic of Iran*, 422 F. Supp. 3d 164, 179 (D.D.C. 2019)); *see* Restatement (Second) of Torts § 46(1) (Am. L. Inst. 1965). Additionally, the family members must themselves be U.S. nationals, members of the armed services, or government employees under Section 1605A(c). *See Karcher II*, 2021 WL 133507, at *68.

As to the first prong, courts construe the immediate-family requirement strictly, and only spouses, parents, siblings, and children may recover. *See Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 335-36 (D.C. Cir. 2003). Here, the family-member Plaintiffs allege that they are either the spouse or the child of an injured servicemember. *See* ECF No. 29 ¶¶ 337, 531, 1192, 1102, 847, 1021, 1463, 1209. But they have not alleged or provided evidence showing that they are U.S. nationals. "In the absence of such evidence, the court makes no final determination as to

the [Section] 1605A(c) claims of the family-member Plaintiffs." *Lee II*, 2026 WL 1243433, at *22. The court will accordingly permit these family-member Plaintiffs to submit additional evidence establishing that they meet Section 1605A(c)'s requirements in a renewed motion for default judgment.

### D. Unsealing

The court files this opinion under seal because many of Plaintiffs' exhibits are sealed. The court will issue an unsealed version of the opinion after giving Plaintiffs an opportunity to propose redactions.

## V. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Plaintiffs' Renewed Motion for Default Judgment, ECF No. 55, is **GRANTED IN PART** and a default judgment of liability is **ENTERED** against the Islamic Republic of Iran as to the claims of Plaintiffs injured in Attacks #3, 27, 28, 32, 35, 37, 38, 39, 40, 44, 49, 55 (as to Sergeant First Class [redacted]), 56, 61, 64, 71, 77, 79, 80, 83, and 90, but not the claims of their immediate family members. It is further **ORDERED** that Plaintiffs' Motion is otherwise **DENIED** without prejudice. It is further **ORDERED** that Plaintiffs shall file, under seal, a version of the court's Memorandum Opinion and Order with proposed redactions on or before October 13, 2026. The court will review Plaintiffs' proposed redactions and issue a redacted version of the Memorandum Opinion and Order on the public docket. It is further **ORDERED** that Plaintiffs shall file a status report on or before October 28, 2026, proposing next steps in this litigation.

**SO ORDERED.**

LOREN L. ALIKHAN
United States District Judge

Date: September 28, 2026